UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE CONN'S, INC. SECURITIES LITIGATION | § § § § § § § | Master File No. 4:14-cv-00548 (KPE) <br><br> <u>CLASS ACTION</u> <br><br> <u>DEMAND FOR JURY TRIAL</u> |

## FOURTH CONSOLIDATED AMENDED COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS

Lead Plaintiffs Laborers Pension Trust Fund – Detroit and Vicinity ("Detroit Laborers"), Connecticut Carpenters Pension Fund and Connecticut Carpenters Annuity Fund (collectively, "Connecticut Carpenters"), St. Paul Teachers' Retirement Fund Association ("St. Paul Teachers"), and Universal Investment Gesellschaft m.b.H. ("Universal," together with Detroit Laborers, Connecticut Carpenters, and St. Paul Teachers, referred to collectively as "Lead Plaintiffs"), allege the following individually and on behalf of a class of all persons and entities similarly situated, upon information and belief, except as to those allegations concerning Lead Plaintiffs, which are alleged upon personal knowledge. Lead Plaintiffs' allegations are based upon the investigation of their undersigned Co-Lead Counsel, which included a review of: U.S. Securities and Exchange Commission ("SEC") filings by Conn's, Inc. ("Conn's" or the "Company"); securities analysts' reports and advisories about the Company; press releases and other public statements issued by the Company; media reports about the Company; and interviews of former employees of Conn's and other persons with knowledge of the matters

1

alleged herein, some of whom have provided information in confidence.[1]  Co-Lead Counsel's investigation into the matters alleged herein is continuing, and many relevant facts are known only to, or are exclusively within the custody or control of, the Defendants.  Lead Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.   INTRODUCTION

1.     This is a federal securities class action brought pursuant to Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5) against Conn's, its Chief Executive Officer ("CEO") Theodore Wright ("Wright"), and its Executive Vice President and Chief Operating Officer Michael J. Poppe ("Poppe"), on behalf of all persons and entities who purchased or otherwise acquired Conn's common stock and/or call options, or sold/wrote Conn's put options between April 3, 2013 and December 9, 2014, inclusive (the "Class Period") and who were damaged thereby.

2.     Conn's is a specialty retailer of home appliances, furniture and mattresses, consumer electronics, and home office equipment that markets its wares by offering flexible financing for its products.  The Company provides in-house credit options for its customers in addition to third-party financing programs and third-party rent-to-own payment plans.  During the Class Period, Conn's operated approximately 80 retail locations in ten states.

3.     During its fiscal year 2014 (which spanned February 1, 2013 through January 31, 2014), Conn's financed more than 77% of its retail sales through its in-house financing plan.  Similarly, for the first six months of its fiscal year 2015 (which spanned February 1, 2014

---

[1]     Confidential witnesses ("CWs") will be identified herein by number (CW-1, CW-2, etc.).  All CWs will be described in the masculine to protect their identities.

through July 31, 2014), more than 77% of its retail sales were financed through the Company's in-house financing plan.  These sales generated three sources of revenue for the Company: (1) merchandise sales revenues; (2) financing fee revenues; and (3) credit insurance revenues.

4.      Beginning in late 2012/early 2013, the Company implemented a new growth strategy pursuant to which Conn's undertook to open new and larger stores (with increased square footage) to be able to expand beyond its core market of consumer electronics.  In the larger format stores, Conn's was able to sell an increased volume of larger ticket items such as furniture and mattresses.  In connection with Conn's growth strategy, but unbeknownst to investors, Defendants lowered Conn's underwriting standards in all of its stores for months to push the larger ticket items onto customers who had little or no ability to pay.  In so doing, Conn's substantially increased sales revenues during the Class Period based, in significant part, on sales that were only achieved through high-risk consumer credit.

5.      Conn's new store openings helped drive a dramatic increase in growth in sales and retail margins, which rose from 1.4% and 28.7%, respectively, in fiscal 2012, to 9.3% and 35.2% respectively, in fiscal 2013, to 38.9% and 39.9%, respectively, in fiscal 2014, and to 30.6% and 41.1%, respectively, for the first six months of fiscal 2015.

6.      At the same time, Defendants told investors that the Company was focused on improving the profitability of its credit operation by *raising* underwriting standards and modifying collections practices *to focus on higher value accounts* that were most likely to be paid.  Defendants also represented during the Class Period that the Company had reduced the amount of promotional credit it offered to customers at its new stores.

7.      Unbeknownst to investors, however, in order to drive sales (including sales in its new stores) in the months leading up to the start of the Class Period, Conn's had dramatically

loosened its lending policies and underwriting guidelines, contrary to its assurances to investors, and had allowed non-creditworthy customers to receive substantial lines of credit at Conn's retail locations, thereby exposing the Company to high amounts of bad debt and increased collections risks.

8.     During the first few months of opening, new stores provided up to $5,000, and sometimes more, of credit to each customer who applied for credit — regardless of the customer's FICO score, income level, employment status, or prior foreclosure history.  In addition, store employees were not only instructed, but practically forced, to ensure that all customers who were approved for credit in a new store (meaning virtually everyone who applied) exhausted their full credit line — regardless of their ability to pay Conn's back. Customers also were forced to purchase credit insurance (or provide evidence on the spot of applicable homeowners insurance).  The cost of credit insurance would be added to the balance owing on the customers' financing agreements.  In almost all cases, the requirement of credit insurance was undisclosed to the consumer but rather buried within the customer's paperwork. These add-ons increased a customer's payment obligations, and, in turn, decreased the likelihood of customers paying their monthly installments.  In this manner, Conn's was able to generate record sales levels in the first few months of opening each new store — a metric watched closely by the financial community.

9.     While Defendants were misleading the market about the success of Conn's new growth strategy, the improving profitability of its Credit Segment (*see* discussion ¶39), and strengthened underwriting standards, the Individual Defendants (as defined herein) were unloading massive amounts of their personal Conn's shares.  For example, having not sold any Company stock since 2007, Defendant Wright sold 30,000 shares for proceeds of $1,932,446,

consisting of 15,000 shares on June 20, 2013 for proceeds of $776,246, and 15,000 shares on December 17, 2013, for proceeds of $1,156,200 when Conn's stock was near its Class Period high.  Similarly, Defendant Poppe — *not having sold any Conn's shares during his entire tenure* — sold 49,000 shares for proceeds of $2,581,830, consisting of 30,000 shares on April 25, 2013, for proceeds of $1,359,219, and 19,900 shares on October 22, 2013, for proceeds of $1,231,611.

10.     The truth about the manner in which Conn's was growing its business and the threats to its financial prospects posed by its lending practices came to light through a series of partial disclosures that began on September 5, 2013.  Prior to the market's opening that day, Conn's reported lower-than-expected quarterly earnings for its 2014 fiscal second quarter, ended July 31, 2013, due to disappointing performance in its credit segment.  Defendants falsely blamed "short-term execution issues in [Conn's] collection operations" for the earnings-miss, a portion of which the Company claimed to have been caused by implementation issues with a software upgrade.   In addition, Defendants falsely assured investors that Conn's had implemented corrective actions and that "negative delinquency trends rapidly reversed."

11.     Despite these assurances, Conn's stock price dropped 11.6% on September 5, 2013, on high trading volume.  Nevertheless, the price of Conn's stock remained artificially inflated as analysts emphasized that they considered the credit segment problems to be "one-time in nature,"[2] and that "early stage delinquencies declined in August [once the software] issue was resolved."[3]

12.     Additional information about Conn's exposure to bad debt was revealed five months later, on the morning of February 20, 2014, when the Company announced disappointing

---

[2]     Rick Nelson & Joe Edelstein, *Conn's, Inc., 2Q Hit by Credit Provision; Retail Posted Strong Results; Remain OW with $67 PT*, Stephens Inc. (Sept. 6, 2013).

[3]     Peter J. Keith, *Conn's, Inc.: Short-Term Credit Execution Issue Sinks Q2; Recommend Buying on Weakness*, Piper Jaffray (Sept. 5, 2013).

preliminary results for its fiscal 2014 fourth quarter ended January 31 2014, as well as a downward revised outlook for fiscal year 2015.  Conn's attributed its poor performance to several factors, including the effect of an increased provision for bad debt that was expected to exceed previously issued fiscal year 2014 guidance.  The Company explained that the provision was made necessary by higher-than-expected accounts receivable charge-offs and delinquency rates in December 2013 and January 2014.

13.    In reaction to these revelations, Conn's stock price fell $23.91 per share, *or 42.85%*, to close at $31.89 per share on February 20, 2014, on extraordinary trading volume.

14.    Then, on March 27, 2014, Conn's announced its actual results for the 2014 fourth quarter and full year.  In a conference call that day explaining those results, Defendants falsely assured the market that the "unexpected delinquency increase" Conn's announced in February 2014 was not a result of a deterioration in the underlying credit quality of Conn's portfolio or a change in underwriting standards.  Rather, Defendants falsely blamed the increase on internal collections issues — specifically, that Conn's needed to hire a large number of employees, more than 200, beginning in late August 2013, to deal with the Company's strong sales growth, and these new employees did not have adequate time to get "up to speed" to be effective at collecting delinquent accounts.  However, Defendants assured the market that the problem was behind the Company, that delinquency trends were improving, and a decline in delinquent balances gave Conn's "agents time to build the experience to become fully effective."   In reality, the delinquency increase was the result of Defendants' lowered underwriting standards and would continue to plague the Company's performance.

15.    Conn's exposure to bad debt was partially revealed on September 2, 2014, before the market opened, when the Company announced disappointing financial results for the second

quarter of fiscal 2015.  The Company's Credit Segment income had significantly decreased, while the customer portfolio balance for accounts 60+ days delinquent had significantly increased.  The Credit Segment provision for bad debts on an annualized basis was 13.9% of the average outstanding portfolio balance.  These results revealed that, despite its statements to the contrary, Conn's underwriting standards, across all accounts, continued to be inadequate.

16.     In reaction to these revelations, Conn's stock price plummeted $13.83 per share, *or 30.85%*, to close at $31.00 per share, on abnormally high trading volume.

17.     The full truth was revealed on December 9, 2014, when Conn's issued a press release announcing its financial results for the third quarter of fiscal 2015.  The Company revealed an increase in provisions for bad debt and customer delinquency rates.  The Credit Segment provision for bad debts for the three months ended October 31, 2014, was $72.0 million, an increase of $49.4 million from the same prior-year period.  In connection with this, the Company "recognize[d] that its credit operations forecasting has not been acceptably accurate."  Conn's also withdrew its earnings guidance for fiscal 2015 and stated that it was not currently providing earnings guidance with respect to fiscal 2016.

18.     In addition, the Company announced the resignation of its Chief Financial Officer ("CFO") Brian Taylor ("Taylor"), which was effective immediately.  Conn's also revealed that "[t]he Company received a voluntary request for information dated November 25, 2014 from the Fort Worth Regional Office of the SEC.  The information request generally relates to the Company's underwriting policies and bad debt provisions."

19.     In reaction to these revelations, Conn's stock price fell by $14.26 per share, *or over 40%*, to close at $20.83 per share, on abnormally high trading volume.

20.     The statements of several former Conn's employees with knowledge of the Company's underwriting practices and collections infrastructure confirm that the Company loosened its underwriting guidelines during the Class Period in an effort to drive sales growth which, predictably, had resulted in rising delinquencies and charge-offs.[4]  For example, CW-1 confirmed that the Company and its executive management were well aware of the risks that Conn's excessively lenient lending practices posed to its bottom line throughout the Class Period.  ¶¶44-48.  CW-1 also confirmed that Defendants affirmatively misled investors by attributing Conn's higher-than-expected delinquency rate to the shift to a new software platform rather than its decision to extend credit to increasingly uncreditworthy consumers in order to boost sales.  ¶47.

21.     Throughout the Class Period, Defendants made false and/or misleading statements, as well as failed to disclose numerous material adverse facts about the Company's business, operations, and prospects.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose the true facts that:

(a)     Conn's was increasing its sales revenues and improving its financial results by using underwriting practices that, despite Defendants' statements to the contrary, weakened the Company's portfolio quality and left it vulnerable to substantial increases in delinquency rates and bad debt;

(b)     Conn's was experiencing rising delinquencies at a substantially higher rate than it was representing;

(c)     Conn's credit segment practices substantially threatened the Company's financial performance;

---

[4]     Details of the CW accounts can be found at ¶¶43-62.

(d)     Seasonal macroeconomic events were not the primary cause of the Company's deteriorating credit performance;

(e)     Issues surrounding the implementation of new software were not the cause of rising delinquencies and increased bad debt;

(f)     A shortage of fully-trained collections personnel was not the cause of increasing delinquencies and increased bad debt;

(g)     Conn's growth strategy was unsustainable; and

(h)     As a result of the above, the Company's statements detailed herein were materially false and misleading at all relevant times and/or lacked a reasonable basis.

22.     As a result of Defendants' wrongful acts and omissions, the market value of the Company's common stock fell by approximately 74% from its Class Period high of $79.24 per share on December 26, 2013, to a close price of $20.83 per share on December 9, 2014.

23.     During the Class Period, on September 13, 2014, *The New York Times* published the article *If a Company Won't Talk, Its Former Employees Will* regarding Conn's credit operations.[5]   The author interviewed certain Conn's customers and former employees regarding the Company's credit and collection practices.   The article provided examples highlighting Conn's reduced credit underwriting standards during the Class Period, including instances of: (1) Conn's providing customers who had faced foreclosure with tens of thousands of dollars of Conn's credit; (2) customers being misled about credit insurance charged by Conn's; and (3) differences between Conn's actual credit and collections practices and those the Company touted during the Class Period.

---

[5]     David Segal, *If a Company Won't Talk, Its Former Employees Will*, N.Y. TIMES (Sept. 13, 2014), http://www.nytimes.com/2014/09/14/your-money/the-haggler-if-a-company-wont-talk-its-former-employees-will.html?partner=rss&emc=rss&_r=0 (the "*NY Times* Article").   A version of the article also appeared in the print edition on September 14, 2014, at BU5.

24.     Then, on October 6, 2014, Conn's announced that it was exploring a range of strategic alternatives, including a sale of the Company, separating its retail and credit businesses, or slowing the pace of new store openings.

25.     Finally, on December 9, 2014, in connection with the announcement of its third quarter fiscal 2015 results, Conn's reported that its CFO Taylor had resigned with immediate effect and that the SEC had requested information regarding the Company's underwriting policies and bad debt provisions.

## II.   JURISDICTION AND VENUE

26.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. §240.10b-5.

27.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331 and 1337(a) and Section 27 of the Exchange Act, 15 U.S.C. §78aa(a).

28.     Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. §1391(b).   Conn's is headquartered in this District and the violations of law complained of herein occurred in part in this District, including the dissemination of materially false and misleading statements complained of herein into this District.

29.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## III.   PARTIES

30.     Court-appointed Lead Plaintiff Detroit Laborers is a defined-benefit pension plan headquartered in Troy, Michigan.   As set forth in the Certification previously submitted to the

Court (ECF No. 22-2), Detroit Laborers purchased Conn's common stock at artificially inflated prices during the Class Period and has been damaged thereby.

31.     Court-appointed Lead Plaintiff Connecticut Carpenters consists of a defined benefit pension plan (the Connecticut Carpenters Pension Fund) and a defined contribution pension plan (the Connecticut Carpenters Annuity Fund), both of which are headquartered in Hamden, Connecticut.  As set forth in the Certification previously submitted to the Court (ECF No. 22-2), Connecticut Carpenters purchased Conn's common stock at artificially inflated prices during the Class Period and has been damaged thereby.

32.     Court-appointed Lead Plaintiff St. Paul Teachers is a defined benefit pension plan based in St. Paul, Minnesota.  As set forth in the Certification previously submitted to the Court (ECF No. 88-1), St. Paul Teachers purchased Conn's common stock at artificially inflated prices during the Class Period and has been damaged thereby.

33.     Court-appointed Lead Plaintiff Universal is an investment company based in Frankfurt, Germany.  As set forth in the Certification previously submitted to the Court (ECF No. 21-4), Universal purchased Conn's common stock at artificially inflated prices during the Class Period and has been damaged thereby.

34.     Conn's has its principal executive offices at 4055 Technology Forest Blvd., Suite 210, The Woodlands, Texas 77381.  The Company is a specialty retailer that offers consumer goods and related services, in addition to proprietary credit and financing services to its customers.  The Company has approximately 86 stores in ten states and conducts business online.

35.     Defendant Wright has been Conn's CEO and President since December 5, 2011. Wright was elected Chairman of the Company's Board of Directors effective December 7, 2010, and has served as a director since 2003, when the Company went public.

36.     Defendant Poppe became the Company's Executive Vice President on June 1, 2010 and has been its COO since April 23, 2012.  Poppe was the Company's CFO from February 1, 2008 through April 23, 2012.

37.     Defendants Wright and Poppe are collectively referred to as the "Individual Defendants."   Conn's and the Individual Defendants are referred to, collectively, as "Defendants."

## IV.     BACKGROUND

38.     Conn's began as a small plumbing and heating business in 1890 and started selling home appliances to the retail market in 1937.  Prior to and throughout the Class Period, Conn's operated in two business segments:   the Retail Segment and the Credit Segment. Through its Retail Segment, the Company sells products, including home appliances, consumer electronics, furniture, mattresses, and home office products through.  As of July 31, 2014, the Company operated 86 retail stores located in ten states:   Arizona, Colorado, Louisiana, Mississippi, Nevada, New Mexico, Oklahoma, South Carolina, Tennessee, and Texas.  Over 50 of those stores are located in Texas.

39.     Conn's Credit Segment is a key source of revenue for the Company from its offering of consumer credit to customers through a proprietary in-house credit program, a third-party financing program, and a third-party rent-to-own payment program.  According to the Company's 2013 Form 10-K filed with the SEC on April 5, 2013 ("2013 Form 10-K"), Conn's "provide[s] access to multiple financing options to address various customer needs including, a proprietary in-house credit program, a third-party financing program and a third-party rent-to-

own payment program."  For the 12 months ended January 31, 2014, the Company financed 77.3% of its retail sales, including down payments, under Conn's in-house financing plan. Similarly, for the first six months of its fiscal year 2015 (which spanned February 1, 2014 through July 31, 2014), more than 77% of its retail sales were financed through the Company's in-house financing plan.

40.     The 2013 Form 10-K described Conn's in-house consumer credit program as "an integral part of [its] business," "a major driver of customer loyalty," and "a significant competitive advantage . . . developed over our 45 years of experience in providing credit."

41.     In addition, the 2013 Form 10-K described the Company's credit process as follows:

> Our decisions to extend credit to our retail customers are made by our internal credit underwriting department - separate and distinct from our stores and retail sales department.  In addition to an auto approval algorithm, we employ a team of credit underwriting personnel to make credit granting decisions using our proprietary underwriting process and oversee our credit underwriting process. Our underwriting process considers one or more of the following elements: credit bureau reporting; income and address verification; current income and debt levels; a review of the customer's previous credit history with us; the credit risk of the particular products being purchased and the level of the down payment made at the time of purchase.
>
> We have developed a proprietary standardized underwriting model that provides credit decisions, including down payment amounts and credit terms, based on customer risk, income level and product risk.  We automatically approved approximately 65.2% of all credit applications that were used in purchases of products from us during fiscal 2013, and the remaining credit decisions are based on evaluation of the customer's creditworthiness by a qualified in-house credit underwriter.  In order to improve the speed and consistency of underwriting decisions, we continually review our auto approval algorithm.  For certain credit applicants that may have past credit problems or lack or credit history, we use using [sic] stricter underwriting criteria.  The additional requirements include verification of employment and recent work history, reference checks and minimum down payment levels.

*      *      *

> We currently extend credit to our customers under our in-house credit program through the use of installment accounts, which are paid over a specified period of time with set monthly payments. We are no longer providing revolving charge accounts under our in-house credit program because we believe that the structure of installment credit accounts results in better credit performance with our core customer.   Additionally, we offer a Conn's-branded revolving charge program through a third-party consumer lender. Most of our installment accounts provide for payment over 12 to 32 months, with the average account remaining outstanding for approximately 15-16 months.

42.     According to numerous CWs, however, prior to the start of the Class Period, Conn's lowered its lending standards for its customers and, on the heels of this change, began experiencing increased delinquencies.  These witnesses also recounted that, by the start of the Class Period, the Company had already begun expanding its collections department workforce and had even engaged a third-party agency to help grapple with its growing collections issues.

## V.     DEFENDANTS' REVENUE GROWTH STRATEGY INCLUDES LOWERING CONN'S LENDING STANDARDS

43.     Knowledgeable credit department employees confirm that: (i) Defendants engaged in a deliberate strategy of lowering credit requirements in late 2012 and early 2013 in order to increase sales; (ii) almost immediately, the Company began experiencing increased delinquencies and charge-offs; and (iii) Defendants lied to investors about the reasons for deteriorating credit performance.

44.     CW-1 was a former Senior Manager of Collections Strategy who was employed by Conn's from 2008 until February 2014 and reported directly to Defendant Poppe.  CW-1 was responsible for collections strategy, development, credit portfolio analysis, and the Company's credit information systems and software.  In fact, CW-1 developed the software used by Conn's for its collection practices.  CW-1 also managed the inside and outside collections teams.

45.      According to CW-1, Defendants lowered credit score requirements for borrowers in late 2012 and early 2013 in order to increase sales and the Company began experiencing a rise in delinquencies in short order by March 2013.  This information was reflected on trend reports containing detailed analytics and metrics including first payment defaults and delinquencies by bucket (*e.g.*, current, 31-60 days delinquent, 61-90 days delinquent, etc.) that CW-1's department produced daily, which were sent to Conn's CEO, Wright, its COO, Poppe, and to the Company's Board of Directors.  CW-1 reported that if these daily trend reports were not circulated by 10:00 a.m. each day, Poppe would call or email looking for the report.

46.      CW-1 stated that, beginning in March 2013, Conn's began hiring additional employees to deal with the rising delinquencies.  In addition, a third-party credit company based in Dallas was retained because Conn's could not hire the number of people necessary to deal with the volume of rising delinquencies.

47.      CW-1, who was required to sit in on all of the Company's earnings conference calls during the Class Period, stated that Defendants misled investors during these calls concerning the reasons for the Company's deteriorating credit performance.  CW-1 stated that Defendants' assertions that more lenient lending standards were not the cause of the increased delinquencies and charge-offs reported during the Class Period were false.  CW-1 stated that Defendants further misled investors on this front by reporting the average credit score of the credit portfolio as a whole, rather than the average credit score of delinquent customers, which had dropped by 40 points.  Likewise, CW-1 stated that contrary to Defendants' statements to investors, the Company's conversion to new software had nothing to do with the rising delinquencies and charge-offs and, to the contrary, that the new software had actually helped the Company.

48.     CW-1 stated that his boss and others warned that the lower lending standards being utilized beginning in late 2012 would adversely impact collections, but their warnings were ignored.

49.     CW-2 was a Credit Manager at Conn's from December 2006 until October 1, 2013, who reported first to the Vice President of Collections, Emily Bowden, and then to David Dubois, the Vice President of Credit and Collections.   CW-2 confirmed that Conn's reduced its credit requirements to increase sales as it was expanding into new markets.   According to CW-2, lending practices were relaxed to such a degree that customers with no reported credit scores were receiving credit lines of $7,000 - $10,000.   Credit department employees referred to these customers' files as "thin files," meaning that there was no substantive information supporting the extension of credit in the file.

50.     CW-2 also confirmed that Defendants reported misleading metrics regarding the credit profiles of Conn's customers to investors.   In this regard, CW-2 confirmed that the average weighted delinquency scores reported by Conn's were inflated by the credit scores of those customers who applied for and used credit offered by GE Capital, as opposed to the Company's own in-house financing.   Customers who used GE Capital credit to purchase merchandise at Conn's had superior credit profiles to those who used the Company's in-house credit program.

51.     During the last six months CW-2 was employed by Conn's, CW-2 worked on the "first payment default portfolio."   According to CW-2, first payment defaults (*i.e.*, customers who defaulted without ever making a payment, a serious indicator of an uncreditworthy borrower or fraud) were increasing.

52.     CW-2 also confirmed that Defendants Wright and Poppe were aware that relaxed underwriting standards had adversely impacted the business because they were hands-on in terms

of running the credit department.  According to CW-2, Wright and Poppe came into the credit department 3-4 times per week and had face-to-face meetings with the credit managers.  Further, CW-2 and other credit managers reported these issues directly to upper-level executives, including Wright and Poppe, and Senior Vice President of Credit, David Dubois.

53.    CW-3 has worked at Conn's since 2000, working as a credit underwriter at the Company from 2004 until March 2013.  CW-3 reported to Betty Conn and then Reymundo de la Fuente, Jr., the then-President of Credit at Conn's.  CW-3 explained that Conn's used an Automated Approval System, rather than underwriters, to review and approve all but a small percentage of credit applications it received.  According to CW-3, the metrics required by the system's underwriting algorithms changed during the 2012 Christmas sales season.  Although credit applications of customers with FICO scores below 520 had been denied previously, the metrics were changed such that FICO scores as low as 400 were being considered, rather than rejected.  In addition, according to CW-3, in another departure from prior practice, Conn's began extending credit to customers who had a history of repossessions and whose homes had been foreclosed.  According to CW-3, many of the underwriters voiced their concerns with the changed metrics in meetings with de la Fuente.

54.    CW-3 stated that these changes resulted in an increase in delinquent accounts.  CW-3 also confirmed that Conn's hired large numbers of employees early in 2013 due to the increase in delinquencies.

55.    While credit requirements had been relaxed overall in late 2012 and early 2013, they were virtually non-existent when it came to new store openings.  CW-3 explained that when new stores were opened, customers for these stores went into a separate queue within Conn's underwriting and collections system known as the "Dollar System."  According to CW-3, new

store customers were considered "gold."  The information provided on their credit applications was not questioned, and all customers were approved for credit.

56.     CW-4, a former Conn's District Manager from March 2011 to September 2013, confirmed that *every* customer was approved for credit during the initial four to five months thsat a new Conn's store was opened, including customers with no income and FICO scores as low as 400.  According to CW-4 — who was personally responsible for opening three Conn's HomePlus stores in Tulsa, Oklahoma and Arlington and Dallas, Texas — this was done to achieve the new store's first month's sales quota of $1,000,000.

57.     CW-4 explained that the managers and sales representatives at new stores had monthly sales quotas that they were required to meet in order to receive a bonus.  As a result, customers who were unable to get credit elsewhere were able to obtain credit at new Conn's stores.  In addition, CW-4 stated that customers who had not been approved for credit at more established Conn's locations were directed by those stores to shop at newly opened Conn's stores, since they would automatically be approved for credit.  In addition, customers whose credit applications had been declined in the past four to five months at other Conn's locations were called when a new store opened in their area and were told to apply for credit there.

58.     CW-4 also explained that Conn's had a group of 10 to 15 experienced sales people known internally as the "Dream Team" that travelled to every new store to assist in meeting the store's sales quota.  The Dream Team obtained automatic approval of credit lines of $2,500 to $5,000 for these high-risk customers and then used aggressive sales tactics to pressure the customers to "max out" the credit line.  CW-4 stated that it was CW-4's job to make sure that customers used all of their credit.  Sales representatives were required to pass off customers to managers if customers in new stores did not spend their entire credit limit.  According to CW-4,

PowerPoint presentations reflecting both the amount of credit approved and utilized during store openings were reviewed at quarterly Profit & Loss ("P&L") meetings attended by both CW-4 and Wright.

59.     CW-4 explained that after the initial four to five month store-opening period, sales at new stores would drop significantly.  According to CW-4, it was common for sales at new stores, which averaged $1.3 million in sales each month during the initial "approve everyone" period, to drop to $800,000 per month when required credit scores were increased to align with existing stores.

60.     CW-4 estimated first payment defaults (*i.e.*, customers who failed to make even their initial payments) at 25% or higher based on the amounts his sales representatives' bonuses were charged back.  CW-4 explained that although sales representatives received a bonus on each sale, a customer's failure to make his or her first payment resulted in a charge-back to the salesperson's bonus.

61.     According to CW-5, Conn's former Vice President of Credit who was employed by Conn's from November 2004 until May 2014, and was responsible for overseeing collections during the relevant period, Conn's had robust internal systems to track first payment defaults and delinquencies, and these reports were distributed daily to all collectors, managers, and the executive leadership team.  CW-5 stated that delinquencies were discussed each day across everyone involved in collections, including Poppe and David Dubois, the Company's Senior Vice President for Credit and Collections, to whom CW-5 reported.  CW-5 met every day (Monday through Saturday) with the Company's executives to discuss the status of collections and delinquencies.  CW-5 described Conn's as a "very flat organization" that does not have

many levels of leadership.  CW-5 noted that as a result, management frequently would become involved in day-to-day issues like collections.

62.     CW-5 confirmed that underwriting (supervised by Poppe) lowered standards during the Class Period, that credit was increasingly being extended to uncreditworthy customers, and that delinquencies were rising during calendar year 2013, a topic that CW-5 raised regularly with SVP Dubois.

## VI.     DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS OF MATERIAL FACT DURING THE CLASS PERIOD

### A.      Fourth Quarter and Full Year Fiscal 2013 Results

63.     The Class Period begins on April 3, 2013.  On that date, Conn's issued a press release announcing record fourth quarter fiscal 2013 earnings for the quarter ended January 31, 2013.

64.     Also on April 3, 2013, during the trading day, the Company hosted a conference call to discuss its fourth quarter fiscal 2013 financial performance.  During the call, and as laid out in the Company's PowerPoint presentation accompanying the call, Defendants touted the percent of Conn's sales generated by the Company's in-house credit offerings that had grown from 66.5% in the fourth quarter of fiscal 2012 to 74.6% in the fourth quarter of fiscal 2013. During the April 3, 2013 conference call, CEO Wright emphasized, among other things, that ***"Our strategy of providing a valuable credit offering to all customers is working."***[6]

65.     Touting the performance of the Company's Credit Segment, Poppe stated, in part:

> Operating profits increased on portfolio growth and stabilizing performance.  We expect to see continued growth in the first quarter driven primarily by portfolio growth on strong sales performance. ***The changes in our portfolio management over the past couple of years are delivering the improved results we***

---

[6]     Statements Lead Plaintiffs allege are false and misleading are bolded and italicized.

*expected,* but drove significant volatility in our performance during that timeframe.

**We now believe the effects of the policy changes made during the last half of fiscal 2012 are largely behind us.  And since our portfolio management practices have been more consistent in recent quarters, we believe we are on track to deliver stable and predictable profitability from the credit operation.**

*        *        *

The 60-plus day delinquency rate declined to 6.5% at March 31, down 60 basis points from year end and 100 basis points from the same time last year.  This is our lowest 60-day delinquency rate in the last 20 months.

Consistent with our prior guidance, the charge-off rate declined sequentially and year-over-year on the fourth quarter.  The preliminary charge-off rates for the first 2 months of fiscal 2014 was approximately 6.2%, down 120 basis points from the fourth quarter and 230 basis points year-over-year.  Based on current trends, we still expect the full year charge-off rate to be between 5% and 6% for fiscal 2014.

The improved portfolio performance is reflected in the weighted average credit score of the portfolio and the weighted average credit score of originations shown on Slide 11.  Both of these measures have been relatively consistent over the past 2 years.  This has resulted in the weighted average credit score for the portfolio of 600 at January 31, up from 585 4 years ago despite a significant reduction in the proportion of balances with a credit score of over 650, which are now financed largely through our program with GE Capital.

Between fiscal 2010 and 2012, we arbitrarily raised the minimum credit score we would underwrite to quickly control underwriting risks and reduce credit sales volumes.  But the standard credit score's not a reliable predictor of credit performance at lower scores given our installment lending structure for purchased home necessities.  In February, we made refinements to our decision process that resulted in declining higher risk accounts with credit scores above 525, and began underwriting applications with credit scores between 500 and 525.  Looking at our February, March results, the impact of these changes was to increase the percent of applications approved by approximately 3% to 4%.

We expect the weighted average origination score to approximate 605 going forward, down slightly from 611 during the fourth quarter. ***Even though the average score underwritten is declining slightly, based on analysis of our portfolio performance, we do not expect these changes to increase the credit risk in the portfolio.***[7]   Continued portfolio performance improvement and proof of our ability to maintain current retail gross margins may give us the ability to profitably increase credit risk in the future, generating additional sales from existing store traffic.

[Emphasis added.]

66.    In response to a question concerning whether Conn's was "doing anything different from a credit standpoint when you open these new stores," and whether Conn's was "underwriting customers who you otherwise wouldn't with the new store openings" and "how much . . . that contributed to the sales that we've seen out of those new stores," Defendant Wright and CFO Taylor respectively stated:

> *The first month or so when we opened the stores, we are doing some things different with credit.   We're more inclined to approve customers for a brief period of time.   And the example that I gave in my comments where I talked about grand opening support being removed beginning in February, that was true in credit as well.*

*            *            *

> *[W]e did approve some customers that we would not approve today, but it was certainly not a significant piece of their business.   It was incremental addition, somewhere, call it, single-digit percent of their sales would have come from those originations.*

[Emphasis added.]

---

[7]     Although Defendants may claim this is a forward-looking statement, Lead Plaintiffs allege it was made with actual knowledge of its falsity.

67.    Later in the call, in response to a question about the Company's willingness to

accept FICO scores lower than the previous year, Poppe stated:

> So we would expect the FICO score to be slightly lower than we
> finished this past year, as we are – we took our minimum
> underwritten score down to 500 from 525 that are refinements to
> our model, *we're also declining some higher-risk accounts that
> we have been approving this past year.  So while we see the
> average underwritten score dropping slightly, we don't see the
> risk going up because we're also deselecting some customers that
> we would have approved in the past*, that will offset – and then
> the customers that we're writing down to 500 are being selected
> based on some additional criteria that we didn't use in the past.
> And then the stores – the new stores go, we will, as we open new
> stores for the first 45 to 60 days, we will have a little more
> flexibility and underwriting there to get the grand opening message
> out and then they will fall right back in line with the underwriting
> criteria of all the other stores in the portfolio.

[Emphasis added.]

68.    Similarly, Poppe refuted any suggestion that an increase in the average balance in

the Company's credit portfolio implied a greater credit risk:

> I think there's a few things driving that.  One, as the portfolio –
> *there's a lot more recent origination, you've got more recent
> balances*, so you don't have a lot of older aged lower balances in
> the portfolio.  And as we, over the last couple of years, worked
> hard to purge out a lot of that older higher-risk credit, it did have
> the impact of increasing the average balance.  So we don't see that
> as increasing risk, the impact to think we decreased risk there.  The
> second thing that's going on is that we changed our merchandising
> mix and we've eliminated a lot of lower price point SKUs, the
> average – the starting ticket size is up, and you have fewer, the
> small tickets, being underwritten and built into finance portfolio.
> And then last, as the web has been a benefit to us in driving more
> new customers and new customers is helping with the first point,
> which is driving more new originations to new customers.  And
> *from a risk standpoint, we don't see the higher average balances
> being a – having any meaningful impact to increasing risk in the
> portfolio*.[8]

---

[8]    Although Defendants may claim this is a forward-looking statement, Lead Plaintiffs
allege it was made with actual knowledge of its falsity.

[Emphasis added.]

69.     In response to another analyst's question regarding whether lower average FICO scores in the fourth quarter of fiscal 2013 might correlate to greater risk, Poppe stated that any such risk was offset by other enhancements to the credit process; "even though [the average FICO score is] dropping a little bit . . . we don't see . . . incremental risk being added to the portfolio because of the changes we made."  Wright expanded on Poppe's answer, stating:

> The simplest explanation I can give to you is at those lower scores, the FICO score, by itself, is not a reliable predictor of risk.  So the fact that our FICO score there moved down slightly, really isn't telling us anything because the impact on risk within the portfolio, all factors considered, hasn't changed.  And so it's really just a function of the fact that it lowered FICO scores, the predictive value of that data point, independently, isn't that meaningful.  And we're not underwriting based on FICO, we never have underwritten based on FICO score solely, there are other factors that are more reliable indicators of risk.  To use a very simple one, at – a FICO 525 income level is a far better predictor of loss rate than FICO score.  So if you have a higher income at a 525 FICO, you may have a much better quality credit than a lower income at 575.  And that's just one example.  So unfortunately, FICO is something that we can all point to and hang our head on, but it's really not a perfect or even close to a perfect indicator of risk.

70.     Defendants' positive statements regarding the successful execution of the Company's business plan had the desired effect.  The price of Conn's common stock rose from $36.08 on April 2, 2013, to $39.01 on April 3, 2013, *an increase of more than 8%.*

71.     Following the earnings release and conference call with management, on April 3, 2013, Bradley B. Thomas, CFA of KeyBanc Capital Markets, issued an Analyst Report on Conn's entitled "CONN: Strong 2013 Outlook, 1Q Off to Strong Start – Reiterate Buy."

72.     On April 4, 2013, Piper Jaffray issued an Analyst Report on Conn's entitled "Conn's Inc.: Powerful Multi-year Growth Story; Raising Price Target to $50; Reiterate Overweight" based on discussions with the Company's management.

73.     On April 5, 2013, Daniel Binder of Jefferies issued an Analyst Report on Conn's that also reiterated the Company's statements that the change in average FICO score would not result in a drop in underwriting standards going forward and would instead help increase store sales.

74.     On April 5, 2013, the Company filed its annual report on Form 10-K for its fiscal year ended January 31, 2013.  The 2013 Form 10-K, which was signed by CEO Wright and contained Sarbanes-Oxley ("SOX") certifications signed by Wright, stated, in part:

> *We also focused on improving the profit contribution of our credit operation by raising our underwriting standards and modifying our collection practices to focus on higher value accounts that we believe are most likely to be paid.  This included, among others, changing our charge-off policy to accelerate the write-off of past due accounts and limiting the re-aging of customer accounts.*
>
> *                    *          *          **
>
> In order to improve the profit contribution of our credit operation, *we have raised our underwriting standards and modified our collection practices over the past two years to focus our portfolio servicing operations on the collection of higher value accounts that we believe are most likely to be paid*.  The primary changes made were to:
>
>> Change our charge-off policy such that accounts will be charged off more quickly than in the past, requiring accounts over 209 days past due at month end to be charged off;
>>
>> Limit re-aging of customer accounts so that no account can be re-aged more than a total of 12 months over the life of the account, among other requirements; and
>>
>> Raise the minimum credit scores and shorten contract terms for higher-risk products and smaller-balances originated to continue to increase the payment rate and improve credit quality.
>
> *The impact of these changes has allowed us to reduce collection costs and improve the quality of our credit portfolio*.  As a result, we have increased the average credit score of our outstanding

balance to 600 as of January 31, 2013 from 586 as of January 31, 2010. ***We believe the above changes will allow us to realize a higher and more consistent level of profitability from our credit operations.***[9]

[Emphasis added.]

75.     Defendants' statements set forth in ¶¶64-69, 74 above were false and misleading when made, as described by the accounts of the CWs in ¶¶43-62 above.  Specifically, the accounts of the CWs demonstrate that: (i) Conn's had lowered credit score requirements for borrowers in late 2012 and early 2013 in order to increase sales, which resulted in an immediate increase in delinquencies (CW-1 ¶45, CW-3 ¶54, CW-5 ¶62); (ii) the rise in delinquencies caused Conn's to retain a third-party credit company to help deal with the volume of the rising delinquencies (CW-1 ¶46); (iii) the lending practices were lowered to such a degree that customers with no reported credit scores were receiving credit lines of $7,000 to $10,000 (CW-2 ¶49); (iv) first payment defaults were increasing (CW-2 ¶51); (v) underwriting algorithms were relaxed during the 2012 Christmas sales season to allow for the extension of credit to a far broader set of customers, including those that had been previously denied and those with a history of repossession and who had faced foreclosures (CW-3 ¶53); (vi) when new stores opened, customers for those stores went into a separate queue within Conn's underwriting and collections system where the credit applications were not questioned, and all customers were approved for credit (CW-3 ¶55); and (vii) every customer was approved for credit during the initial four to five months after a new Conn's store opened (CW-4 ¶¶56-57).  Concerning the Company's statement that lower credit requirements at new stores did not implicate "a significant piece of their business" and was only a "single-digit percent of their sales" (¶66),

---

[9]     Although Defendants may claim this is a forward-looking statement, Lead Plaintiffs allege it was made with actual knowledge of its falsity.

CW-4 says that it was common for sales at new stores, which averaged $1.3 million in sales each month during the initial "approve everyone" period, to drop to $800,000 per month when required credit scores were increased to align with existing stores.  This amounts to over 38% of their sales, not a "single-digit percent."  (¶59)

76.     Later developments also establish that Defendants' statements, as set forth in ¶¶64-69, 74 above, were false and misleading when made.  Specifically, Defendants later admitted in December 2014 that:  (i) Conn's credit operations forecasting had "not been acceptably accurate" (¶¶17, 197); (ii) originations at new stores needed to be restricted and the levels of revenues there was unsustainable (¶203); (iii) bad debts and delinquencies were so great that they were materially threatening the Company (¶195); and (iv) "What will change, though, is the trend of sales when we open.  We're more restrictive on originations to new customers, so the store at opening, in its early months or even year of operation, will not have the same level of revenues." (¶203), which directly contradicts Defendants' statements that lowered credit at new stores stopped by February 1, 2013.

77.     In sum, the following true facts were known by Defendants, but concealed from the investing public, during the Class Period:

(a)     Conn's was growing its sales revenues and financial results by relaxing, rather than enhancing, its underwriting practices, and despite Defendants' statements to the contrary, weakened the Company's portfolio quality and left it susceptible to substantial increases in its delinquency rates and bad debt;

(b)     Conn's faced increased delinquency and charge-off rates in its Credit Segment;

(c)     At all relevant times, Conn's financial performance was substantially and materially threatened due to the Company's lax underwriting practices in its Credit Segment;

(d)     Rather than approving just "some" customers in new stores that would otherwise not have been approved "for a brief period of time," virtually *all* new store customers were approved for credit in order to meet sales quotas, including customers with abysmal FICO scores and customers who previously had been denied credit at other Conn's stores;

(e)     Conn's was not "get[ing] ahead of the curve" and making sure it had the staffing and people in place to support the credit portfolio growth;

(f)     Conn's financial performance was substantially and materially threatened due to the undisclosed lax underwriting practices in its Credit Segment;

(g)     Conn's projected growth strategy was unsustainable, as the Company touted increased sales generated by the in-house credit offering without disclosing the real reason why the sales were improved and the risk inherent in such practices; and

(h)     As a result of the foregoing, Defendants' statements regarding the Company's financial performance were false and misleading and lacked a reasonable basis when made.

78.     The accounts of numerous CWs demonstrate that Defendants were well aware of the adverse impact that their deliberate decision to loosen credit requirements had on collections and the Company's performance and thus, had actual knowledge of the falsity of their statements.  CW-1 stated that Wright and Poppe were regularly informed of the Company's collections struggles through daily trend reports delivered to them by the collections department. CW-1 ¶45; Poppe's regular visits to the credit department and involvement in its policies and procedures, as described by CW-2, also reflect management's awareness of Conn's collection

troubles, even as it reassured investors as to its ability to collect and its bright prospects. Defendants also received reports on first payment defaults and delinquencies, which, according to CW-1, were circulated daily to Conn's executive leadership team.  Wright's attendance at quarterly P&L meetings, as described by CW-4 ¶58, likewise demonstrates that he was aware of the deterioration of the Company's portfolio, as the increase in first payment defaults was a topic discussed at these meetings. The CWs also described that warnings that lower lending standards would create risk and adversely impact collections were ignored (CW-1 ¶48), and that the Individual Defendants were "hands-on" in running the credit department and held face-to-face meetings with credit managers (CW-2 ¶52).

**B.     First Quarter Fiscal 2014 Results**

79.     On June 6, 2013, the Company issued a press release announcing its financial results for the quarter ended April 30, 2013.  The press release stated, in part:

> **Credit Segment Results**
>
> Revenues were $41.3 million for the current quarter, up 22.6% from the prior-year period.  The revenue increase resulted from an increase in the average receivable portfolio balance outstanding. The portfolio balance rose to $773.4 million at April 30, 2013, from $635.2 million in the prior-year period, due to higher retail sales volumes and credit penetration over the past year.   The portfolio interest and fee income yield was 18.0% for the three months ended April 30, 2013, relatively consistent with the prior-year period, but down 70 basis points sequentially as a result of increased short-term, no-interest financing.
>
> Provision for bad debts was $13.8 million for the quarter ended April 30, 2013, an increase of $4.8 million from the prior-year period.  ***This additional provision was driven primarily by the substantial year-over-year growth in the average receivable portfolio balance outstanding, which includes an increase of $31.9 million during the current quarter.***

[Emphasis added.]

80.     On June 6, 2013, during the trading day, the Company hosted a conference call to

discuss its first quarter fiscal 2014 results.  During the call, with regard to the Company's credit

business, Poppe stated, in part:

> As discussed in the prior call, we implemented changes in our
> underwriting process during the quarter.  These changes were
> based on analysis performed over the past year through identified
> credit attributes that would allow us to enhance our decision model
> to better identify quality credit customers.  It is important to note
> that standard credit scores are not reliable predictors of customer
> performance at lower scores.  We continue to test and enhance the
> internal custom grading process we've developed over our 45-plus
> years of offering credit to sub-prime borrowers.  The analysis was
> based on our historical portfolio of performance data and
> supported approving certain and lower score customers we had
> been declining while declining certain higher score customers we
> had been approving.  As a result, the approval rate increased about
> 400 basis points compared to the prior year quarter.  ***Additionally,
> the analysis indicates that the changes should have little effect on
> the credit risk and the receivables underwritten despite the fact
> that the average score underwritten dropped from 611 in the
> fourth quarter to 602 in the first quarter.[10]  Early results indicate
> that this is in fact the case as first payment delinquency rate for
> the February and March originations trended lower compared to
> prior year performance***.
>
> Our approval rate and decline decisions – or sorry, our approval
> and decline decisions are based on expected transaction
> profitability.  Our ability to incrementally approve customers being
> declined today and still deliver our targeted 20% return on equity
> increases as the interest yield and retail gross margin increase.  The
> additional expected credit losses would be more than paid for by
> the increased gross profit.
>
> Our ability to improve credit profitability over time will be driven
> by improving portfolio performance, portfolio growth driven by
> same-store sales growth and new store openings, portfolio yield
> expansion from the ability to charge higher interest rates as we
> enter new markets such as New Mexico and Arizona, where we're
> earning 26% on interest-bearing accounts, increased operating

---

[10]     Although Defendants may claim this is a forward-looking statement, Lead Plaintiffs
allege it was made with actual knowledge of its falsity.

leverage as a result of portfolio growth and the ability to fund much of the portfolio growth from company earnings. ***As such, we expect continued improvement in the profit contribution to the credit operation over the coming year.***[11]

[Emphasis added.]

81.     During the question and answer portion of the call, Poppe responded to a question regarding the Company's increasing bad debt provision, stating:

> ***The – it is driven largely just by the – as we accelerate growth and you continue to see more receivables roll into the portfolio and move into – and season in the portfolio is driving this acceleration in the provision rate.  And if performance continues to improve, that should moderate over time, and we would expect the guidance implies that the provision rate should improve over the remainder of the year.***[12]

[Emphasis added.]

82.     When asked later in the call why the Company's provision for bad debt was increasing, and whether the increase was tied to credit metrics, Poppe responded negatively, stating that "***It's the speed of growth and the portfolio***."  [Emphasis added.]

83.     When an analyst expressed curiosity regarding whether "credit [was] the same around the new stores as it is around the rest of the store base in terms of approvals and down payment requirements," Wright falsely stated that "***the credit granting process in the new stores was the same as in our other stores.  So for the quarterly period that's presented here it is in fact the same***."  [Emphasis added.]  Then, when asked for the delinquency metrics for the new stores, Poppe demurred, saying that it was "still early."  When the analyst persisted and inquired

---

[11]     Although Defendants may claim this is a forward-looking statement, Lead Plaintiffs allege it was made with actual knowledge of its falsity.

[12]     Although Defendants may claim this is a forward-looking statement, Lead Plaintiffs allege it was made with actual knowledge of its falsity.

how 60-day delinquencies for the new stores would compare to the Company average, Poppe responded:

> It's still early to have a really strong read, but generally, they're going to be a little bit higher because it's a new customer base and doesn't have the seasoning of a bunch of existing customers rolling through, but would be for the originations during the quarter under the same rules of every other store. ***Those new customers will perform very similarly to a new customer in an existing store.***[13]

84.     Also on June 6, 2013, the Company filed its quarterly report on Form 10-Q for the quarter ended April 30, 2013, which confirmed the financial results in the June 6, 2013 press release and contained required SOX certifications signed by CEO Wright.

85.     Once again, Defendants' positive statements had the desired effect as Conn's stock price continued its steady rise from a market close of $48.46 per share on June 5, 2013 to $53.96 per share on June 6, 2013, an increase of over 11.3%.

86.     Defendants' statements set forth in ¶¶79-83 above were false and misleading when made because, as described by the accounts of the CWs in ¶¶43-62 above.  Specifically, the accounts of the CWs demonstrate that: (i) Conn's had lowered credit score requirements for borrowers in late 2012 and early 2013 in order to increase sales, which resulted in an immediate increase in delinquencies (CW-1 ¶45, CW-2 ¶54, CW-5 ¶62); (ii) the rise in delinquencies caused Conn's to retain a third-party credit company to help deal with the volume of the rising delinquencies (CW-1 ¶46 ); (iii) the lending practices were lowered to such a degree that customers with no reported credit scores were receiving credit lines of $7,000 to $10,000 (CW-2 ¶49); (iv) first payment defaults were increasing (CW-2 ¶51); (v) underwriting algorithms were relaxed during the 2012 Christmas sales season to allow for the extension of credit to a far

---

[13]     Although Defendants may claim this is a forward-looking statement, Lead Plaintiffs allege it was made with actual knowledge of its falsity.

broader set of customers, including those that had been previously denied and those with a history of repossession and had faced foreclosures (CW-3 ¶53); (vi) when new stores opened, customers for those stores went into a separate queue within Conn's underwriting and collections system where the credit applications were not questioned, and all customers were approved for credit (CW-3 ¶55); and (vii) every customer was approved for credit during the initial four to five months after a new Conn's store opened (CW-4 ¶¶56-57).

87.     Later developments also establish that Defendants' statements, as set forth in ¶¶79-83 above, were false and misleading when made.  Specifically, Defendants later admitted that: (i) Conn's credit operations forecasting had "not been acceptably accurate" (¶¶17, 197); (ii) originations at new stores needed to be restricted and the levels of revenues there were unsustainable (¶203); (iii) bad debts and delinquencies were so great that they were materially threatening the Company (¶195); and (iv) "What will change, though, is the trend of sales when we open.  We're more restrictive on originations to new customers, so the store at opening, in its early months or even year of operation, will not have the same level of revenues." (¶203), which directly contradicts Defendants' statement that "the credit granting process in the new stores was the same as in our other stores.  So for the quarterly period that's presented here it is in fact the same."  (¶83).

88.     In sum, the following true facts were known by Defendants, but concealed from the investing public, during the Class Period:

(a)     Conn's was growing its sales revenues and financial results by relaxing its underwriting practices despite Defendants' statements to the contrary, which weakened Conn's portfolio quality and left it susceptible to substantial increases in bad debt;

(b)     Conn's faced increased delinquency and charge-off rates in its credit segment;

(c)     At all relevant times, Conn's financial performance was substantially and materially threatened due to the Company's practices in its credit segment;

(d)     Uncreditworthy customers had been approved for credit so that sales quotas could be met, including customers who previously had been denied credit at other Conn's stores; and

(e)     As a result of the foregoing, Defendants' statements regarding the Company's financial performance and expected earnings in 2014 and 2015 were false and misleading and lacked a reasonable basis when made.

89.     The accounts of numerous CWs demonstrate that Defendants were well aware of the adverse impact that their deliberate decision to loosen credit requirements had on collections and the Company's performance and thus, had actual knowledge of the falsity of their statements.  CW-1 stated that Wright and Poppe were regularly informed of the Company's collections struggles through daily trend reports delivered to them by the collections department. CW-1 ¶45).  Poppe's regular visits to the credit department and involvement in its policies and procedures, as described by CW-2, also reflect management's awareness of Conn's collection troubles, even as it reassured investors as to its ability to collect and its bright prospects. Defendants also received reports on first payment defaults and delinquencies, which, according to CW-1, were circulated daily to Conn's executive leadership team.  Wright's attendance at quarterly P&L meetings, as described by CW-4 ¶58, likewise demonstrates that he was aware of the deterioration of the Company's portfolio as the increase in first payment defaults was a topic discussed at these meetings. The CWs also described that warnings that lower lending standards

would create risk and adversely impact collections were ignored (CW-1 ¶48) and that the Individual Defendants were "hands-on" in running the credit department and held face-to-face meetings with credit managers (CW-2 ¶52).

     C.     **Presentations at Analyst Conferences (June 2013 - August 2013)**

          1.     **Oppenheimer Consumer Conference – June 25, 2013**

     90.     On June 25, 2013, Poppe presented at the 13th Annual Oppenheimer Consumer Conference in Boston.  Poppe spoke about the Company's expansion plans, its retail business, and its credit and collections.   In connection with the Company's credit business and underwriting standards, Poppe stated:

> ***And the credit business performance continues to improve, with delinquency, re-age and charge-off metrics continuing to show improvement.***
>
>         \*      \*      \*
>
> ***As we have tightened underwriting and improved our underwriting processes and our collection policies and procedures, we have seen significant improvement in the credit quality in the portfolio over the last couple years***; the blue line being the distribution of credit scores two years ago, the green line being the distribution of credit scores in the portfolio as of the end of April.  And you can see the bell curve has really tightened up into that 550 to 650 band, which is what we've identified as core customer who really understands and takes – can take advantage of the value of our product offering.
>
> Looking at credit portfolio trends, looking on the right, the black and red lines are the net charge-off and 60-day delinquency rates. Some volatility there in 2012, when we were making some changes to our charge-off and re-aging policies and procedures. ***As those changes have seasoned into the portfolio and we are beginning to get more consistency in performance, you can see that re-aging is down almost to half of what it was a few years ago.  And we've been in a fairly consistent downward trend now in net charge-offs and 60-day delinquencies over the last few quarters***.

[Emphasis added.]

### 2.    Canaccord Genuity Global Growth Conference – August 14, 2013

91.    On August 14, 2013, Poppe presented at the Canaccord Genuity Growth Conference.  Poppe spoke about the Company's expansion plans, its retail business, and its credit and collections.  In connection with the Company's employee training, credit business, and underwriting standards, Poppe stated:

> ***We have, over the last few years and through the recession, raised our minimum underwriting standards and tightened credit quality.***  As a result, the blue line was – April of 2011 was the distribution by FICO score of our credit portfolio.  ***You can see how that range has tightened up and is very targeted on the 550 to 650 range, resulting in an increase in the average score in the portfolio and the improving portfolio trends we saw through April 30.***

> Those trends shown here on the graph on the right-hand side of the page – as we tightened our re-aging practices and became more conservative in our charge-off policies, we created some volatility in portfolio performance in the fiscal 2012 period.  ***And as those changes have seasoned in, you have seen the decline in percentage of the portfolio re-aged and the delinquency and charge-off rates as we moved into the April 30 ending period***.

> ***With that, we have been able to reduce servicing costs and financing costs in the portfolio to help deliver a more consistent, profitable business and expect to see it to be a much more predictable business on a go-forward basis. . . .***

[Emphasis added.]

92.    Defendants' statements set forth in ¶¶90-91 above were false and misleading when made because, as described by the accounts of the CWs in ¶¶43-62 above.  Specifically, the accounts of the CWs demonstrate that: (i) Conn's had lowered credit score requirements for borrowers in late 2012 and early 2013 in order to increase sales, which resulted in an immediate increase in delinquencies (CW-1 ¶45, CW-3 ¶54, CW-5 ¶62); (ii) the rise in delinquencies caused Conn's to retain a third-party credit company to help deal with the volume of the rising delinquencies (CW-1 ¶46); (iii) the lending practices were lowered to such a degree that

customers with no reported credit scores were receiving credit lines of $7,000 to $10,000 (CW-2 ¶49); (iv) first payment defaults were increasing (CW-2 ¶51); (v) underwriting algorithms were relaxed during the 2012 Christmas sales season to allow for the extension of credit to a far broader set of customers, including those that had been previously denied and those with a history of repossession and had faced foreclosures (CW-3 ¶53); (vi) when new stores opened, customers for those stores went into a separate queue within Conn's underwriting and collections system where the credit applications were not questioned, and all customers were approved for credit (CW-3 ¶55 ); and (vii) every customer was approved for credit during the initial four to five months after a new Conn's store opened (CW-4 ¶¶56-57).

93.     Later developments also establish that Defendants' statements, as set forth in ¶¶90-91 above, were false and misleading when made.  Specifically, it was later admitted that: (i) Conn's credit operations forecasting had "not been acceptably accurate" (¶¶17, 197); (ii) originations at new stores needed to be restricted and the levels of revenues there were unsustainable (¶203); and (iii) bad debts and delinquencies were so great that they were materially threatening the Company (¶195).

94.     In sum, the following true facts were known by Defendants, but concealed from the investing public, during the Class Period:

(a)     Conn's was growing its sales revenues and financial results by relaxing its underwriting practices despite Defendants' statements to the contrary, which weakened Conn's portfolio quality and left it susceptible to substantial increases in bad debt;

(b)     Conn's faced increased delinquency and charge-off rates in its credit segment;

(c)    At all relevant times, Conn's financial performance was substantially and materially threatened due to the Company's practices in its credit segment;

(d)    Uncreditworthy customers had been approved for credit so that sales quotas could be met, including customers who previously had been denied credit at other Conn's stores; and

(e)    As a result of the foregoing, Defendants' statements regarding the Company's financial performance and expected earnings in 2014 and 2015 were false and misleading and lacked a reasonable basis when made.

95.    The accounts of numerous CWs demonstrate that Defendants were well aware of the adverse impact that their deliberate decision to loosen credit requirements had on collections and the Company's performance and thus, had actual knowledge of the falsity of their statements.  CW-1 stated that Wright and Poppe were regularly informed of the Company's collections struggles through daily trend reports delivered to them by the collections department. CW-1 ¶45.  Poppe's regular visits to the credit department and involvement in its policies and procedures, as described by CW-2, also reflect management's awareness of Conn's collection troubles, even as it reassured investors as to its ability to collect and its bright prospects. Defendants also received reports on first payment defaults and delinquencies, which, according to CW-1, were circulated daily to Conn's executive leadership team.  Wright's attendance at quarterly P&L meetings, as described by CW-4 ¶58, likewise demonstrates that he was aware of the deterioration of the Company's portfolio as the increase in first payment defaults was a topic discussed at these meetings. The CWs also described that warnings that lower lending standards would create risk and adversely impact collections were ignored (CW-1 ¶48) and that the

Individual Defendants were "hands-on" in running the credit department and held face-to-face meetings with credit managers (CW-2 ¶52).

## VII.    THE TRUTH BEGINS TO EMERGE

### A.    Second Quarter Fiscal 2014 Results

96.    On September 5, 2013, the Company issued a press release announcing disappointing financial results for the quarter ended July 31, 2013.  The press release stated, in part:

> Theodore M. Wright, the Company's Chairman and CEO, commented, "August net sales increased 51% over the prior-year period.  Same store sales in August rose 31%.  Phoenix market store openings have been successful with three stores now open. We plan to open four more Phoenix area locations over the next several quarters."

> Mr. Wright continued, "***The performance of our credit segment for the second quarter was below our expectations due to short-term execution issues in our collection operations.  Corrective actions were taken and negative delinquency trends rapidly reversed.***  Early stage delinquency at the end of August had declined 12% from peak levels earlier in the month.  At August 31, early stage delinquency was below the levels experienced at the end of each of the past nine quarters.  We expect further improvement in overall delinquency rates over the next several months.  ***Despite the challenges in our collections operations in the second quarter,*** we are reaffirming our guidance for the year."

 [Emphasis added.]

97.    On September 5, 2013, during the trading day, the Company hosted a conference call to discuss its second quarter fiscal 2014 results.  During the call, Wright blamed the disappointing results in Conn's Credit Segment on implementation problems encountered during the rollout of a new software system.  However, he emphasized that the problems were identified, fixed, and now behind the Company:

> Starting with the credit segment, ***our provision for bad debts for the second quarter was higher than forecast, and delinquency***

*unexpectedly deteriorated*. In late May, we upgraded our collections platform. This is the software system our collections agents use when collecting delinquent balances. The system we upgraded to is widely installed and has been in use elsewhere for years. Our former platform was internally developed older technology and not the best long-term solution for the company.

Although software systems are never perfect and we can improve the use of the new system, the platform worked properly when placed in service. Unfortunately, there were errors in the construction of data flows from our other systems to the collections platform. Some information wasn't transferred to the new system and wasn't available to our collections agents, some information was lost and not recovered. User errors, typical with the new system, made matters worse.

Our primary collection method is phone communication with delinquent customers. These implementation errors reduced the phone numbers available for our collections agents to pursue collections. Because the reduction in phone numbers available occurred over time, the effects were not immediately apparent. By *July, delinquency was increasing for reasons we couldn't understand. But by mid-July, we have identified the causes. And by early August, corrective actions were completed*.

Since that time, collections performance has improved rapidly, and Mike will provide more details on this improvement. The damage was already done. Later stage delinquency deteriorated and charge-offs of uncollectible accounts during June and July were higher than expected. Additional provision for bad debt expense of $5.9 million was required in the second quarter. *Our failure to implement the system properly and to identify issues quickly enough was painful and expensive, but the issues were identified and were corrected*.

We don't expect any additional expense from these implementation issues in the third quarter of this year or other future periods. We are reaffirming the earnings guidance provided last quarter for the full year of $2.50 to $2.65 per share.

[Emphasis added.]

98.    As the second quarter fiscal 2014 conference call continued, Poppe stated, in part:

Turning to underwriting trends for the quarter. As shown on Slide 15, roughly 92% of our sales in the quarter were paid for using 1 of the 3 monthly payment options we offer. The increase in the

percent of sales under our finance program was driven largely by the changes in our advertising program, as well as merchandise mix changes, which drove higher ASPs and reduced the volume of cash tickets. The approval rate under our in-house credit program increased by 2.6% over the prior-year period, and the average score underwritten during the quarter was 601 compared to 602 in the first quarter.

Results so far indicate that performance of current year originations is within expectations. At the end of August, our delinquency issues are concentrated largely in late stage delinquencies, as previously shown on Slide 12. The deterioration in performance occurred across all years of loans originated, and less than 10% of the late stage delinquency at the end of August of this year and last year was from accounts originated in each respective fiscal year. ***We expect to see improvement in the profit contribution in the credit segment over the coming quarters***.[14]

[Emphasis added.]

99.     During the question and answer portion of the call, Defendants emphasized that the current quarter's problem was related only to the implementation of the new software, and not to problems with the credit quality of the portfolio. Wright stated:

I think one caution is with the credit portfolio, saying something with 100% certainty is always a dangerous thing. But I would say, ***we are certain that the impact in the current quarter was related to the systems issue***. To the extent that we've had other issues where credit portfolio performance wasn't as good as we would like or there were other influences, those were already in place the quarter before and reflected in our provision at that time and our provision forecast going forward. So 100% certainty, I'm a little cautious saying that. But ***it's clear that other than the systems-related issue, there was no change in performance – meaningful change in performance or trend compared to the prior quarter***.

[Emphasis added.]

100.     Defendants also continued to insist that there had been no change in underwriting practices. Wright stated that the Company's customers were "***still the same type of customers***

---

14      Although Defendants may claim this is a forward-looking statement, Lead Plaintiffs allege it was made with actual knowledge of its falsity.

*we've always gotten.  We're still using the same underwriting tools and practices that we used*

*before*.  And so we expect we'll get a similar result."  [Emphasis added.]  Likewise, when asked

point-blank whether Conn's was "doing anything different from a credit standpoint with –

around new store openings, the approvals, and the down payments there," Poppe responded:

> *From an underwriting standpoint, Rick, this year in the new*
> *stores, we are using the same underwriting rules and procedures*
> *in new stores as we use in existing stores.  So nothing different*
> *there.*  From a delinquency standpoint, it's still relatively early.
> They generally will see slightly higher delinquency in the new
> market because it's all new customers and we're building that
> repeat customer base.  But everything, I'd say, is in line with what
> we would expect.

[Emphasis added.]

101.    Also on September 5, 2013, the Company filed its quarterly report on Form 10-Q

for the quarter ended July 31, 2013, which confirmed the financial results in the September 5,

2013 press release and contained required SOX certifications signed by Wright.

102.    In reaction to these disclosures, Conn's stock price dropped from $68.31 per share

on September 4, 2013, to close at $60.36 per share on September 5, 2013, *a decrease of 11.6%*,

on unusually high trading volume.  However, the Company's stock price remained artificially

inflated after this partial disclosure of fraud as even analysts believed the increased loan loss

provision reflected a temporary setback.

103.    Following the earnings release and conference call with management, on

September 5, 2013, Peter J. Keith of Piper Jaffray issued an Analyst Report on Conn's,

reiterating the Company's discussion of execution issues relating to a computer system

conversion which supposedly caused the increase in Conn's delinquencies.   The report

concluded, based on managements' representations, that the delinquencies were not related to

any underwriting issues:

**Systems Issue Related to Credit Segment Appears Corrected.**
A new collections system implementation at the end of May
resulted in the loss of certain contact information (e.g. phone
numbers) for credit customers.  As a result, the auto-dial feature of
the system skipped over a number of delinquent accounts and the
company cycled through its call inventory faster than normal.
User error with the new system also exacerbated the problem.  By
early July, the company noticed delinquency rates had increased.
The problem was identified by mid-July, and was corrected by
early August.  For Aug, the 0-90 day delinquency rate dropped
below the rate from Apr/May.

104.    As a Stephens Inc. analyst stated in a report dated September 6, 2013:  "Conn's

disappointed investors with a 2Q miss driven by a significant increase in the provision for loan

loss related to the poor implementation of a new collections system platform.  Importantly, we

view the systems issue as *one-time in nature*."  [Emphasis added.]

105.    On September 5, 2013, Brian Nagel of Oppenheimer Equity Research issued an

Analyst Report entitled "Conn's Inc.: Pullback an Opportunity for Investors."  Oppenheimer

analysts echoed the sentiment that Conn's issue in the second quarter was already addressed by

the Company:  "Our bottom-line message:  The CONN retail business is tracking very strongly,

and the credit issues that impacted Q2 results are *one-time and already fixed*."  [Emphasis

added.]

106.    Defendants' statements set forth in ¶¶96-100 above were false and misleading

when made because, as described by the accounts of the CWs in ¶¶43-62 above.  Specifically,

CW-1, who was responsible for collections strategy, credit portfolio analysis, the Company's

credit information systems and software, who developed the collections and reporting software

used by Conn's during the Class Period, stated that Defendants' assertions that more lenient

lending standards were not the cause of the increased delinquencies and charge-offs reported

during the Class Period were false (¶¶44-47).  Likewise, CW-1 stated that contrary to

Defendants' statements to investors, the Company's conversion to new software had nothing to

do with the rising delinquencies and charge-offs and, to the contrary, that the new software had actually helped the Company (¶47).  The accounts of the CWs also demonstrate that: (i) Conn's had lowered credit score requirements for borrowers in late 2012 and early 2013 in order to increase sales, which resulted in an immediate increase in delinquencies (CW-1 ¶45, CW-3 ¶54, CW-5 ¶62); (ii) the rise in delinquencies caused Conn's to retain a third-party credit company to help deal with the volume of the rising delinquencies (CW-1 ¶46); (iii) the lending practices were lowered to such a degree that customers with no reported credit scores were receiving credit lines of $7,000 to $10,000 (CW-2 ¶49); (iv) first payment defaults were increasing (CW-2 ¶51); (v) underwriting algorithms were relaxed during the 2012 Christmas sales season to allow for the extension of credit to a far broader set of customers, including those that had been previously denied and those with a history of repossession and had faced foreclosures (CW-3 ¶53); (vi) when new stores opened, customers for those stores went into a separate queue within Conn's underwriting and collections system where the credit applications were not questioned, and all customers were approved for credit (CW-3 ¶55); and (vii) every customer was approved for credit during the initial four to five months after a new Conn's store opened (CW-4 ¶¶56-57).

107.   Later developments also establish that Defendants' statements, as set forth in ¶¶96-100 above, were false and misleading when made.  Specifically, it was later admitted that: (i) Conn's credit operations forecasting had "not been acceptably accurate" (¶¶17, 197); (ii) originations at new stores needed to be restricted and the levels of revenues there was unsustainable (¶203); (iii) bad debts and delinquencies were so great that they were materially threatening the Company (¶195); and (iv) "What will change, though, is the trend of sales when we open.  We're more restrictive on originations to new customers, so the store at opening, in its early months or even year of operation, will not have the same level of revenues." (¶203), which

directly contradicts Defendants' statement that "[f]rom an underwriting standpoint, Rick, this year in the new stores, we are using the same underwriting rules and procedures in new stores as we use in existing stores.  So nothing different there."  (¶100).

108.    In sum, the following true facts were known by Defendants, but concealed from the investing public, during the Class Period:

       (a)    The rising delinquencies and charge-offs the Company was experiencing were directly related to the Company's deliberate loosening of its underwriting standards;

       (b)    Systems issues were not to blame for the deteriorating performance of the Company's credit portfolio; and

       (c)    Credit origination standards for new stores were not the same as those for established stores.

109.    The accounts of numerous CWs demonstrate that Defendants were well aware of the adverse impact that their deliberate decision to loosen credit requirements had on collections and the Company's performance and thus, had actual knowledge of the falsity of their statements.  CW-1 stated that Wright and Poppe were regularly informed of the Company's collections struggles through daily trend reports delivered to them by the collections department.  CW-1 ¶45.  Poppe's regular visits to the credit department and involvement in its policies and procedures, as described by CW-2, also reflect management's awareness of Conn's collection troubles, even as it reassured investors as to its ability to collect and its bright prospects.  Defendants also received reports on first payment defaults and delinquencies, which, according to CW-1, were circulated daily to Conn's executive leadership team.  Wright's attendance at quarterly P&L meetings, as described by CW-4 ¶58, likewise demonstrates that he was aware of the deterioration of the Company's portfolio as the increase in first payment defaults was a topic

discussed at these meetings. The CWs also described that warnings that lower lending standards would create risk and adversely impact collections were ignored (CW-1 ¶48) and that the Individual Defendants were "hands-on" in running the credit department and held face-to-face meetings with credit managers (CW-2 ¶52).

### B.    Third Quarter Fiscal 2014 Results

110.    On December 5, 2013, the Company issued a press release announcing its financial results for the quarter ended October 31, 2013.  The press release stated, in part:

> "We achieved the highest quarterly revenue and net income in Conn's history," stated Theodore M. Wright, the Company's Chairman and CEO.  "This sales trend continued into November with retail sales expanding 49%.  November same store sales rose 32%."

111.    On December 5, 2013, the Company hosted a conference call to discuss its third quarter fiscal 2014 financial results.  During the call, Wright stated, in part:

> Conn's earned $0.71 per share in the third quarter on an adjusted basis.  This compares to an adjusted $0.38 in the same quarter a year ago, an increase of 87%.  We're raising our guidance for the full fiscal year 2014 to $2.75 to $2.80.  A year ago, we initiated guidance for fiscal 2014 at $2.05 to $2.15 and has since raised our guidance twice for an increase in our guidance of 30% at the top end.
>
> Consistent with our past practice, we are initiating guidance for fiscal 2015 at $3.80 to $4.  Guidance at the top end for fiscal 2015 is a 43% increase over the top end for fiscal 2014.
>
> *             *             *
>
> Turning to our credit segment.  ***The company made good progress in addressing the issues we experienced in the second quarter about credit collection system.  We're on track to meet our timetable 4 to 5 months from our last conference call to fully***

> *address the effects of these issues on our portfolio.  Delinquency*
> *should improve markedly over the next quarter.[15]*

[Emphasis added.]

112.    As the call continued, Poppe discussed details concerning the Company's credit

segment, stating, in part:

> Credit segment profits increased sequentially on portfolio growth
> and declined year-over-year due to a higher provision for bad debts
> and lower interest yields, given the increased balance of interest
> fee receivables.
>
> *            *            *
>
> The net charge-off rate increased during the quarter as we
> discussed on the last earnings call and is expected to be elevated
> during the fourth quarter as we address the increased delinquencies
> created by the second quarter system implementation issues.  To
> date, we have not identified any new issues related to the system
> implementation and are focusing on enhancements to the system to
> improve collector efficiency and effectiveness.   Early stage
> delinquency has stabilized and, as we can see on slide 10, late
> stage delinquency, 91 days to 209 days past due has improved
> since August.
>
> Slide 11 shows static pool loss information for the portfolio over
> the past nine years.   The static pool loss rate shown become
> cumulative charge-off rates based on the fiscal year of origination.
> Other than fiscal 2009, which was significantly impacted by the
> recession, static pool loss rates have been fairly stable over time, at
> around 6%, while charge-off and provision for bad debt rates were
> highly volatile.
>
> Many years of experience underwriting a single type of credit for
> our core customer, limited variation and underwriting practices
> over time and experienced collecting this specific type of credit
> allow us to deliver consistent performance.
>
> During fiscal 2012, changes were made that shortened contract
> terms and the time period before charge-off, including limiting
> reaging.  Credit accounts are now paying down more quickly and
> charge-offs are occurring sooner in the contract life.

---

[15]     Although Defendants may claim the last sentence is a forward-looking statement, Lead
Plaintiffs allege it was made with actual knowledge of its falsity.

Since the receivables pay off quickly, only small balances remain from recent fiscal year originations.  1% of fiscal 2011, 11% of fiscal 2012 and only 35% of the balances originated last fiscal year.  The more conservative reaging and charge-off practices result in the balances remaining in the portfolio being higher quality than in the past.

We expect the final static pool loss rates for the recent fiscal years to be in line with historical experience, though there may be modest upward pressure as a result of the recent execution issues and for the current fiscal year due to the increased volume of new credit customers.  However, due to the rapid pay down of the receivables we now experience, we do not expect the final static pool loss rates under reasonably foreseeable scenarios to exceed 7%.

Turning to underwriting trends for the quarter . . . roughly 93% of our sales in the quarter were paid for using 1 of the 3 monthly payment options offered.  The increase in the percent of sales under our finance program was driven largely by changes in our advertising programs, as well as merchandise mix exchanges which drove higher ASPs and reduced the volume of cash tickets.

The approval rate under our in-house credit program decreased by 3.2% from the prior quarter level, and the average score underwritten during the quarter was 599 compared to 601 in the second quarter.  Results so far indicate that performance of current year originations is within expectations.  ***We expect this quarter's improvement in the profit contribution to credit segment to continue over the coming quarters***.[16]

[Emphasis added.]

113.    During the question and answer portion of the call, Wright assured the analysts that at the end of the fourth quarter, the Company's delinquency rate would "***definitely be improved from where it is today***."[17] [Emphasis added.]  When Piper Jaffray analyst Peter Keith

---

[16]     Although Defendants may claim the last sentence is a forward-looking statement, Lead Plaintiffs allege it was made with actual knowledge of its falsity.

[17]     Although Defendants may claim the last sentence is a forward-looking statement, Lead Plaintiffs allege it was made with actual knowledge of its falsity.

specifically asked, "[s]o that would be down sequentially from the 8.5%," Wright responded, "Yes."

114.     Also on December 5, 2013, the Company filed its quarterly report on Form 10-Q for the quarter ended October 31, 2013, which confirmed the financial results in the December 5, 2013 press release and contained required SOX certifications signed by CEO Wright.

115.     Once again, Defendants' positive statements had the desired effect as Conn's stock price rose from $58.46 on December 4, 2013 to close at $69.82 on December 5, 2013, *an increase of over 19%*.  In fact, Conn's stock price reached a Class Period high of $79.24 on December 26, 2013.

116.     After the earnings release and conference call, on December 5, 2013, Peter J. Keith of Piper Jaffray issued a report on Conn's entitled "Conn's Inc.: Q3 Retail Results Exceptionally Strong; Delinquency Trends Now Declining."  In the report, Keith stated in part: "*The Q3 earnings call provided confidence that the elevated delinquency trend from Q2's collections issues is beginning to decline*.  [Fiscal] year EPS was guided to $3.80-$4.00 (well above consensus of $3.57) due to upside on comp and new store guidance."  [Emphasis added.]

117.     Defendants' statements set forth in ¶¶110-113 above were false and misleading when made because, as described by the accounts of the CWs in ¶¶43-62 above.  Specifically, CW-1, who was responsible for collections strategy, credit portfolio analysis, the Company's credit information systems and software, who developed the collections and reporting software used by Conn's during the Class Period, stated that Defendants' assertions that more lenient lending standards were not the cause of the increased delinquencies and charge-offs reported during the Class Period were false (¶¶44-47).  Likewise, CW-1 stated that contrary to Defendants' statements to investors, the Company's conversion to new software had nothing to

do with the rising delinquencies and charge-offs and, to the contrary, that the new software had actually helped the Company (¶47).  The accounts of the CWs also demonstrate that: (i) Conn's had lowered credit score requirements for borrowers in late 2012 and early 2013 in order to increase sales, which resulted in an immediate increase in delinquencies (CW-1 ¶45, CW-3 ¶54, CW-5 ¶62); (ii) the rise in delinquencies caused Conn's to retain a third party credit company to help deal with the volume of the rising delinquencies (CW-1 ¶46); (iii) the lending practices were lowered to such a degree that customers with no reported credit scores were receiving credit lines of $7,000 to $10,000 (CW-2 ¶49); (iv) first payment defaults were increasing (CW-2 ¶51); (v) underwriting algorithms were relaxed during the 2012 Christmas sales season to allow for the extension of credit to a far broader set of customers, including those that had been previously denied and those with a history of repossession and had faced foreclosures (CW-3 ¶53); (vi) when new stores opened, customers for those stores went into a separate queue within Conn's underwriting and collections system where the credit applications were not questioned, and all customers were approved for credit (CW-3 ¶55); and (vii) every customer was approved for credit during the initial four to five months after a new Conn's store opened (CW-4 ¶¶56-57).

118.    Later developments also establish that Defendants' statements, as set forth in ¶¶110-113 above, were false and misleading when made.  Specifically, it was later admitted that: (i) Conn's credit operations forecasting had "not been acceptably accurate" (¶¶17, 197); (ii) originations at new stores needed to be restricted and the levels of revenues there was unsustainable (¶203); and (iii) bad debts and delinquencies were so great that they were materially threatening the Company (¶195).

119.    In sum, Defendants continued to suppress following true facts that were known by Defendants, but concealed from the investing public, during the Class Period:

(a)     Conn's was growing its sales revenues and financial results by relaxing its underwriting practices despite Defendants' statements to the contrary, which weakened its portfolio quality and left it susceptible to substantial increases in delinquency rates and bad debt;

(b)     Conn's faced increased delinquency and charge-off rates in its credit segment;

(c)     At all relevant times, Conn's financial performance was substantially and materially threatened due to the Company's practices in its credit segment;

(d)     Conn's projected growth strategy was unsustainable; and

(e)     As a result of the foregoing, Defendants' statements regarding the Company's financial performance and expected earnings in 2014 and 2015 were false and misleading and lacked a reasonable basis when made.

120.    The accounts of numerous CWs demonstrate that Defendants were well aware of the adverse impact that their deliberate decision to loosen credit requirements had on collections and the Company's performance and thus, had actual knowledge of the falsity of their statements.   CW-1 stated that Wright and Poppe were regularly informed of the Company's collections struggles through daily trend reports delivered to them by the collections department. CW-1 ¶45.  Poppe's regular visits to the credit department and involvement in its policies and procedures, as described by CW-2, also reflect management's awareness of Conn's collection troubles, even as it reassured investors as to its ability to collect and its bright prospects. Defendants also received reports on first payment defaults and delinquencies, which, according to CW-1, were circulated daily to Conn's executive leadership team.  Wright's attendance at quarterly P&L meetings, as described by CW-4 ¶58, likewise demonstrates that he was aware of the deterioration of the Company's portfolio as the increase in first payment defaults was a topic

discussed at these meetings. The CWs also described that warnings that lower lending standards would create risk and adversely impact collections were ignored (CW-1 ¶48) and that the Individual Defendants were "hands-on" in running the credit department and held face-to-face meetings with credit managers (CW-2 ¶52).

### C.    Fourth Quarter Fiscal 2014 Preliminary Results

121.    On February 20, 2014, before the market opened, the Company issued a press release announcing preliminary fourth quarter fiscal 2014 results and updated its fiscal 2015 earnings guidance.  The press release revealed that the Company's "[c]redit segment provision for bad debts as a percentage of the average outstanding portfolio balance is *expected to exceed previously issued full-year fiscal 2014 guidance*" and that the "percentage of the customer portfolio balance 60-plus days delinquent was 8.8% at January 31, 2014, an increase of 30 basis points from October 31, 2013."  [Emphasis added.]

122.    In the press release, the Company also revealed that it was lowering its recently issued fiscal 2015 earnings guidance to $3.40 per diluted share — down from $3.70 per diluted share.   Conn's press release revealed, among other things, that the percentage of the loan portfolio delinquent 60 days or more rose 30 basis points from the end of October 2013 to 8.8% by January 31, 2014, the end of Conn's fiscal year.

123.    The press release also stated, in part:

> Based on preliminary results, the Company expects to generate diluted earnings per share of between $0.76 and $0.81 in the fourth quarter of fiscal 2014, which includes a net benefit of approximately $0.01 per diluted share associated with facility closures.   After excluding this benefit, adjusted diluted earnings per share for the three months ended January 31, 2014, is expected to range between $0.75 and $0.80 – below the level anticipated in the Company's previously issued full-year fiscal 2014 guidance. ***This decline reflects the impact of increased provision for bad debt due to higher-than-expected accounts receivable charge-offs***

*and delinquency rates in December and January, and portfolio growth*.

*The Company updated its full-year fiscal 2015 earnings guidance to reflect the impact of higher-than-anticipated recent delinquency rates and lower expected sales increases, principally in the electronics category*.  For the fiscal year ending January 31, 2015, the Company currently expects to generate diluted earnings per share of $3.40 to $3.70 which compares to previous guidance of $3.80 to $4.00 per diluted share.

Theodore M. Wright, Conn's chairman and chief executive officer stated, "Our revised earnings guidance for fiscal 2014 of an adjusted $2.59 to $2.64 per diluted share is an increase of approximately 60% from the prior year.  Our retail performance was outstanding for the fourth quarter and full year.  We achieved our target of 40% retail gross margin for the quarter and realized significant operating leverage.   Newly opened stores are performing well and contributing to profitability.

Credit segment performance did not keep pace and delinquency and charge-offs rose in December and January.  *Sales driven portfolio growth combined with seasonal portfolio increases placed pressure on our collections operation and execution deteriorated.  Sustained below-normal temperatures and the related higher energy costs in some of our markets also temporarily impacted our consumer's income available for debt service.*

[Emphasis added.]

124.   Investor shock at Conn's results was reflected in the reports of equities analysts, who questioned the Company's blame of external factors for its credit portfolio's growth. Oppenheimer Equity Research analysts downgraded Conn's, commenting that a conversation with CFO Taylor left the research firm with the impression that "Credit issues at CONN in Q4 (Jan. 2014) reflect *more internal and specifically collections issues than external factors*."[18] [Emphasis added.]  A SunTrust Robinson Humphrey analyst stated as follows:  "It appears that

---

[18]      Brian Nagel, *Snap Commentaries, Update: CONN Issues More Its Own?*, Oppenheimer Equity Research (Feb. 20, 2014).

the credit shortfall was due more to poor execution (i.e. not collecting effectively enough) vs. environmentally related.  We understand that the lower income consumer may be under more stress, but are not aware of Texas residents having similar problems."[19]

125.    The market reacted swiftly to the Company's February 20, 2014 pre-announcement.  On abnormally high trading volume of more than 25 million shares traded, the price of Conn's common stock fell $23.91 per share, *or 42.85 %*, from the prior day's close, to close on February 20, 2014 at $31.89, only pennies more than the stock's trading price when preliminary fiscal 2013 results had been announced the prior year.

126.    Defendants' continued false statements and omissions, mixed with the partial disclosure of the true state of Conn's Credit Segment, however, had the desired effect of keeping Conn's stock price artificially inflated as analysts were led to believe Conn's had corrected or was correcting problems.  For example, the same Oppenheimer analyst issuing the report noted in ¶124 stated:  "The company did tweak its underwriting standards later in the 4Q, which seems to be having some positive effect on early stage delinquencies thus far" and "[o]ur gut says that the credit business will be managed better and perhaps the company got caught up in the 4Q consolidated issues (related to the environment, holiday and fast growth)."

### D.    Fourth Quarter Fiscal 2014 Results

127.    On March 27, 2014, Conn's issued a press release announcing fourth quarter fiscal 2014 and fiscal year ended January 31, 2014 financial results.  The press release included comments from Wright, stating, in part:

> ***Credit portfolio performance improved since quarter end with delinquency declining***.  Modifications to underwriting standards implemented in the third quarter are providing benefits to

---

[19]    David G. Magee, *4Q Outlook Lowered Due to Higher Delinquencies in the Credit Business*, SunTrust Robinson Humphrey (Feb. 20, 2014).

delinquency in the current quarter. ***Collections execution is improving as well***.

[Emphasis added.]

128. Concerning Retail and Credit Segment results, the press release stated, in part:

**Credit Segment Results**

Credit revenues increased 41.9%, to $59.1 million. ***The revenue growth was attributable to the increase in the average receivable portfolio balance outstanding.*** The customer portfolio balance equaled $1.07 billion at Jan. 31, rising 44.1%, or $326.7 million ***from a year ago.*** The portfolio interest and fee income yield was 18.2% for the fourth quarter, down 60 basis points from the prior year as a result of increased short-term, no-interest financing. On a sequential basis, interest and fee income yield expanded 40 basis points.

[Emphasis added.]

129. Also on March 27, 2014, the Company filed its annual financial report on Form 10-K for its fiscal year 2014 ended January 31, 2014. The Form 10-K, which contained SOX certifications signed by Wright, stated, in part:

Revenues were $200.4 million for the year ended January 31, 2014, an increase of $50.9 million, or 34.0%, from the prior year. The increase was primarily driven by 30.0% year-over-year growth in the average balance of the customer receivable portfolio and increased origination volumes. The impact of portfolio growth was tempered by a 70 basis point year-over-year decline in interest and portfolio yield as a result of increased short-term, no-interest financing and higher provision for uncollectible interest.

Provision for bad debts was $95.8 million for the year ended January 31, 2014, an increase of $48.9 million from the prior-year period. This additional provision was driven primarily by a $326.7 million, or 44.1%, increase in the outstanding receivable portfolio balance. ***Additionally, the provision for bad debts rose due to higher than anticipated charge-offs during fiscal 2014 and a year-over-year deterioration in portfolio delinquency rates.*** The percentage of the customer portfolio balance greater than 60 days past due was 8.8% as of January 31, 2014, which compares to 7.1% a year ago.

\*       \*       \*

The provision for bad debts is primarily related to the operations of our credit segment, with approximately $0.5 million and $0.8 million for the periods ended January 31, 2014 and 2013, respectively, included in the results of operations for the retail segment.

The provision for bad debts of the credit segment increased by $48.9 million from the prior year.  This additional provision was driven by a $326.7 million, or 44.1% growth in the outstanding receivable portfolio balance.  ***Additionally, the provision for bad debts rose due to higher than anticipated charge-offs during fiscal year 2014 and deterioration in the delinquency rate for accounts greater than 60 days past due from 7.1% as of January 31, 2013 to 8.8% as of January 31, 2014.***

\*       \*       \*

**Credit Segment**
Revenues were $149.5 million for the year ended January 31, 2013, an increase of $12.2 million, or 8.9%, from the prior year. The increase reflects the impact of year-over-year growth of 6.8% in the average balance of the customer receivable portfolio and increased insurance commissions driven by higher retail sales and increased penetration on the sale of insurance.

\*       \*       \*

Provision for bad debts was $46.9 million for the year ended January 31, 2013, a decrease of $6.1 million from the prior year. The year-over-year decrease is attributable to the $13.1 million impact in the prior year of required adoption of accounting guidance related to Troubled Debt Restructuring and our implementation of stricter re-aging and charge-off policies in the second and third quarters of fiscal year 2012.

\*       \*       \*

**Customer Receivable Portfolio**
Our overall allowance for uncollectible accounts as a percentage of the total portfolio balance increased to 6.7% as of January 31, 2014 from 5.9% as of January 31, 2013.  The year-over-year increase was primarily driven by a 220 basis point increase in 60+ day delinquency for non-restructured customer accounts receivables. The impact of this increase was partially offset by a 100 basis point decline in the relative proportion of the total restructured account

balance to the total customer receivable portfolio balance from January 31, 2013.

For non-restructured accounts, the allowance for uncollectible accounts as a percentage of the outstanding balance rose from 3.9% as of January 31, 2013 to 5.1% as of January 31, 2014, due primarily to execution issues we encountered in our collection operations during December and January of fiscal 2014 and inclement weather conditions experienced during that same period.

***This resulted in an elevation in delinquency rates and higher than anticipated charge-offs during the period***.  The estimated effect of this matter and delinquency changes were reflected in our projection model, driving an increase in the losses we expected to realize over the next 12-month period.  We adjusted our allowance for uncollectible accounts based on this analysis.

For restructured accounts, the allowance for uncollectible accounts as a percentage of the portfolio balance was 41.8% as of January 31, 2013 as compared to 38.3% as of January 31, 2014.  This 350 basis point reduction reflects the impact of improved delinquency and continued improvement in the performance of restructured accounts under stricter restructuring policies.

The percent of bad debt charge-offs (net of recoveries) to average outstanding balance was 8.0% for the year ended January 31, 2014 and 2013.  Bad debt charge-offs in the second half of fiscal 2014 were influenced by unexpected execution issues experienced in the second quarter in connection with the implementation of a new collections system and deterioration in collection performance in the fourth quarter.

[Emphasis added.]

130.    During the trading day on March 27, 2014, Conn's hosted a conference call to discuss its fourth quarter fiscal 2014 and end of fiscal year 2014 financial performance. Defendants used the call to falsely assure the market that the "unexpected delinquency increase" Conn's announced in February 2014 was not a result of a deterioration in the underlying credit quality of Conn's portfolio or a change in underwriting standards.  Rather than problems implementing new software, this time Defendants falsely blamed the increase on internal collections issues, and specifically, on Conn's need to hire a large number of employees — more

than 200 — beginning in late August 2013, to deal with the Company's strong sales growth. According to Defendants, those employees did not have adequate time to get "up to speed" to be effective at collecting delinquent accounts. For example, in the prepared comments portion of the call, Wright stated, in part:

> Turning to our credit segment. ***The Company made good progress in the third quarter of fiscal 2014 addressing the issues we experienced in the second quarter with our credit collection system.*** We were on track to meet our timetable of four to five months from the second-quarter conference call to fully address the effects of these issues on our portfolio. As announced in our prior conference call on November 30, greater than 60 days delinquency was down 20 basis points from the end of August. This is a better trend than normal for November.

> In December, 60-plus delinquency was flat, followed by an increase of 30 basis points in January. Normal seasonality in December and January for the growth in the portfolio from higher fourth-quarter sales to offset the lower payment rate in this period. We didn't see the normal trend this year.

> In the fourth quarter, the portfolio grew at a 52% annualized rate. Collection headcount grew from 450 agents at August 31 to 650 agents at January 31. ***During this period, late-stage delinquency was also increasing. We weren't able to get newer collectors up to speed fast enough to be effective collecting late-stage delinquency.***

> The variation of performance between an effective tenured collector at Conn's and a new or ineffective collector is substantial. A good collector is 100% or 200% more productive, not 10% or 20%. ***A shortage of fully trained, tenured collectors in our most challenging collection season led to increasing delinquency and charge-offs.*** Add to this weather impacted the portfolio by reducing payment activity. More than 50% of our payments are received from customers in store.

> Portfolio growth and portfolio growth rates for the first quarter will be much lower than in Q4. Our hiring pace has decreased. ***With delinquent balances declining, we are able to give our agents time to build the experience to become fully effective.*** Portfolio growth will also be impacted by lower same-store sales growth, store closings, and elimination of the lawn and garden category

which is about 4% of sales in the first half of the year and 1.8% for the full year.

Turning to underwriting on slide 6 is our average FICO score in the portfolio for the last five years. The portfolio has been in a narrow range of credit quality, with average income increasing each of the last four years. ***The unexpected delinquency increase in the fourth quarter was not a result of deterioration and underlying credit quality or a meaningful change in underwriting standards.***

A few supporting data points. Fiscal 2012 originations Q4 delinquency increased 2.2% in the quarter, fiscal 2013 originations increased 1.6%, and fiscal 2014 originations increased 1.7%. The deterioration was consistent for all years of origination. Using 600 to 649 FICO scores as an example, this score band saw increased delinquency year-over-year of 60 basis points. All FICO score bands delinquency increased. Said differently, ***the deterioration and delinquency was evenly distributed in the portfolio and not caused disproportionately by higher-risk accounts.*** The increase in delinquency was also consistent between new and repeat customers.

In Q3 and in early Q4, we made some ***minor*** changes to our underwriting to reduce risk – for declining some accounts we would've previously approved, reducing credit limits for some accounts, and demanding more and larger down-payments for some accounts. In Q1 of this fiscal year, we made additional changes, although not a significant as the changes we made in Q3 and early Q4 of last year. The aggregate impact of these changes is estimated as a reduction in sales rate from Q3 of 2014 of 5% to 7%, most of which was fully reflected in Q4 sales rates.

We are already seeing the benefit of these changes as first-payment default rates have declined, and the entry rate into early-stage delinquency is low by our historical standards as shown on slide 7. These changes to underwriting reduce pressure on our collections operations. We don't believe additional changes to underwriting are necessary now, and none are planned.

Currently about 40% of our portfolio balances were originated after November 1, reflecting most of the enhancements to our underwriting. Because of the rapid turnover in the portfolio, the effect of our changes to underwriting should be fully realized within the next few quarters. To address many questions we receive from investors about portfolio performance, please refer to slide 8.

*      *      *

New-market delinquency is 8.3%, compared to 8.8% in mature markets at February 28.   In Arizona and New Mexico, ***our underwriting has been slightly less restrictive until recently*** because we can charge a higher rate in interest.  Of our portfolio, 85% originated in Texas.   Our underwriting and collections operations are centralized, not managed locally or by state like many other consumer credit companies.  Our collections practices are largely consistent across states.   We wouldn't expect significant variation by geography, and we don't see variation by geography.  None of our markets are experiencing local trends in employment that might cause a divergent trend in delinquency.

In the fourth quarter, we demonstrated the strength and resilience of our business model.   Despite a weak performance in our collections operations, we delivered solid profitability and earnings growth.   Our commitment to the business remains intact.   Our returns on investment and equity justify continued investment in the business.   New store openings are performing better than expected.  We believe the best use of the Company's capital is to execute our growth strategy.

[Emphasis added.]

131.    Later in the call, Poppe provided prepared remarks on the Company's Credit Segment emphasizing that the delinquency situation was under control and delinquency trends were improving:

Thank you, Theo.   As Theo commented, ***credit segment performance was impacted by a number of factors this quarter, particularly the rapid portfolio growth and related lack of seasoned collection agents.  As a result, delinquency and charge-offs trends deteriorated***.  The recent delinquency charge-offs and re-aged trends are shown on slides 9 and 10. As of January 31, 60-plus-day delinquency was up 30 basis points from October month-end.   This compares to a 10-basis-point increase for the same period in the prior year.  60-plus delinquency was down 10 basis points in February, consistent with the prior-year trend.

*      *      *

Turning to underwriting trends for the quarter as shown on slide 12, roughly 94% of our sales in the quarter were paid for using one of the three monthly payment options offered.  The increase in the

percent of sales under our finance program was driven largely by the changes in our advertising programs as well as merchandise mix changes which drove higher ASP's and reduced the volume of cash tickets.  The approval rate under our in-house credit program increased by 1.5% from the prior quarter level, and the average credit score underwritten during the quarter was higher at 605 compared to 599 in the third quarter.  The average credit score origination for the month of February was 602.

As we look at expected profitability of the credit segment going forward, the portfolio yield should increase modestly over time as we benefit from increased origination volume in our new markets that have higher interest rates than our legacy markets.  SG&A expense as a percent of the portfolio balance should decline as collector effectiveness improves and we leverage fixed cost as the portfolio grows.  ***And the provision for bad debt should decline based on the reduction in delinquent balances during February and March, though it will fluctuate quarter to quarter based on the level of the portfolio growth during the period.***[20]

***We expect the improving delinquency trends seen in February and so far in March to continue over the coming quarters as we are more appropriately staffed for the portfolio growth and with the increased focus on training and monitoring of daily execution.***[21]

[Emphasis added.]

132.    During the Q&A portion of the conference call, Laura Champine, an analyst at Canaccord Genuity, asked Conn's management:  "Did you grow last fiscal year?  Particularly in Q4, did you grow the collection staff in line with your internal expectations for growth in the credit portfolio?  And if not, why not?"  In response, Wright stated:

We grew the collection staff in line with our expectations.  I think what we didn't do was grow the credit staff in advance of those expected increases in portfolio balances.  We didn't grow them far enough in advance.  ***It wasn't we didn't have enough people, it's***

---

[20]    Although Defendants may claim the last sentence is a forward-looking statement, Lead Plaintiffs allege it was made with actual knowledge of its falsity.

[21]    Although Defendants may claim the last sentence is a forward-looking statement, Lead Plaintiffs allege it was made with actual knowledge of its falsity.

> ***just those people didn't have sufficient tenure and experience to be fully effective.***

[Emphasis added.]

133.    Ms. Champine followed up by asking Wright:  "Theo, that sort of seems like basic credit portfolio management.  And in Q2, to take 2.5 months to find the problem – I'm just wondering if you are considering any different structure, any different personnel in your actual collections management team."  Wright responded:

> We've made some significant changes to our collections management team, and we've expanded the management structure there as well.  So we are making changes*.  **But I would say again that the most important thing we have is a clearer understanding of the pace of increases in the portfolio balance, and we're getting the staff hired in advance of the need so that they have enough time to gain the maturity and experience they need.***

[Emphasis added.]

134.    In a subsequent question, analyst Brian Nagel from Oppenheimer & Co. asked:

> I was wondering if we could step back here.  Obviously, a lot of questions on finance.  But just to be clear, as you go back on the fourth-quarter performance with some deterioration in delinquencies, are you basically saying that in your view and looking at all the data this was purely a collections issue?  Meaning that your collections infrastructure was simply not adequate to keep up with the rapid growth of sales?  Or is there some other factor?  And how should we think about the breakout in those buckets?

135.    Wright responded:

> ***The issues in the fourth quarter were predominantly collections execution.***  There was an additional factor, which was weather, and we saw that in our retail business as well as in our credit business.  There was definitely an impact on activity with our customers in January and the early part of February.

[Emphasis added.]

136.    Later in the call, analyst Brad Thomas from KeyBanc Capital Markets asked:

> Want to just to follow up on credit and how it's affecting the comp. Your underwriting from 3Q to 4Q did tighten a little bit; your FICO score in 4Q was still lower year-over-year.  Theo, can you maybe give us a little bit of a sense for, year-over-year, how much of a benefit in comps came from that underwriting being a little bit looser versus the marketing that you have in place, which is clearly a big driver of comps in the last couple of quarters?

137.    Wright responded:

> Yes, I really can't answer that question because, ***based on the way we approach the underwriting, I wouldn't say the underwriting was looser***.    I'm saying differently that tightening the underwriting, which we did, did reduce the sales rate by, as we've said, roughly 5% to 7%.  So if you reverse that logic, it would say if you were looser that's what it would – that's the kind of sales increase it would generate.  And our sales increases on a same-store basis were much larger than that.
>
> ***So whatever influence underwriting may have had during the year, it was dwarfed by the influence of our changes in marketing program.***

[Emphasis added.]

138.    Defendants' statements regarding the successful execution of the Company's business plan had the desired effect.  The price of Conn's common stock rose, on abnormally high trading volume, from a closing price of $34.52 per share on March 26, 2014, to a closing price of $39.02 per share on March 27, 2014, an increase of more than 13%.  Moreover, Conn's stock price peaked at $39.90 per share during intra-day trading on March 27, 2014.

139.    Following the earnings release and conference call with management, on March 28, 2014, analyst David G. Magee, CFA of SunTrust Robinson Humphrey, issued an Analyst Report on Conn's entitled "4Q: Credit Execution Improving."  In that report, the Company's statements regarding its Credit Segment were discussed:

> In the 4Q, CONN's bad debt expense increased, as delinquency rates rose from 8.5% in the 3Q to 8.8% in the 4Q.  The higher bad

debt provision was mostly due to poor execution as CONN's collection personnel expanded rapidly in the quarter (by an additional 200 agents), and comps grew well above plan.  The spike in sales made it difficult to train the new agents sufficiently. As these agents have become more efficient (i.e. better execution), the collections efforts have improved (better weather trends have also helped as 50%+ of payments are made in the store).  In February, the 60+ days delinquency rate fell 10 bps YoY. And in March, the 60 days and 60+ days have declined seasonally.  In fact, management noted that the delinquency rate for 1-90 days is now lower than it was a year ago.

However, we would note that the higher delinquencies in the 4Q didn't seem tied to any particular category, geography or age of stores . . . and, in our opinion, weren't tied to changes in underwriting standards either.  Further, as comps moderate in 2014 (mid to low double digits), the risk of this happening again is less, in our opinion.  Along with tightening its credit standards over the past couple of quarters (including minor revisions in early 1Q), CONN has restructured the management team of this side of the business over the past few months, and feels confident in its ability to at least maintain the current level of collection efforts (which is reflected in the low end of its bad debt provision guidance 8%-10% for this year).

In our opinion, CONN appears to be "back on track" with its credit operations and has rectified its collection efforts.  The stock was up 13% yesterday due to the positive comments management made around this business, and we believe that investor sentiment regarding this business will improve over the next quarter.[22]

[Emphasis added.]

140.    Similarly, an analyst report published by Peter J. Keith of Piper Jaffray on the same day noted, in part:  "We a have greater comfort with the credit trends based on several helpful data points on the conference call."[23]

---

[22]    David G. Magee, *Conn's Inc. (CONN): 4Q: Credit Execution Improving*, SunTrust Robinson Humphrey (Mar. 28, 2014).

[23]    Peter J. Keith, *Conn's Inc. (CONN): Clouds Beginning to Clear; More Room for Shares to Run; Overweight*, Piper Jaffray (Mar. 28, 2014).

141.    Defendants' statements set forth in ¶¶127-137 above were false and misleading when made because, as described by the accounts of the CWs in ¶¶43-62 above.  Specifically, the accounts of the CWs demonstrate that: (i) Conn's had lowered credit score requirements for borrowers in late 2012 and early 2013 in order to increase sales, which resulted in an immediate increase in delinquencies (CW-1 ¶45, CW-3 ¶54, CW-5 ¶62); (ii) the rise in delinquencies caused Conn's to retain a third party credit company to help deal with the volume of the rising delinquencies (CW-1 ¶46); (iii) the lending practices were lowered to such a degree that customers with no reported credit scores were receiving credit lines of $7,000 to $10,000 (CW-2 ¶49); (iv) first payment defaults were increasing (CW-2 ¶51); (v) underwriting algorithms were relaxed during the 2012 Christmas sales season to allow for the extension of credit to a far broader set of customers, including those that had been previously denied and those with a history of repossession and had faced foreclosures (CW-3 ¶53); (vi) when new stores opened, customers for those stores went into a separate queue within Conn's underwriting and collections system where the credit applications were not questioned, and all customers were approved for credit (CW-3 ¶55); and (vii) every customer was approved for credit during the initial four to five months after a new Conn's store opened (CW-4 ¶¶56-57).

142.    Later developments also establish that Defendants' statements, as set forth in ¶¶127-137 above, were false and misleading when made.  Specifically, it was later admitted that: (i) Conn's credit operations forecasting had "not been acceptably accurate" (¶¶17, 197); (ii) originations at new stores needed to be restricted and the levels of revenues there was unsustainable (¶203); and (iii) bad debts and delinquencies were so great that they were materially threatening the Company (¶195).

143.   In sum, the following true facts were known by Defendants, but concealed from the investing public:

(a)   Conn's was growing its sales revenues and financial results by relaxing its underwriting practices despite Defendants' statements to the contrary, which weakened Conn's portfolio quality and left it susceptible to substantial increases in its delinquency rates and bad debt;

(b)   Conn's faced increased delinquency and charge-off rates in its credit segment;

(c)   Conn's financial performance was substantially and materially threatened due to the Company's practices in its credit segment;

(d)   The rising delinquencies and charge-offs the Company was experiencing were directly related to the Company's deliberate loosening of its underwriting standards;

(e)   Allowing employees time to "get up to speed" was not one of the main causes of the deteriorating performance of the Company's credit portfolio;

(f)   Seasonal weather was not a primary cause for the deteriorating performance of the Company's credit portfolio;

(g)   Conn's projected growth strategy was unsustainable; and

(h)   As a result of the foregoing, Defendants' statements regarding the Company's financial performance were false and misleading and lacked a reasonable basis when made.

144.   The accounts of numerous CWs demonstrate that Defendants were well aware of the adverse impact that their deliberate decision to loosen credit requirements had on collections and the Company's performance and thus, had actual knowledge of the falsity of their

statements.  CW-1 stated that Wright and Poppe were regularly informed of the Company's collections struggles through daily trend reports delivered to them by the collections department. CW-1 ¶45.  Poppe's regular visits to the credit department and involvement in its policies and procedures, as described by CW-2, also reflect management's awareness of Conn's collection troubles, even as it reassured investors as to its ability to collect and its bright prospects. Defendants also received reports on first payment defaults and delinquencies, which, according to CW-1, were circulated daily to Conn's executive leadership team.  Wright's attendance at quarterly P&L meetings, as described by CW-4 ¶58, likewise demonstrates that he was aware of the deterioration of the Company's portfolio as the increase in first payment defaults was a topic discussed at these meetings. The CWs also described that warnings that lower lending standards would create risk and adversely impact collections were ignored (CW-1 ¶48) and that the Individual Defendants were "hands-on" in running the credit department and held face-to-face meetings with credit managers (CW-2 ¶52).

### E.   First Quarter Fiscal 2015 Results

145.   On June 2, 2014, the Company issued a press release announcing first quarter fiscal 2015 financial results for the quarter ended April 30, 2014.  The press release included comments from Wright, stating, in part:  "***Execution in our collections operation improved during the quarter and delinquency declined as anticipated.   We expect to see further execution improvement in the coming quarters.***"[24]

---

[24]   Although Defendants may claim the last sentence is a forward-looking statement, Lead Plaintiffs allege it was made with actual knowledge of its falsity.

146.    Regarding the Credit Segment results, the press release stated that Credit revenues increased 38.9%, to $57.4 million.

147.    Also on June 2, 2014, the Company filed its corresponding financial report on Form 10-Q for its first quarter fiscal 2015 results.  The Form 10-Q, which contained SOX certifications signed by Wright, stated, in part:

> **Customer Receivable Portfolio**
> Our overall allowance for uncollectible accounts as a percentage of the total portfolio balance increased to 6.6% as of April 30, 2014 from 6.0% as of April 30, 2013.  The year-over-year increase was primarily driven by a 190 basis point increase in 60+ day delinquency for nonrestructured customer accounts receivables. The impact of this increase was partially offset by a 50 basis point decline in the relative proportion of the total restructured account balance to the total customer receivable portfolio balance from April 30, 2013.
>
> For non-restructured accounts, the allowance for uncollectible accounts as a percentage of the outstanding balance rose from 4.1% as of April 30, 2013 to 5.3% as of April 30, 2014*, due primarily to execution issues we encountered in our collection operations during December and January of fiscal 2014 and inclement weather conditions experienced during that same period.*  This resulted in an elevation in delinquency rates and higher than anticipated charge-offs during the period.  Delinquency rates declined from January 31, 2014 to April 30, 2014 but we expect that the impact of the fourth quarter issues will result in elevated charge-offs over the next three to six months.  The estimated effect of this matter and delinquency changes were reflected in our projection models as of January 31, 2014 and April 30, 2014, driving an increase in the losses we expected to realize over the next 12-month period.  We adjusted our allowance for uncollectible accounts based on these analyses.
>
> For restructured accounts, the allowance for uncollectible accounts as a percentage of the portfolio balance was 41.0% as of April 30, 2013 as compared to 33.8% as of April 30, 2014.  This 720 basis point reduction reflects the impact of improved delinquency and continued improvement in the performance of restructured accounts under stricter restructuring policies.
>
> The percent of bad debt charge-offs (net of recoveries) to average outstanding balance increased from 6.1% for the three months

> ended April 30, 2013 to 7.8% for the three months ended April 30, 2014.  ***The increase was primarily due to execution issues in our collections operations and inclement weather experienced during the fourth quarter of fiscal 2014.***

[Emphasis added.]

148.   During the trading day on June 2, 2014, Conn's hosted a conference call to discuss its first quarter fiscal 2015 financial performance.  In the prepared comments portion of the call, Wright stated, in part:

> Delinquency rates by product category are on slide 13.  Normalized for credit quality, there is no material difference in delinquency.  The shift to higher sales in furniture and mattress categories is not putting pressure on delinquencies.

> In Q3 and Q4 fiscal 2014 and in Q1 of fiscal 2015 we made changes to our underwriting to reduce risk.  We are declining some accounts we would have previously approved, reducing credit limits for some accounts, and demanding more and larger down payments for some accounts.  These changes were reflected in the FICO score underwritten in Q1 of fiscal 2015 of 605 compared to 599 in Q3 of fiscal 2014.

> The aggregate impact of these changes is estimated to be a reduction of sales rate of 5% to 7% compared to the same period a year ago.  First payment default rates have declined and the entry rate into delinquency is low by our historical standards.

> Delinquency is 20 basis points better than the same time a year ago from 30 to 120 days past due, in part because of the changes in underwriting.  By the end of August, the benefit of lower first payment default rates will impact all of our delinquencies.  No additional changes for underwriting are planned at this time, although we are consistently evaluating our standards.

> ***Volatility and recorded provisions for bad debt and charge-off of bad debts can create impressions about our underwriting that are inconsistent with the underlying economics of our credit offering and how we are managing the business.  Static losses are much more stable and more representative of the underlying economics of our credit segment.***  We are establishing a goal of maintaining static losses at or below 7% to assist investors in understanding how the Company is underwriting accounts.  If our approach to

underwriting changes, we intend to communicate this by revising our goal.

*In the fourth quarter of fiscal 2014, we demonstrated the resiliency of our business model.  Despite a poor performance in our collections operations due mostly to planning errors, we delivered solid profitability and earnings growth.  In the first quarter of fiscal 2015 we returned a form with improving credit performance and overall performance exceeding expectations for the quarter.*

[Emphasis added.]

149.    Later in the call, Poppe provided prepared remarks on the Company's Credit

Segment, during which he stated, in part:

*We expect the final static pool lost rates for the recent fiscal years to be in line with historical experience, though there may be modest upward pressure to around 7% as a result of the execution issues experienced in fiscal 2014 and due to the increased volume of new credit customers originated during those periods.*[25]

\*        \*        \*

We have remained focused on achieving and maintaining appropriate collector staffing levels and improving training, additionally we brought in additional management talent to continue to develop the collection organization and prepare for the coming growth.  *We expect the delinquency trends to continue to improve over the coming quarter, benefiting from recent underwriting changes, improved staffing levels with improved visibility to the expected portfolio growth, and increased focus on training and monitoring of daily execution.*[26]

[Emphasis added.]

---

[25]    Although Defendants may claim the last sentence is a forward-looking statement, Lead Plaintiffs allege it was made with actual knowledge of its falsity.

[26]    Although Defendants may claim the last sentence is a forward-looking statement, Lead Plaintiffs allege it was made with actual knowledge of its falsity.

150.     Defendants' statements regarding the purported successful execution of the Company's business plan had the desired effect.  The price of Conn's common stock rose, on abnormally high trading volume, from the prior day's closing price of $46.64 per share on May 30, 2014 to a closing trading price of $49.87 per share on June 2, 2014.  Moreover, Conn's stock price opened and peaked at $51.50 during intra-day trading on June 2, 2014.

151.     Defendants' statements set forth in ¶¶145-149 above were false and misleading when made because, as described by the accounts of the CWs in ¶¶43-62 above.  Specifically, the accounts of the CWs demonstrate that: (i) Conn's had lowered credit score requirements for borrowers in late 2012 and early 2013 in order to increase sales, which resulted in an immediate increase in delinquencies (CW-1 ¶45, CW-3 ¶54, CW-5 ¶62); (ii) the rise in delinquencies caused Conn's to retain a third party credit company to help deal with the volume of the rising delinquencies (CW-1 ¶46); (iii) the lending practices were lowered to such a degree that customers with no reported credit scores were receiving credit lines of $7,000 to $10,000 (CW-2 ¶49); (iv) first payment defaults had increased (CW-2 ¶51); (v) underwriting algorithms were relaxed during the 2012 Christmas sales season to allow for the extension of credit to a far broader set of customers, including those that had been previously denied and those with a history of repossession and had faced foreclosures (CW-3 ¶53); (vi) when new stores opened, customers for those stores went into a separate queue within Conn's underwriting and collections system where the credit applications were not questioned, and all customers were approved for credit (CW-3 ¶55); and (vii) every customer was approved for credit during the initial four to five months after a new Conn's store opened (CW-4 ¶¶56-57).

152.     Later developments also establish that Defendants' statements, as set forth in ¶¶145-149 above, were false and misleading when made.  Specifically, it was later admitted that:

(i) Conn's credit operations forecasting had "not been acceptably accurate" (¶¶ 17, 197); (ii) originations at new stores needed to be restricted and the levels of revenues there was unsustainable (¶203); and (iii) bad debts and delinquencies were so great that they were materially threatening the Company (¶195).

153.    In sum, the following true facts were known by Defendants, but concealed from the investing public:

(a)    Conn's was growing its sales revenues and financial results by relaxing its underwriting practices despite Defendants' statements to the contrary, which weakened Conn's portfolio quality and left it susceptible to substantial increases in its delinquency rates and bad debt;

(b)    Conn's faced increased delinquency and charge-off rates in its credit segment;

(c)    Conn's financial performance was substantially and materially threatened due to the Company's practices in its credit segment;

(d)    The rising delinquencies and charge-offs the Company was experiencing were directly related to the Company's deliberate loosening of its underwriting standards;

(e)    Seasonal macroeconomics were not the main cause of the deteriorating performance of the Company's credit portfolio;

(f)    Allowing employees time to "get up to speed" was not one of the main causes of the deteriorating performance of the Company's credit portfolio;

(g)    Conn's projected growth strategy was unsustainable; and

(h)     As a result of the foregoing, Defendants' statements regarding the Company's financial performance were false and misleading and lacked a reasonable basis when made.

154.    The accounts of numerous CWs demonstrate that Defendants were well aware of the adverse impact that their deliberate decision to loosen credit requirements had on collections and the Company's performance and thus, had actual knowledge of the falsity of their statements.   CW-1 stated that Wright and Poppe were regularly informed of the Company's collections struggles through daily trend reports delivered to them by the collections department. CW-1 ¶45.   Poppe's regular visits to the credit department and involvement in its policies and procedures, as described by CW-2, also reflect management's awareness of Conn's collection troubles, even as it reassured investors as to its ability to collect and its bright prospects. Defendants also received reports on first payment defaults and delinquencies, which, according to CW-1, were circulated daily to Conn's executive leadership team.   Wright's attendance at quarterly P&L meetings, as described by CW-4 ¶58, likewise demonstrates that he was aware of the deterioration of the Company's portfolio, as the increase in first payment defaults was a topic discussed at these meetings. The CWs also described that warnings that lower lending standards would create risk and adversely impact collections were ignored (CW-1 ¶48) and that the Individual Defendants were "hands-on" in running the credit department and held face-to-face meetings with credit managers (CW-2 ¶52).

### F.      June 4, 2014 Stephens Spring Investment Conference

155.    On June 4, 2014, Poppe participated in a Company presentation at the analyst-hosted Stephens Spring Investment Conference.    In discussing first quarter fiscal 2015 performance, Poppe stated, in part:

> Retail margin expanded to over 40%.  And after some execution issues in the prior fiscal year, we saw improved credit execution, with delinquency dropping from 8.8% in January 31 to 8% in April and 7.8% in May.  And the provision for bad debt is 8.2% in the quarter at the low end of the range of guidance.  But with growing sales and seasonality and delinquency, we would expect that there's some volatility, and we still are comfortable with 8% to 10% range.
>
> Additional comments on delinquency, the changes we made in underwriting and improving execution over the fourth quarter and first quarter – our 1- to 120-day delinquency is lower than it was the same time last year.  So **_we are seeing the improvement in execution and underwriting show up in early-stage delinquency, and we expect those benefits to continue to flow through to the later stages of delinquency._**  And we've also seen first-payment default or those customers that have never made in a payment on their account – the absolute balance of those accounts has dropped dramatically since the back half of last year.  So **_the underwriting changes have proven to be very effective also._**
>
> *      *      *
>
> And then lastly, the other driver of growth is just our credit advantage and ties in with the marketing and store locations, making sure we properly promote and educate consumers about the benefits of our financing program as a low-cost alternative and affordable monthly payment to buy the durable branded goods they need for their home.
>
> *      *      *
>
> And then lastly, as it relates to credit, we've never really had any long-term goals stated for the credit business.  And as we thought through what can we give that is something that should be fairly consistent and predictable, the static loss rate as we've been talking over the last three quarters about where our static loss rate is, where it's headed, what it's been, we set a goal to be at or below 7%.  Long-term – over the – over our history, it has generally

averaged around 6% level. ***Over the last couple of years, combination of the execution issues during last fiscal year and then the increase in the mix of new customers in the portfolio, new credit customers do not perform as well as the existing customer base.*** As we move from 30% new customers to 50% new customers in the credit portfolio, it has the effect of putting upward pressure on the delinquency charge-off and static loss rates to the extent we think of about a 30-basis-point upward movement. ***And with the underwriting changes we made in the fourth quarter and the improvements we've seen, we believe fiscal 2015 going forward, maintaining a static loss rate at or below 7% is very achievable.***[27]

[Emphasis added.]

156.   Defendants' statements set forth in ¶155 above were false and misleading when made because, as described by the accounts of the CWs in ¶¶43-62 above. Specifically, the accounts of the CWs demonstrate that: (i) Conn's had lowered credit score requirements for borrowers in late 2012 and early 2013 in order to increase sales, which resulted in an immediate increase in delinquencies (CW-1 ¶45, CW-3 ¶54 CW-5 ¶62); (ii) the rise in delinquencies caused Conn's to retain a third party credit company to help deal with the volume of the rising delinquencies (CW-1 ¶46); (iii) the lending practices were lowered to such a degree that customers with no reported credit scores were receiving credit lines of $7,000 to $10,000 (CW-2 ¶49); (iv) first payment defaults were increasing (CW-2 ¶51); (v) underwriting algorithms were relaxed during the 2012 Christmas sales season to allow for the extension of credit to a far broader set of customers, including those that had been previously denied and those with a history of repossession and had faced foreclosures (CW-3 ¶53); (vi) when new stores opened, customers for those stores went into a separate queue within Conn's underwriting and collections system where the credit applications were not questioned, and all customers were approved for

---

[27]   Although Defendants may claim the last sentence is a forward-looking statement, Lead Plaintiffs allege it was made with actual knowledge of its falsity.

credit (CW-3 ¶55); and (vii) every customer was approved for credit during the initial four to five months after a new Conn's store opened (CW-4 ¶¶56-57).

157.    Later developments also establish that Defendants' statements, as set forth in ¶155 above, were false and misleading when made.  Specifically, it was later admitted that: (i) Conn's credit operations forecasting had "not been acceptably accurate" (¶¶17, 197); (ii) originations at new stores needed to be restricted and the levels of revenues there was unsustainable (¶203); and (iii) bad debts and delinquencies were so great that they were materially threatening the Company (¶195).

158.    In sum, the following true facts were known by Defendants, but concealed from the investing public:

(a)     Conn's was growing its sales revenues and financial results by relaxing its underwriting practices despite Defendants' statements to the contrary, which weakened its portfolio quality and left it susceptible to substantial increases in its delinquency rates and bad debt;

(b)     Conn's faced increased delinquency and charge-off rates in its credit segment;

(c)     At all relevant times, Conn's financial performance was substantially and materially threatened due to the Company's practices in its credit segment;

(d)     The rising delinquencies and charge-offs the Company was experiencing were directly related to the Company's deliberate loosening of its underwriting standards;

(e)     Seasonal macroeconomics were not the main cause of the deteriorating performance of the Company's credit portfolio;

(f)     Allowing employees time to "get up to speed" was not one of the main causes of the deteriorating performance of the Company's credit portfolio;

(g)     Conn's projected growth strategy was unsustainable; and

(h)     As a result of the foregoing, Defendants' statements regarding the Company's financial performance were false and misleading and lacked a reasonable basis when made.

159.    The accounts of numerous CWs demonstrate that Defendants were well aware of the adverse impact that their deliberate decision to loosen credit requirements had on collections and the Company's performance and thus, had actual knowledge of the falsity of their statements.  CW-1 stated that Wright and Poppe were regularly informed of the Company's collections struggles through daily trend reports delivered to them by the collections department. CW-1 ¶45.  Poppe's regular visits to the credit department and involvement in its policies and procedures, as described by CW-2, also reflect management's awareness of Conn's collection troubles, even as it reassured investors as to its ability to collect and its bright prospects. Defendants also received reports on first payment defaults and delinquencies, which, according to CW-1, were circulated daily to Conn's executive leadership team.  Wright's attendance at quarterly P&L meetings, as described by CW-4 ¶58, likewise demonstrates that he was aware of the deterioration of the Company's portfolio as the increase in first payment defaults was a topic discussed at these meetings. The CWs also described that warnings that lower lending standards would create risk and adversely impact collections were ignored (CW-1 ¶48) and that the Individual Defendants were "hands-on" in running the credit department and held face-to-face meetings with credit managers (CW-2 ¶52).

**G.     June 11, 2014 Piper Jaffray Consumer Conference**

160.    On June 11, 2014, Conn's made a presentation at the Piper Jaffray Consumer

conference.  Host Peter Keith of Piper Jaffray began the conference by stating, in part:

> So I was going to go into a couple of questions. First, just to take
> maybe some of the basic questions off the table and talk a little bit
> about credit, what's happened, what's going to happen going
> forward. And then I want to get into retail growth strategy, and
> then we'll open it up to the audience here.
>
> So first off, everyone is pretty well aware you guys have talked at
> length about what happened last year with two different events that
> seemed isolated and caused some negative surprises with the credit
> book. I guess curious on the steps that you've taken in the recent
> months to sort of create better stability and minimize some of those
> negative credit surprises going forward.

161.    Poppe, for Conn's, responded:

> You bet.  A few of the things that impacted us – certainly the
> system changes that occurred in the summer aren't going to
> reoccur, so we're not going to experience those kind of challenges
> again.
>
> Relative to the accelerated growth that occurred in the fourth
> quarter – as long as we have good visibility to the pace of growth,
> we can plan ahead and staff up and hire and train the agents.  It
> does take a few months to get them hired, trained, and with enough
> experience to really handle late-stage collections.  And so making
> sure that the staffing, planning – we have a good look for it on the
> planning and staffing model for the agents.  And we wouldn't
> expect to have that kind of upward surprise in sales.  It impacted us
> in distribution and in credit.  The sales pace accelerated beyond
> what our planning horizon was.
>
> But the other thing we've done to address besides continuing to
> make sure we hire ahead of the growth plan in credit is we have
> had in retail and in the credit side of the business – we continue to
> add more senior-level management to give us the ability to
> continue to scale up the organization and prepare for the coming
> growth so that we have more seasoned veterans in the organization
> that as the retail, distribution, and credit organization grow, we
> have got the senior leadership in the organization that has
> experience in these lines of business and with growth of the

business to plan and prepare the team to manage through the coming opportunity.

162.    As a follow up question, Mr. Keith, the Piper Jaffray host, asked:

Okay.  One thing you did mention would be underwriting.  So there are some suspicions that part of that strong sales growth last year was driven by loosening underwriting standards.  So could you, A, talk about if there's any truth to that; and then, B, talk about the adjustments you've made in the last two quarters and going forward on your underwriting, particularly for new accounts?

163.    Poppe responded:

You bet.  So if you look over the long-term of the credit score in the portfolio and in underwriting, there has not been a lot of movement.  ***So there isn't evidence that there was this significant loosening of underwriting standards last year.***  We did have a little more open underwriting standards in the newer markets in Arizona, New Mexico because we were getting a higher interest rate.  So it would justify taking a little more incremental risk because we were getting 26% interest instead of our average 21% historically in the legacy markets.

[Emphasis added.]

164.    Keith asked another question regarding the Company's static loss rate:

Okay.  That's helpful.  One topic that seems popular as of late is your static loss rate.  Historically, it has kind of trended around 6% to 6.5%. I think last week on your earnings call you had mentioned that longer-term you would probably be at 7%.  How should we think about that static loss rate with maybe some of the underwriting in the last two years?  Are you going to be above 7% for a while?  And talk about how that static loss rate ties in with some of your new account growth.

165.    Poppe responded:

You bet.  So we did set a long-term goal.  We were trying to come up with a metric that we could communicate with investors that would give a – give visibility to how we were thinking about underwriting and collection prospects within the portfolio and also would be really tied to the true underlying performance in the portfolio, where delinquency and charge-off rates can be volatile from period to period just based on seasonality, cyclicality.  We've

seen and shown over time that static loss rates are very consistent and, as you pointed out, 6%, 6.5% over a long period of time.

We did say for fiscal 2013 and 2014, we think in or around 7%, with 14 [sic] more likely to be slightly above 7% but not materially above 7% – with a long-term goal at or below 7%.

And what's driving the 2013 and 2014 to be different – 2013 is really more the result of the execution issues we experienced. ***The underwriting in those years were consistent or tighter than years prior to that.*** 2014 would be the impact of the execution issues as well as the increase in new customers in the portfolio.

Our mix – historically we were 70% existing customers, 30% new. Last year it moved closer to kind of 50-50, and we think that puts 30 basis points, give or take, of pressure on delinquency and charge-off rates just based on our historical experience with the delinquency rates and charge-off rates on new versus existing customers.

[Emphasis added.]

166.   Towards the end of the Q&A time with Poppe, an audience member asked:

I just have a question on collections. Can you talk about the [inaudible] stepped-up investment you've made on the collection side [inaudible] improve the delinquency ratios going forward? And have you – do you, will you, have you used any third-party collections to help get there?  And as a kind of follow-up question, you mentioned earlier that there may be some regulatory discrepancy on the collection side.  Can you talk about that a little more in terms of what that might entail vis-a-vis additional investment on the collection side and/or any kind of change in lending practices pertaining to collections . . . ?

167.   Poppe responded:

So the first question, what have we done on the collections side to improve collection performance. ***And I'd start with the one thing we did on the underwriting side is we made the underwriting adjustments in the third and fourth quarter to tighten at the lower end of the credit spectrum.   And we made the standards across all states, even at our higher interest rate states.  We put everybody the exact same standard.  So we raised everybody to the same level, and so we've tightened underwriting and raised down payment requirements.***

The investment is we will continue to hire and hire in advance of the delinquency.   But we have also – with our plans for store growth and revenue growth over time, we are adding – bringing in additional industry experience, hiring in additional talent into the Company to help manage that growth.   And people that have managed larger organizations and high-growth credit portfolio operations that understand the growing pains of the business we're in and can make sure we have all the right eyes and ears on the business in planning properly for that growth.

And we do additionally – to help give us that ability to scale up as need be, we do have a third-party collection relationship.  The vast majority of our collection operation is in house, but we do have a small third-party relationship that helps us scale up as need be in early stage – very early, kind of 1- to 30-day collections if we need to ramp up ahead of growth.  That gives us a third site to help spread out kind of that hiring into management burden and gives us a little better scaling operability.

And then from a – your regulatory question, we don't have a lot of visibility yet to what they're going to do.  But as it sits today, there are no bright-line rules on you can call customers this many times or you can contact them this way.  It's very broad and general rules.   And so we take a very middle-of-the-road approach to making sure what we're is appropriate, and we'll continue to monitor what their guidance is and what we hear coming out of their current act to regulatory activities.

[Emphasis added.]

168.    Defendants' statements set forth in ¶¶160-167 above were false and misleading when made because, as described by the accounts of the CWs in ¶¶43-62 above.  Specifically, the accounts of the CWs demonstrate that: (i) Conn's had lowered credit score requirements for borrowers in late 2012 and early 2013 in order to increase sales, which resulted in an immediate increase in delinquencies (CW-1 ¶45, CW-3 ¶54, CW-5 ¶62); (ii) the rise in delinquencies caused Conn's to retain a third party credit company to help deal with the volume of the rising delinquencies (CW-1 ¶46); (iii) the lending practices were lowered to such a degree that customers with no reported credit scores were receiving credit lines of $7,000 to $10,000 (CW-2 ¶49); (iv) first payment defaults were increasing (CW-2 ¶ 51); (v) underwriting algorithms were

relaxed during the 2012 Christmas sales season to allow for the extension of credit to a far broader set of customers, including those that had been previously denied and those with a history of repossession and had faced foreclosures (CW-3 ¶53); (vi) when new stores opened, customers for those stores went into a separate queue within Conn's underwriting and collections system where the credit applications were not questioned, and all customers were approved for credit (CW-3 ¶55); and (vii) every customer was approved for credit during the initial four to five months after a new Conn's store opened (CW-4 ¶¶56-57).

169.    Later developments also establish that Defendants' statements, as set forth in ¶¶160-167 above, were false and misleading when made.  Specifically, it was later admitted that: (i) Conn's credit operations forecasting had "not been acceptably accurate" (¶¶17, 197); (ii) originations at new stores needed to be restricted and the levels of revenues there was unsustainable (¶203); and (iii) bad debts and delinquencies were so great that they were materially threatening the Company (¶195).

170.    In sum, the following true facts were known by Defendants, but concealed from the investing public:

(a)    Conn's was growing its sales revenues and financial results by relaxing its underwriting practices despite Defendants' statements to the contrary, which weakened its portfolio quality and left it susceptible to substantial increases in its delinquency rates and bad debt;

(b)    Conn's faced increased delinquency and charge-off rates in its credit segment;

(c)    At all relevant times, Conn's financial performance was substantially and materially threatened due to the Company's practices in its credit segment;

(d)     The rising delinquencies and charge-offs the Company was experiencing were directly related to the Company's deliberate loosening of its underwriting standards;

(e)     Software system issues were not the main cause of the deteriorating performance of the Company's credit portfolio;

(f)     Seasonal macroeconomics were not primary causes of the deteriorating performance of the Company's credit portfolio;

(g)     Allowing employees time to "get up to speed" was not one of the main causes of the deteriorating performance of the Company's credit portfolio;

(h)     Conn's projected growth strategy was unsustainable;

(i)     As a result of the foregoing, Defendants' statements regarding the Company's financial performance were false and misleading and lacked a reasonable basis when made.

171.    The accounts of numerous CWs demonstrate that Defendants were well aware of the adverse impact that their deliberate decision to loosen credit requirements had on collections and the Company's performance and thus, had actual knowledge of the falsity of their statements.  CW-1 stated that Wright and Poppe were regularly informed of the Company's collections struggles through daily trend reports delivered to them by the collections department.  CW-1 ¶45.  Poppe's regular visits to the credit department and involvement in its policies and procedures, as described by CW-2, also reflect management's awareness of Conn's collection troubles, even as it reassured investors as to its ability to collect and its bright prospects.  Defendants also received reports on first payment defaults and delinquencies, which, according to CW-1, were circulated daily to Conn's executive leadership team.  Wright's attendance at quarterly P&L meetings, as described by CW-4 ¶58, likewise demonstrates that he was aware of

the deterioration of the Company's portfolio as the increase in first payment defaults was a topic discussed at these meetings. The CWs also described that warnings that lower lending standards would create risk and adversely impact collections were ignored (CW-1 ¶48) and that the Individual Defendants were "hands-on" in running the credit department and held face-to-face meetings with credit managers (CW-2 ¶52).

## I.   Second Quarter Fiscal 2015 Results

172.   On September 2, 2014, before the market opened, the Company issued a press release announcing second quarter fiscal 2015 financial results and updated its fiscal year 2015 earnings guidance.  The press release revealed that the Company's "[c]redit segment operating income declined $7.7 million to an operating loss of $0.2 million," "[t]he percentage of the customer portfolio balance 60+ days delinquent increased 70 basis points sequentially to 8.7% as of July 31, 2014," and "[c]redit segment provision for bad debts on an annualized basis was 13.9% of the average outstanding portfolio balance in the current quarter and 11.1% on an annualized basis for the first six months of fiscal 2015."  [Emphasis added.]

173.   In the press release, the Company also revealed that it was lowering its recently-affirmed fiscal 2015 earnings guidance to a range of $2.80 to $3.00 adjusted earnings per diluted share — down from $3.40 to $3.70 adjusted earnings per diluted share.

174.   The press release included comments from Wright, stating, in part:

> Overall results were not satisfactory. Our credit operations ran into unexpected headwinds, resulting in portfolio performance deterioration.   Despite tighter underwriting, lower early-stage delinquency and improved collections staffing and execution, **delinquency unexpectedly deteriorated across all credit quality levels, customer groups, product categories, geographic regions and years of origination.   Tighter underwriting and better collections execution did not offset deterioration in our customer's ability to resolve delinquency.**

Delinquency rates improved through May and increased modestly in June, consistent with typical seasonal trends.  However, ***over sixty-day delinquency rates unexpectedly deteriorated a combined 90 basis points in July and August.***  We now expect future 60-plus day delinquency to increase to levels above our historical highs in the third and fourth quarter of fiscal 2015.  Early stage delinquency remains lower than historical averages through August.

We have made additional minor changes to tighten underwriting in August.  Over time, more of the total portfolio will have been originated under the tighter underwriting policies implemented in late fiscal 2014 and early fiscal 2015.  Declining sales of electronics as a percentage of total sales, slower expected originations growth and an expected reduction in the percentage of originations to new customers should also benefit future portfolio performance.  Longer term, we believe the changes necessary to optimize portfolio performance are in place, although we may not return to credit loss rates of prior years.

[Emphasis added.]

175.    The press release also stated, in part:

Provision for bad debts increased $18.3 million to $39.6 million for the second quarter, for a 13.9% annualized provision rate, up 330 basis points from the prior year.  The increase was driven primarily by a 41.1% increase in the average portfolio balance, on a 24.9% increase in loan originations over the same period in the prior year, and higher than expected delinquency and future charge-offs.  An increase in the balance of accounts which are accounted for as troubled debt restructurings to $62.1 million, or 5.3% of the total portfolio balance, was responsible for $3.4 million of the increase in the provision for bad debts.  The percentage of the customer portfolio balance greater than 60-days delinquent was 8.7% as of July 31, 2014, which compares to 8.0% as of April 30, 2014 and 8.2% as of July 31, 2013.  As of August 31, 2014, the percentage of the customer portfolio balance greater than 60-days delinquent was 9.2%.

176.     During the trading day on September 2, 2014, Conn's hosted a conference call to discuss its second quarter fiscal 2015 financial performance.  In the prepared comments portion of the call, Wright stated, in part:

> Turning to our credit segment, we completed the first quarter in May with high confidence in the portfolio performance improvement trend because of the actions taken over the last several quarters to improve performance.  Those trends were not sustained.
>
> **The Company's credit segment performance unexpectedly deteriorated.**  Delinquency over 60 days increased 70 basis points in the quarter and was up another 50 basis points in August.  Our failure to return to the expected trend required adjustments to our expectations for future portfolio performance.
>
> Provision for loan losses and guidance has been adjusted to reflect this expectation.  The increase in delinquency occurred despite actions the last several quarters to improve delinquency performance.  Tighter underwriting since late fiscal 2014 has led to increases in average credit score underwritten, average credit score in the portfolio and down-payment percentage.
>
> \*          \*          \*
>
> Once customers become delinquent more than 60 days our customers are not resolving the delinquency at the same rate as in the past, or as expected.  Customers are under pressure from a number of directions.  Inflation of rents is one example, increased subprime issuance for vehicle purchases may also be pressuring customers' ability to pay Conn's.
>
> Car loans and rent will generally rank ahead of Conn's and customers priority to pay.  **Although we cannot specifically identify the causes for pressure on our customers' ability to resolve delinquency, we haven't identified any internal factor causing the increase in delinquency.**"
>
> \*          \*          \*
>
> Turning to underwriting, on slide 12 is our average FICO score in the portfolio for the last five years.  The portfolio has been in a narrow range of credit quality and remained there in the last quarter.

In Q3 and Q4 of fiscal 2014 and Q1 of fiscal 2015, we made changes to our underwriting to reduce risk. These changes were reflected in the FICO score underwritten in Q2 of fiscal 2015 of 607 compared to 599 in Q3 of fiscal 2014. . . .

The aggregate impact of these changes is estimated to be a reduction in sales rate of 8% to 10% compared to the same period a year ago. The changes to tighten underwriting affect about half of the current portfolio. Over the next several quarters more of the portfolio will have been originated under current standards.

*        *        *

Static losses for fiscal 2013 originations are now expected to be higher than originally forecast moving from seven to around eight. As we've indicated previously, the fiscal 2014 originations static losses will be elevated and we now expect these to be around 9.5%.

*        *        *

Fiscal 2015 origination static losses are expected to turn down from fiscal 2014. We stated the goal of maintaining static losses at 7% or below to assist investors in understanding how the Company is underwriting accounts. At historical rates of curing late stage delinquency, this goal should be achieved or exceeded.

Based on our most recent performance this goal doesn't appear realistic. Given the items discussed above that should benefit performance over time we are revising our goal to deliver a long-term static loss around 8%.

Tightening underwriting enough to deliver a 7% static loss given current late stage performance would reduce profitability and returns on capital. If our approach to underwriting changes we intend to communicate this by revising our stated goal.

[Emphasis added.]

177.    After the prepared comments, Defendant Wright engaged in the following conversation with Peter Keith, an Analyst at Piper Jaffray:

**Peter Keith**:  Okay. So to that point, you have identified there is nothing internally that you can see that caused that unexpected rise in delinquencies in July and August.  So I guess as you step back now, it now becomes more of an economic issue around rent and subprime auto lending?  That's your best assessment here?

**Theo Wright**: *That's our best assessment*.  What we are seeing is that once the customers become delinquent beyond a certain period of time, they are simply not able to resolve that delinquency in the way that we have expected.  And *although we can't identify it specifically*, it appears that they simply lack the financial resources to get current with their other responsibilities as well as with Conn's.

**Peter Keith**:  Okay.  And then just one last question as a follow-on to that.  So if I heard Mike correctly, you are thinking that the delinquency rate will max out at around 9% in October?  So you ran at 9.2% in August.  I guess that sounds to me like you are sort of calling for stabilization from the current level while you have seen it kind of rise up in the last two months.  So what gives you the confidence that you will max out only at 9% a few months from now?

**Theo Wright**:  What gives us confidence at least in the foreseeable term is what we see in early stage delinquency today with 1- to 60-day delinquency actually declining in August.  So what we see in the earlier stage performance gives us confidence that at least in the short term that *there shouldn't be significant upward additional upward pressure on 60-plus delinquency*.

178.    Defendant Wright also responded to questions from Brian Nagel, an Analyst at

Oppenheimer & Co., on delinquency rates as follows:

**Brian Nagel**:  Hi, good morning.  In your prepared comments you made a comment with respect to the static loss rate in the adjustment there and then what impact keeping that at 7% could have on – I guess you mentioned the property bill, the retail business – so my question is, could you maybe go a little further into that math?  And then beyond that, as you look at this now, at the business, and we have had several quarters with higher-than-expected delinquencies.  How do you think about the trade-off between maybe it's oversimplified, but delinquencies, 60-plus delinquencies, and your comp store sales.  How do you manage towards that?

**Theo Wright**:  There were several questions there.  I will try to start with the first.  If you look at the margin that we are achieving in our stores, gross margin, and you consider the fact that all of our stores are above four-wall breakeven, the contribution margin of an incremental sale is in the vicinity of 30% after direct SG&A.  So to

the extent that we reduce same-store sales, the impact on profitability would be about 30% of that reduction.  So there's a significant impact on profitability of same-store sales by reduced.

I think that leads into the answer to the second part of your question, which is that given our current gross margin performance, significant tightening of underwriting would not result in improvement in profitability or returns on capital.  And we have already over the last four quarters now, three quarters now, tightened underwriting significantly.   And the difference between the bottom end of our underwriting and the average isn't enough where we could cut a small proportion of the total originations and have a meaningful impact on delinquency, or loss.

**Brian Nagel**:  Okay.  And maybe a follow-up to the prior question in a way. If you adjust – if we take out the 0% offers you have, and you mentioned that there really isn't – or the delinquency rate on those has actually been better than the house, I think that is correct, but you are taking that out in an effort to increase yield.  Doesn't that then suggest that you could potentially have higher delinquencies?

**Theo Wright**:  It's a little more complicated than that because you also have the impact on the portfolio from the early repayment of those no-interest programs.  So you are in effect taking the best performing customers out of the portfolio more quickly. Even though those customers are less likely to go delinquent they stay in the portfolio a shorter period of time *so overall we think the impact on reported delinquency will be neutral*.

179.    Investor surprise at Conn's results was reflected in the reports of equity analysts who questioned the Company's blaming external factors for the deteriorating Credit Segment performance.  Piper Jaffray issued an Analyst Report, announcing that it downgraded Conn's, commenting that the Company's problems were "self-inflicted," as opposed to management's blame on external factors:

We are downgrading CONN shares to Neutral and lowering our target to $33 following a very disappointing Q2 earnings miss and guide down.   While we dislike downgrading stocks after significant blow-ups, we are holding to a "3 strikes and you're out" rule that we placed on CONN shares after the Q4 blow-up in Feb.  Also, *management credibility will take several quarters to rebuild*

which likely places shares in a trading range for the foreseeable future.

*      *      *

*Credit Deterioration Appears All Self-Inflicted.* As we previewed last week, *our research of public and private subprime lenders suggests no major change to the economic backdrop for subprime lenders. Therefore, we believe the credit issues at CONN are predominantly self-inflicted,* for any number of reasons. In particular the abnormal growth of new accounts in new accounts (we believe) has elevated the risk profile. While CONN is increasing the interest rate in certain markets, the potential for an elevated risk profile in new markets remains. Also, while we have defended CONN's increased usage of interest-free financing, this sales tool now seems to be an issue as CONN now plans to reduce the level of no-interest programs.

*      *      *

*Credit Trends Still Deteriorating*. In the press release management said that 60+ day delinquencies at the end of July were 8.7% and at the end of August had climbed to 9.2%. Additionally, the company now expects the 60+ day delinquency rate to increase above historic highs in Q3 and Q4. The company has implemented further underwriting tightening in August which should help bring delinquency rates down over time but will not have an immediate impact. Further, *we are concerned that CONN is seeing delinquency trends surpass previous recession-level peaks in a relatively benign economic environment*. Deterioration in the economy at any point over the next two years would likely keep delinquencies at an elevated rate.[28]

[Emphasis added.]

180. The market reacted quickly to the Company's September 2, 2014 earnings announcements. On abnormally high trading volume of more than 14.2 million shares traded,

---

[28]   Peter J. Keith, *Conn's Inc. (CONN): Downgrading to Neutral on Very Disappointing Q2 Results*, Piper Jaffray (Sept. 2, 2014). Similarly, on September 3, 2014, Rick Nelson of Stephens Inc. issued an Analyst Report commenting: "We are lowering our F2015 oper. EPS estimate from $3.47 to $2.87 and our F2016 EPS estimate from $4.56 to $3.25. We remain on the sidelines until we see evidence that Conn's has its arms firmly around the credit operation and has adequate reserves for loan losses." Rick Nelson, *Research Brief, Conn's Inc.: 2q Miss and Lower Guide on Credit Deterioration; Maintain EW*, Stephens Inc. (Sept. 3, 2014).

the price of Conn's common stock fell $13.83 per share, or 30.85%, to close on September 2, 2014 at $31.00 per share, completely wiping out any share price appreciation during the Class Period.  Conn's share price had not traded at or below $31.00 since February 27, 2013, a date more than five weeks before the Class Period began.

181.    Despite this, the market was not fully apprised of the magnitude and scale of Conn's underwriting problems and bad debt exposure (which would only be fully revealed four months later).  For example, a September 2, 2014 Canaccord Genuity Analyst Report noted that the Company's credit struggles "appear[] isolated to accounts that were already multiple payments overdue and not new loans."

182.    Defendants' statements set forth in ¶¶172-178 above were false and misleading when made because, as described by the accounts of the CWs in ¶¶43-62 above.  Specifically, the accounts of the CWs demonstrate that: (i) Conn's had lowered credit score requirements for borrowers in late 2012 and early 2013 in order to increase sales, which resulted in an immediate increase in delinquencies (CW-1 ¶45, CW-3 ¶54, CW-5 ¶62); (ii) the rise in delinquencies caused Conn's to retain a third party credit company to help deal with the volume of the rising delinquencies (CW-1 ¶46); (iii) the lending practices were lowered to such a degree that customers with no reported credit scores were receiving credit lines of $7,000 to $10,000 (CW-2 ¶49); (iv) first payment defaults were increasing (CW-2 ¶51); (v) underwriting algorithms were relaxed during the 2012 Christmas sales season to allow for the extension of credit to a far broader set of customers, including those that had been previously denied and those with a history of repossession and had faced foreclosures (CW-3 ¶53); (vi) when new stores opened, customers for those stores went into a separate queue within Conn's underwriting and collections system where the credit applications were not questioned, and all customers were approved for

credit (CW-3 ¶55); and (vii) every customer was approved for credit during the initial four to five months after a new Conn's store opened (CW-4 ¶¶56-57).

183.    Later developments also establish that Defendants' statements, as set forth in ¶¶172-178 above, were false and misleading when made.  Specifically, it was later admitted that: (i) Conn's credit operations forecasting had "not been acceptably accurate" (¶¶17, 197); (ii) originations at new stores needed to be restricted and the levels of revenues there was unsustainable (¶203); and (iii) bad debts and delinquencies were so great that they were materially threatening the Company (¶195).

184.    In sum, the following true facts were known by Defendants but concealed from the investing public:

(a)    Conn's was growing its sales revenues and financial results by relaxing its underwriting practices despite Defendants' statements to the contrary, which weakened its portfolio quality and left it susceptible to substantial increases in its delinquency rates and bad debt;

(b)    Conn's faced increased delinquency and charge-off rates in its credit segment;

(c)    At all relevant times, Conn's financial performance was substantially and materially threatened due to the Company's practices in its credit segment;

(d)    The rising delinquencies and charge-offs the Company was experiencing were directly related to the Company's deliberate loosening of its underwriting standards;

(e)    Conn's projected growth strategy was unsustainable; and

(f)     As a result of the foregoing, Defendants' statements regarding the Company's financial performance were false and misleading and lacked a reasonable basis when made.

185.     The accounts of numerous CWs demonstrate that Defendants were well aware of the adverse impact that their deliberate decision to loosen credit requirements had on collections and the Company's performance and thus, had actual knowledge of the falsity of their statements.   CW-1 stated that Wright and Poppe were regularly informed of the Company's collections struggles through daily trend reports delivered to them by the collections department. CW-1 ¶45.   Poppe's regular visits to the credit department and involvement in its policies and procedures, as described by CW-2, also reflect management's awareness of Conn's collection troubles, even as it reassured investors as to its ability to collect and its bright prospects. Defendants also received reports on first payment defaults and delinquencies, which, according to CW-1, were circulated daily to Conn's executive leadership team.   Wright's attendance at quarterly P&L meetings, as described by CW-4 ¶58, likewise demonstrates that he was aware of the deterioration of the Company's portfolio as the increase in first payment defaults was a topic discussed at these meetings. The CWs also described that warnings that lower lending standards would create risk and adversely impact collections were ignored (CW-1 ¶48) and that the Individual Defendants were "hands-on" in running the credit department and held face-to-face meetings with credit managers (CW-2 ¶52).

186.     On September 13, 2014, the *NY Times* Article corroborated problems with Conn's Credit Segment, as alleged herein.[29]   The author interviewed certain Conn's customers and former employees regarding the Company's credit and collection practices.   The article provided

---

[29]     *See* Segal, *supra* note 5.

additional examples highlighting Conn's reduced credit underwriting standards during the Class Period including instances of:  (1) Conn's providing tens of thousands of dollars of Conn's credit to customers who had faced foreclosure; (2) customers being misled about credit insurance charged by Conn's; and (3) the differences between Conn's actual credit and collections practices differed from those the Company touted during the Class Period:

> The Haggler has striven in recent months to get someone at Conn's, a Texas-based chain that sells appliances and furniture, on the phone.  But as regular readers know, the company will not discuss a complaint from an unhappy customer named Grace Bunmi Salako Smith, who last year bought a computer and a refrigerator from the company and disputes the $751 in interest that Conn's says she now owes.
>
> The cold shoulder has only piqued the Haggler's curiosity. What kind of place is Conn's, and how does it operate?
>
> A bit of light has lately been shed on those questions, thanks to conversations with customers and former employees.  One of the customers is Justin Raizk of Tucson, Ariz., who last year walked into a Conn's in his hometown to visit a friend who worked there. He had no intention of buying anything because he didn't think it was possible.  His house had just been foreclosed on.
>
> I thought my credit was destroyed," he said on the phone last week.   "I assumed that nobody would offer me credit for something like seven to 10 years."
>
> But an employee at Conn's took Mr. Raizk's name and personal information and a few minutes later offered some very good news: He could buy $14,000 worth of whatever he liked in the store, and finance it on the spot.
>
> "I was like a kid in a candy store," he said.  "Me and electronics?"
>
> Over the course of several visits, he ended up buying a Samsung television and camera, an iPad and Bose speakers.  Ultimately, he spent more than $3,000, all of it to be paid off at a 25 percent annual interest rate over 32 months.
>
> Was this a good idea?  No, and Mr. Raizk acknowledges this now. But his regret has little to do with the precept that a man struggling

with debt should not add to his struggles with more debt.  He wishes he'd never walked into Conn's for other reasons.

"I should have done more research," he says.  For one thing, he says he didn't know that in the last three years the company has had more than 1,500 complaints lodged against it with the Better Business Bureau.

This is true.  A vast majority of those complaints, more than 1,200, are related to a category the Better Business Bureau calls "problems with product/service," while "billing/collection issues" are a distant second, with 122 complaints.

Mr. Raizk has another reason to regret his purchases.  His contract includes $215 worth of credit insurance.  The idea is that if you die, are rendered disabled or fired from your job, you — or your heirs — won't be on the hook for payments.

Many experts consider credit insurance a waste of money for expenditures in this price range.  But Mr. Raizk was unaware that he had bought credit insurance at all until the Haggler asked him to look at his contract.  But there it was, right on the document, a few inches below the words "itemization of amount financed."

Is it surprising that he missed this?  Not to several former Conn's employees, who say they were given some pretty odd instructions when it came to selling credit insurance.  They were encouraged to sell it in order to earn the biggest possible monthly bonuses, they said, but they were not supposed to discuss it with customers.

That's right — these former sales staffers said they sold a product that they should not mention.  The reason, they surmised, may have been that Arizona requires anyone collecting commissions for selling insurance to have a license, and that licensing all the Conn's sales staff would be cost-prohibitive.

How exactly do you sell something that you can't discuss?  These former sales staff members, who requested anonymity because they said they feared the wrath of Conn's, explained.

"We give credit mostly to people who can't get credit anywhere else, so 90 percent of people don't ask about credit insurance when it shows up on their contract," one former Conn's employee said.  "Or I would make it sound like it was standard.  'You're covered in terms of property, life and disability coverage.' "

The Haggler emailed Conn's and described Mr. Raizk's experience, and the stratagems of former salespeople.

"Conn's strives for customer satisfaction, a great buying experience and open communication with all of its customers," wrote Angela Lagrone, an executive assistant to the chief operating officer, in an email.  "This is a key reason for our success for more than a century and our 90-plus percent customer satisfaction rate."

She added that when it comes to credit insurance, "all details are clearly laid out during the purchasing process — both at the point of sale and within the contract, which customers have to acknowledge with multiple signatures."

Let's get to the final reason that Mr. Raizk rues the day when he walked into Conn's.  He says he lost his health care coverage at work soon after his purchases and fell behind on payments.  Every other creditor has worked with him to reduce monthly outlays, except for Conn's.

"They call me eight times every day and tell me I qualify for refinancing, but that I need to send them $280 before they will send me the paperwork for the refi," he said.  "Well, I don't trust this company, so I tell them I want to see the paperwork before I send the money.  And they won't until I send them $280."

In her email, Ms. Lagrone described Mr. Raizk as "a valued customer" and added that "we have been in direct communication with the customer, and we believe we have come to a resolution that is satisfactory to the customer."

That was news to the customer.  Yes, a pleasant man from Conn's had just been in touch, Mr. Raizk reported.

"But the company didn't help me out," he said.  "They said the same thing they always say.  Just a nicer guy said it."

187.    On the next day of trading and in response to the publication of the *NY Times* Article, the price of Conn's common stock fell $1.71 per share, or over 5%, to close on Sep 15, 2014 at $29.39 per share.

### J.    September 22, 2014 Corporate Analyst and Investor Event

188.    On September 22, 2014, Conn's hosted a Corporate Analyst and Investor Event. During the presentation, Wright stated that, "I think our business model is defensible on the retail side . . . but is also defensible on the credit side."

189.    Poppe likewise assured investors about the Company's underwriting standards,

stating, in relevant part:

> While we do make adjustments from time to time in our underwriting rules, generally, *we've maintained consistent standards* and the purpose behind that is to ensure our customers have a consistent message about the availability of credit when they are ready to shop. . . .
>
>           \*      \*      \*
>
> Next slide summarizes the underwriting changes we've made and talked about over the past few quarters. *The changes have been successful in and were targeted at reducing first payment defaults*. Primary changes were to reduce limits, increase down payments and raise the minimum FICO score we use to determine eligibility to be underwritten on our financing program.
>
>           \*      \*      \*
>
> With the changes we made in underwriting, we have been able to maintain a fairly consistent FICO score in the portfolio over time in a fairly narrow range from about 585 to 600 and today, we are currently right about the middle of that range.
>
>           \*      \*      \*
>
> Turning to recent portfolio trends, we have seen a reduction in first payment default as the total balance and percent of the portfolio since January 31. Looking at it relative to how it has trended after we've changed the underwriting policy, looking at 90 days after the month of origination, you can see that the third-quarter originations, approximate 5% of the originations, were first payment defaults 90 days later. As we made the changes in underwriting in the fourth quarter and first quarter, our first-quarter origination average dropped to only 3.3% of the originations, so a significant reduction in first payment delinquencies relative to the volume of originations.
>
> We've also seen 1 to 60-day delinquency rates drop year over year at July 31. However the 60 plus delinquency rate is up year over year. Once the customer gets multiple payments delinquent, they have a more difficult time resolving their delinquency issues and clearing their account. With increased delinquency and improved collector effectiveness, we've seen re-aging as a percentage of the portfolio increase. However, it's still well below the historical

highs because of the more stringent re-aging rules that we have in place to be eligible to re-age and bring your account current.

\*       \*       \*

Looking at our expectations for portfolio performance and why we believe we should see improvement from fiscal 2014 levels, the tighter underwriting we've already discussed should give us benefits.

[Emphasis added.]

190.    During the question-and-answer session, Wright responded to a question from an

unidentified audience member as follows:

The question was did we reduce the credit quality as we rolled out the new [home] plus format to stimulate growth. I'm paraphrasing, but hopefully that's close. The answer, two-part answer is when we opened the first four stores we opened back in 2013, we did do that a little bit and it took us about three months to figure out that was a really bad idea. ***And so other than that brief period of time in a small group of stores, the answer to the question is no, we didn't -- our underwriting standards have been really stable***. Over time, if you look at the average FICO score underwritten, average FICO score in the portfolio, the income data that I presented at all would indicate the same thing with that minor exception that I gave you.

So the answer is no, we didn't. I think the reason that credit risk has increased for us though is partly due to more new customers and we did point that out. To a certain extent, that was known and is inevitable. If we're going to attract new customers, we're going to have a higher -- more new customers equals higher credit risk even with identical credit standards. And the best way I can describe that is if you think about the customer who's bought from us before and had a great experience and bought a second time and a third time, they really want to stay current with us. That person who bought from us once and they are not sure if they really like us, even though they might have identical income and credit scores and everything, their degree of commitment to us is different.

[Emphasis added.]

191.    Defendants' statements set forth in ¶¶189-190 above were false and misleading

when made because, as described by the accounts of the CWs in ¶¶43-62 above.  Specifically,

the accounts of the CWs demonstrate that: (i) Conn's had lowered credit score requirements for borrowers in late 2012 and early 2013 in order to increase sales, which resulted in an immediate increase in delinquencies (CW-1 ¶45, CW-3 ¶54, CW-5 ¶62); (ii) the rise in delinquencies caused Conn's to retain a third party credit company to help deal with the volume of the rising delinquencies (CW-1 ¶46); (iii) the lending practices were lowered to such a degree that customers with no reported credit scores were receiving credit lines of $7,000 to $10,000 (CW-2 ¶49); (iv) first payment defaults were increasing (CW-2 ¶ 51); (v) underwriting algorithms were relaxed during the 2012 Christmas sales season to allow for the extension of credit to a far broader set of customers, including those that had been previously denied and those with a history of repossession and had faced foreclosures (CW-3 ¶53); (vi) when new stores opened, customers for those stores went into a separate queue within Conn's underwriting and collections system where the credit applications were not questioned, and all customers were approved for credit (CW-3 ¶55); and (vii) every customer was approved for credit during the initial four to five months after a new Conn's store opened (CW-4 ¶¶56-57).

192.    Later developments also establish that Defendants' statements, as set forth in ¶¶189-190 above, were false and misleading when made. Specifically, it was later admitted that: (i) Conn's credit operations forecasting had "not been acceptably accurate" (¶¶17, 197); (ii) originations at new stores needed to be restricted and the levels of revenues there was unsustainable (¶203); and (iii) bad debts and delinquencies were so great that they were materially threatening the Company (¶195).

193.    In sum, the following true facts were known by Defendants but concealed from the investing public:

(a)    Conn's was growing its sales revenues and financial results by relaxing its underwriting practices despite Defendants' statements to the contrary, which weakened its portfolio quality and left it susceptible to substantial increases in its delinquency rates and bad debt;

(b)    Conn's faced increased delinquency and charge-off rates in its credit segment;

(c)    At all relevant times, Conn's financial performance was substantially and materially threatened due to the Company's practices in its credit segment;

(d)    The rising delinquencies and charge-offs the Company was experiencing were directly related to the Company's deliberate loosening of its underwriting standards;

(e)    Conn's projected growth strategy was unsustainable; and

(f)    As a result of the foregoing, Defendants' statements regarding the Company's financial performance were false and misleading and lacked a reasonable basis when made.

194.    The accounts of numerous CWs demonstrate that Defendants were well aware of the adverse impact that their deliberate decision to loosen credit requirements had on collections and the Company's performance and thus, had actual knowledge of the falsity of their statements.  CW-1 stated that Wright and Poppe were regularly informed of the Company's collections struggles through daily trend reports delivered to them by the collections department. CW-1 ¶45.  Poppe's regular visits to the credit department and involvement in its policies and procedures, as described by CW-2, also reflect management's awareness of Conn's collection

troubles, even as it reassured investors as to its ability to collect and its bright prospects. Defendants also received reports on first payment defaults and delinquencies, which, according to CW-1, were circulated daily to Conn's executive leadership team.  Wright's attendance at quarterly P&L meetings, as described by CW-4 ¶58, likewise demonstrates that he was aware of the deterioration of the Company's portfolio as the increase in first payment defaults was a topic discussed at these meetings. The CWs also described that warnings that lower lending standards would create risk and adversely impact collections were ignored (CW-1 ¶48) and that the Individual Defendants were "hands-on" in running the credit department and held face-to-face meetings with credit managers (CW-2 ¶52).

195.    Then, on October 6, 2014, Conn's announced that was exploring a range of strategic alternatives, including a sale of the Company, separating its retail and credit businesses or slowing the pace of new store openings.  On the same day, a *Bloomberg* article noted, in part, "the move follows a proliferation of bad debts at Conn's, which has long enticed customers with no-interest loans.  Though it's recently been tightening underwriting standards and improving collections, the delinquent loans forced the company to cut its annual profit forecast last month, sending the shares tumbling 31 percent in a single day."[30]  Like the *NY Times* Article, Conn's announcement that it was pursuing strategic alternatives further evidenced that Conn's could no longer conceal the challenges it faced during the Class Period.

## VIII.   THE TRUTH IS REVEALED

196.    The full truth about Conn's operations was not revealed until December 9, 2014, when the Company issued a press release (which was incorporated into a Form 8-K that same

---

[30]    Craig Giammona, *Conn's Mulls Breaking Off Credit Unit as Bad Debts Grow*, Bloomberg (Oct. 6, 2014), *available at* http://www.bloomberg.com/news/2014-10-06/conn-s-looks-at-options-including-sale-amid-customer-debt.html (last visited Apr. 10, 2015).

day) announcing its third quarter fiscal 2015 financial results.  The press release revealed the Company's increase in provisions for bad debt had increased by $49.4 million from the same prior year period and further increases in customer delinquency rates and deteriorations in customer credit scores.  The press release stated in relevant parts:

> In the third quarter, we drove significant growth and expanded gross margins in the retail segment, but these gains were more than offset by additional provisions for credit losses. *Customer credit scores continue to deteriorate. Despite underwriting changes reducing the percentage of originations to customers with scores below 550, the proportion of customers in late stage delinquency with a score below 550 increased this year, though it has remained relatively constant since the end of the second quarter. As a result, delinquency rates have increased and losses are being realized at a faster pace than originally anticipated.* We recorded additional provisions for credit losses this quarter, based on the assumption that we will not realize any improvement in these trends over the next 12 months, despite the underwriting changes and improved collections execution. Although the realization of losses associated with the credit segment is occurring at a faster pace than originally anticipated, at this time, we do not believe we will experience static loss rates that are significantly different from our previous estimates. November credit performance has provided evidence of stabilizing credit trends, with the over-sixty-day delinquency rate holding steady at 10%. The percentage of balances 31 to 60 days past due declined for the quarter and again in November 2014 to 3.3% as compared to 3.6% a year ago.

> *       *       *

> **Credit Segment Results (on a year-over-year basis unless otherwise noted)**

> Credit revenues increased 21.6% to $64.9 million. The credit revenue growth was attributable to the increase in the average receivable portfolio balance outstanding. The customer portfolio balance equaled $1.25 billion at October 31, 2014, rising 32.7%, or $308.7 million from the prior year. The portfolio interest and fee income yield on an annualized basis was 16.9% for the third quarter, down 90 basis points from the same period last year reflecting a higher provision for uncollectable interest.

> Provision for bad debts for the three months ended October 31, 2014 was $72.0 million, an increase of $49.4 million from the

same prior-year period. The year-over-year increase was impacted by the following:

- New store openings of 18;

- A 12.3% increase in the balances originated during the quarter compared to the prior year;

- An increase of 150 basis points in the percentage of customer accounts receivable balances greater than 60 days delinquent to 10.0% at October 31, 2014. Delinquency increased year-over-year across credit quality levels, customer groups, product categories, geographic regions and years of origination. Despite tighter underwriting and better collections execution, deterioration in the customer's ability to resolve delinquency continued throughout the quarter and the expectations for charge-offs over the next 12 months were adjusted to fully reflect this trend;

- Higher expected charge-offs over the next twelve-month period as losses are occurring at a faster pace than previously anticipated, due to the continued deterioration in the customer's ability to resolve delinquency;

- The decision to pursue collection of past and future charged-off accounts internally rather than selling charged off accounts to a third party. This change resulted in $7.6 million in additional provision as recoveries are expected to occur over an extended time period, which results in a reduction in expected cash recoveries over the next twelve months; and

- The balance of customer receivables accounted for as troubled debt restructurings increased to $73.4 million, or 5.9% of the total portfolio balance, driving $4.1 million of the increase in provision for bad debts.

[Emphasis added.]

197. In addition, the Company acknowledged that the forecasting of its credit operations had not been acceptably accurate and announced the implementation of additional oversight, stating in relevant parts:

**Additional Oversight**

Conn's also announced several new initiatives by its Board of Directors that are intended to enhance oversight of the business at

a time when the senior management team is contending with a combination of rapid portfolio growth and a more difficult credit collection environment. Although the Company's retail operations have performed well, with successful new store openings and product margin expansion, the performance of the Company's credit operations has been disappointing several times over the last twelve months. *Additionally, the Company recognizes that its credit operations forecasting has not been acceptably accurate.*

To help address these challenges, the Board of Directors has established a Credit Risk and Compliance Committee. The Board of Directors members on this committee will be responsible for reviewing credit risks, underwriting strategy and credit compliance activities. The committee will direct and supervise an independent evaluation of underwriting standards to validate underwriting processes and results. A Board of Directors-directed evaluation of collections operations by two independent third-party advisors has already been completed. These reviews identified no significant deficiencies in operations effectiveness but did identify opportunities for improvement, particularly in collections cost efficiency.

Additionally, the Board of Directors has approved two new positions to augment its management team. The Board of Directors has initiated a search for a President, who will report directly to the Company's Chairman and Chief Executive Officer. The Company is seeking candidates for this position with demonstrated senior leadership capabilities in large, complex retail and/or consumer credit organizations. The Board of Directors has also initiated a search for a Chief Risk Officer, who will report to the Company's Chief Operating Officer and provide periodic reporting to the Credit Risk and Compliance Committee of the Board of Directors. The Board of Directors is taking these actions in response to the growing scale and complexity of the Company's credit business, along with increasing industry-wide regulatory scrutiny.

[Emphasis added.]

198.    In the same press release, the Company announced the withdrawal of its earnings guidance for the 2015 fiscal year and refused to provide earnings guidance for fiscal year 2016:

### Outlook and Guidance

*With the ongoing review of strategic alternatives and the oversight initiatives being undertaken by the Company, the Company has decided to withdraw its earnings guidance for fiscal 2015 and is*

*not currently providing earnings guidance with respect to fiscal 2016.*

The following are the Company's expectations for its business for the fourth quarter:

• Same stores sales flat to up 3%;
• Retail gross margin between 39.0% and 40.0%;
• Opening of 2 new stores during the quarter; and
• Closure of 1 store during the quarter.

Beginning with December results, the Company will release, shortly after the end of the month, same store sales and greater than 60 days delinquency performance. The Company believes this will provide investors with timely, relevant information about business trends and expects to continue this practice until the Company experiences more stability in its results.

[Emphasis added.]

199.    Conn's also announced the resignation of CFO Taylor, effective immediately.

200.    Also on December 9, 2014, during the trading day, the Company hosted a conference call to discuss its third quarter fiscal 2015 financial performance.  During the call, in addition to recognizing the financial results is the December 9, 2014 press release, Defendant Wright acknowledge that the Company had "recorded additional provisions for credit losses this quarter based on the assumption that we will not realize any improvements in these trends over the next 12 months, despite the underwriting changes and improved collections execution."

201.    Acknowledging the problems facing the Company's underwriting operations specifically and overall future generally, Wright stated, in part:

The Board has established a Credit Risk and Compliance Committee, responsible for reviewing credit risk, underwriting strategy, and credit compliance activities.  The committee will supervise an independent evaluation of underwriting standards.

The Board has also commenced efforts to augment the Management team.  The Board has initiated a search for a President to provide additional senior leadership for the Company. The search has also been initiated for a Chief Risk Officer to

provide additional capability in analyzing and assessing credit risk. The previously announced Strategic Alternatives process is underway, and the Company is actively engaged with its advisors exploring a number of potential strategic alternatives.

*   *   *

We continue to evaluate our underwriting standards, and may make further changes to reduce credit risk.  As mentioned earlier, the Credit Risk and Compliance Committee will direct and supervise an independent evaluation of underwriting standards to validate underwriting processes and results.

202.    In addition, in response to a question from an analyst, Wright acknowledged that the Company had aggressively marketed the availability of credit, stating in part:

A year or more ago, we began to communicate to the customer more directly the availability of credit. . . .  So we began to communicate more directly the availability of funds, in addition to price and product.  We used more direct mail, more television advertising to communicate that.  And as a result, we generated a lot of business, significant growth, with customers who had never purchased from us.

203.    Similarly, Wright addressed the change in the availability of credit at new stores, stating in part:

*What will change, though, is the trend of sales when we open. We're more restrictive on originations to new customers, so the store at opening, in its early months or even year of operation, will not have the same level of revenues.*  But as that repeat and referral business builds over time, we expect we'll end up in the same place.  It will just take us a little longer to get there, rather than opening up incredibly strongly the day we open the doors.

204.    In response, the Company's share price plummeted by $14.26 per share, *or over 40%*, to close at $20.83 per share on December 9, 2014.

205.    On December 10, 2014, Conn's filed its quarterly report with the SEC on a Form 10-Q for the quarter ended October 31, 2014.  The Form 10-Q confirmed the financial results announced in the December 9, 2014 press release and Form 8-K and revealed that the Fort Worth

Regional Office of the SEC had requested information relating to the Company's underwriting policies and bad debt provisions.  In response, the price of Conn's common stock fell $2.61 per share, or over 12%, to close on December 10, 2014 at $20.83 per share.

## IX.   ADDITIONAL SCIENTER ALLEGATIONS

206.   During the Class Period, Defendants had both the motive and opportunity to commit fraud.  Poppe and Wright profited handsomely from their wrongdoing during the Class Period through large sales of shares of Conn's common stock that they owned at inflated prices.

207.   Defendants also had actual knowledge of the misleading nature of the statements they made or acted with reckless disregard for the true information known to them at the time for the reasons discussed above.   In so doing, Defendants committed acts and practiced and participated in a course of business that operated as a fraud or deceit on purchasers and acquirers of Conn's common stock and/or call options and sellers or writers of put options during the Class Period.

208.   Statements by CWs corroborate the conclusion that Conn's and its management were aware of the Company's deficient lending practices and collections issues even as they issued materially false and misleading statements to investors.  According to numerous CWs, not only did the Company lower its prerequisites for the extension of customer credit shortly before the Class Period — resulting in an unavoidable increase in delinquencies — but the CWs' accounts show that Conn's and its executive management were deeply involved in the affairs of the collections department in the period following this loosening of standards.  According to CW-1, Wright and Poppe were provided with daily reports on delinquencies and first payment defaults from the credit department.   ¶45.  In addition, according to CW-2, Poppe regularly visited the credit department, met with the credit managers, and was involved in the credit department's policies and procedures.  ¶52  Further, CW-4 stated that Wright attended quarterly

P&L meetings in which the increase in first payment defaults was discussed.  ¶58  In addition, CW-5 attested to the fact that account delinquencies were discussed "every day" by everyone involved in collections, including Poppe.  ¶61

### A.   Poppe and Wright's Insider Sales During the Class Period

209.   The Individual Defendants also possessed the motive to commit fraud.  During the Class Period, Poppe and Wright together reaped more than $4.5 million in insider trading proceeds.

210.   Having not sold any Company stock since 2007, Wright made two large sales during the Class Period while the price of Conn's shares was artificially inflated.  On June 20, 2013, Wright sold 15,000 shares at an average price of $51.75 for proceeds of $776,246.  On December 17, 2013, when Conn's stock price was near its Class Period-high, Wright sold an additional 15,000 shares at an average price of $77.08 for proceeds of $1,156,200.  In total, Defendant Wright sold 30,000 shares *for total proceeds of $1,932,446.*  If these shares had been sold at the prices prevailing after the inflation was removed from Conn's stock price, Defendant Wright's sales would have netted proceeds of only $930,000.

211.   Likewise, having not sold any Company stock during his entire tenure, Poppe departed from past practices and also made two large sales during the Class Period while the price of Conn's shares was artificially inflated.  On April 25, 2013, Poppe sold 30,000 shares at an average price of $45.01 for proceeds of $1,350,219.  On October 22, 2013, Poppe sold 19,900 shares at an average price of $61.89 for proceeds of $1,231,611.  With these two sales, Poppe sold 49,900 shares at substantially inflated prices *for total proceeds of $2,581,830.*  If these shares had been sold at the prices prevailing after the inflation was removed from Conn's stock price, Poppe's sales would have only netted proceeds of $1,546,900.

### B. Trades During the Class Period Made Pursuant to 10b5-1 Plans Are Not Insulated from Scrutiny

212. In 2000, the SEC adopted Rule 10b5-1, 17 C.F.R. §240.10b5-1, which provides that a person will be deemed to have traded "on the basis of" material, nonpublic information if the person engaging in the transaction was "aware of" that information at the time of the trade.

213. The SEC also created an affirmative defense to insider trading claims for trades made pursuant to a binding agreement or plan ("10b5-1 plans"). *Id.* Pursuant to SEC Rule 10b5-1(c), a 10b5-1 plan is a potential defense to accusations of insider trading only if it is entered into by an insider "before becoming aware" of inside information and was established "in good faith and not as part of a plan or scheme to evade the prohibitions" against insider trading.

214. Because of this, insiders are advised to "design a trading plan with the intention that it will not be modified or amended frequently, since changes to the plan will raise issues as to a person's good faith." Thomas J. Griffith, *Corporate Counsel's Guide to Insider Trading and Reporting* §12:26 (2013). Conversely, the adoption and/or modification of these plans while in possession of material, non-public information is highly suspicious and supportive of scienter.

215. While Poppe's stock sales were made pursuant to a 10b5-1 plan, the circumstances of those sales are sufficiently suspicious to overwhelm any inference that they were made in good faith. Poppe sold irregular amounts of shares at irregular intervals under the plan.

216. Sales pursuant to a trading plan should occur with a prescribed, regular pattern of stock sales, such as 500 shares a month on the 10th day of the month. This was not the case here. In this circumstance, even trades according to a 10b5-1 plan are highly suspicious and indicative of insider trading behavior.

217.    10b5-1 plans are under heavy scrutiny from the SEC in light of a recent *Wall Street Journal* investigation that found that insiders who were trading pursuant to 10b5-1 plans were still trading at opportune times and reaping better-than-expected results.  According to the November 27, 2012 *Wall Street Journal* article entitled "Executives' Good Luck in Trading Own Stock," executives trading pursuant to 10b5-1 plans are still able to time their trades to avoid losses and increase earnings because trading plans are not public and can be canceled or amended at any time without disclosure.

218.    With regard to such trading plans, a December 13, 2012 *Wall Street Journal* article entitled "SEC Draws Fire Over Executive Trading Plans" noted that "[i]n building this 'safe harbor' for executives, the SEC has unwittingly given them a defense for unethical behavior."  According to one source cited in the article, "[c]ompanies are using these plans as a tool . . . that allows executives to do insider trading."

219.    Indeed, according to a report issued by Wilson Sonsini Goodrich & Rosati in March 2013, "[t]he floodlights now aimed at such plans are the result of recent *Wall Street Journal* articles showing that corporate insiders, even those executing trades pursuant to Rule 10b5-1 plans, have generated significant profits — or avoided significant losses — by trading company stock in the days just before their companies issued market-moving news."

220.    The report recommends that clients avoid multiple trading plans, as well as frequent modifications, and suggests clients adopt "[s]imple plans with a prescribed, regular pattern of stock sales (*e.g.*, 1,000 shares a month on the 15th day of the month)."

221.    Further, although Poppe filed reports on Form 4 disclosing his trades and indicating that certain of them were made pursuant to 10b5-1 plans, no further information is available on the plans.  Without discovery, investors cannot understand the details pertaining to

the plans' creation and amendments, whether any trades pursuant to the plans were canceled, or what criteria, such as share price, may have triggered sales pursuant to the plans.

### C. The Individual Defendants Were Motivated by Conn's Incentive Compensation Structure

222.   Defendants also profited greatly from the Class Period wrongdoing in the form of excessive compensation paid by the Company, consisting in large part of bonuses and incentive payments that would have been much smaller, or would not have been paid at all, were it not for the fraudulent activity alleged herein.

223.   Significant portions of the Individual Defendants' total compensation during the Class Period were bonus payments that were based on the Company's achievement of certain performance goals.  The Company's operating income was the primary performance metric upon which the Individual Defendants' bonuses were based.  If Conn's operating income for the fiscal year 2014 (ending January 31, 2014) reached a $120.3 million threshold, Wright and Poppe would have received bonuses of $85,000 and $51,000, respectively.  If, however, the Company's operating income reached $165.8 million, Wright and Poppe would have received maximum bonuses of $850,000 and $510,000, respectively, both of which would have exceeded their base salaries for the year.  Obtaining these bonus payments thus represented a significant motivator for the fraud alleged herein.   Conn's operating income for the fiscal year 2014 was approximately $161.9 million, giving the Individual Defendants almost all of their maximum allowable bonuses.

224.   Wright's compensation for fiscal year 2014 totaled $2,219,569, of which $819,603, or approximately 37%, was attributable to the incentive payment tied to the Company's operating income.  Wright also received $699,966 in stock awards, which comprised approximately 32% of his total compensation.

225.    Poppe's compensation for fiscal year 2014 totaled $1,360,915, of which $419,762, or approximately 31%, was attributable to the incentive payment tied to the Company's operating income.  Poppe also received $424,004 in stock awards, which comprised approximately 31% of his total compensation.

226.    Because their bonuses were tied to the Company's operating income, the Individual Defendants knew that they could loosen their credit standards in order to increase the Company's operating income, which consequently increased their bonuses.  Any negative consequences of this strategy would be pushed into the next fiscal year after the substantial bonuses were paid.

## X.    CLASS ACTION ALLEGATIONS

227.    Lead Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased or otherwise acquired Conn's common stock and/or call options, or sold/wrote Conn's put options during the Class Period (the "Class").  Excluded from the Class are Defendants and their families, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

228.    The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  Throughout the Class Period, Conn's stock actively traded on the NASDAQ Global Select Market (the "NASDAQ") under the ticker symbol "CONN."  As of March 25, 2015, Conn's had 36.35 million shares outstanding, owned by thousands of persons.

229.    There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class that predominate over questions that may affect individual Class members include:

(a)    whether the Exchange Act was violated by Defendants;

(b)    whether Defendants omitted and/or misrepresented material facts;

(c)    whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)    whether Defendants knew or recklessly disregarded that their statements were false and misleading;

(e)    whether the price of Conn's common stock was artificially inflated; and

(f)    the extent of damage sustained by Class members and the appropriate measure of damages.

230.    Lead Plaintiffs' claims are typical of the claims of members of the Class because Lead Plaintiffs and the Class sustained damages from Defendants' wrongful conduct.

231.    Lead Plaintiffs will adequately protect the interests of the Class and have retained counsel experienced in class action securities litigation.  Lead Plaintiffs have no interests that conflict with those of the Class.

232.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

**XI.    LOSS CAUSATION/ECONOMIC LOSS**

233.    Lead Plaintiffs repeat, incorporate, and reallege paragraphs 1 through 232 by reference.

234.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the damages suffered by Lead Plaintiffs and the Class.

235.    The truth about Conn's business was disclosed in a series of corrective disclosures beginning on September 5, 2013 with the release of the Company's second quarter fiscal 2014 results and concluding on December 9, 2014, with the announcement of the Company's third quarter fiscal 2015 results in which Defendants acknowledged that the Company's delinquency rates, bad debt provision, and static loss rates had materially increased.

236.    The release of the Company's second quarter fiscal 2014 results on September 5, 2013, before the market opened, was a partial corrective disclosure in which the Company disclosed that its provision for bad debts was higher than expected and the Company's delinquency rates had deteriorated.

(a)    In reaction to these disclosures, Conn's stock price dropped from $68.31 per share on September 4, 2013 to close at $60.36 per share on September 5, 2013, a decrease of 11.6%, on unusually high trading volume.  However, the Company's stock price remained artificially inflated after this partial disclosure of fraud as even analysts believed the increased loan loss provision reflected a temporary setback.

(b)    The September 5, 2013 price decline was a direct result of the nature and extent of Defendants' fraud being revealed to investors and the market.  The timing and magnitude of the price decline in Conn's common stock negate any inference that the loss suffered by Lead Plaintiffs and the other Class members was caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to

Defendants' fraudulent conduct.  The economic loss (i.e., damages) suffered by Lead Plaintiffs and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the price of Conn's common stock and the subsequent significant decline in the value of Conn's common stock when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

237.    On February 20, 2014, before the market opened, the Company made a second corrective partial disclosure when it announced its preliminary fourth quarter fiscal 2014 results and updated its fiscal 2015 earnings guidance.  The Company disclosed that its "[c]redit segment provision for bad debts as a percentage of the average outstanding portfolio balance is expected to exceed previously issued full-year fiscal 2014 guidance" and that the "percentage of the customer portfolio balance 60-plus days delinquent was 8.8% at January 31, 2014, an increase of 30 basis points from October 31, 2013."  In the press release, the Company also revealed that it was lowering its recently issued fiscal 2015 earnings guidance to $3.40 per diluted share - down from $3.70 per diluted share.

(a)    The market reacted swiftly to the February 20, 2014 press release.  On abnormally high trading volume of more than 25 million shares traded, the price of Conn's common stock fell $23.91 per share, *or 42.85%*, from the prior day's close, to close on February 20, 2014 at $31.89 per share.  Nevertheless, the Company's stock price remained artificially inflated after this partial disclosure of fraud as analysts and investors were led to believe that the Company was better managing its credit business including improvement to its underwriting standards.

(b)    The decline was a direct result of the nature and extent of Defendants' fraud being revealed to investors and the market.  The timing and magnitude of the price decline

in Conn's common stock negate any inference that the loss suffered by Lead Plaintiffs and the other Class members was caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' fraudulent conduct.  The economic loss (i.e., damages) suffered by Lead Plaintiffs and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the price of Conn's common stock and the subsequent significant decline in the value of Conn's common stock when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

238.    On September 2, 2014, before the market opened, Conn's made a partially corrective disclosure in a press release that announced its second quarter of fiscal 2015 financial results and updated the Company's fiscal 2015 earnings guidance.  Conn's disclosed that its "[c]redit segment operating income declined $7.7 million to an operating loss of $0.2 million," "[t]he percentage of the customer portfolio balance 60+ days delinquent increased 70 basis points sequentially to 8.7% as of July 31, 2014," and "[c]redit segment provision for bad debts on an annualized basis was 13.9% of the average outstanding portfolio balance in the current quarter and 11.1% on an annualized basis for the first six months of fiscal 2015."  The Company also revealed that it was lowering its recently affirmed fiscal 2015 earnings guidance to a range of $2.80 to $3.00 adjusted earnings per diluted share — down from $3.40 to $3.70 adjusted earnings per diluted share.  During a conference call the same day, Conn's management surprised investors by stating its goal of maintain static losses at 7% or below, "doesn't appear realistic" and revised its long-term static loss rate to around 8%.  Moreover, the Company announced its fiscal 2014 originations static losses would be elevated to around 9.5%.

(a)    The market reacted quickly to the Company's September 2, 2014 earnings announcements.  On abnormally high trading volume of more than 14.2 million shares traded,

the price of Conn's common stock fell $13.83 per share, *or 30.85%*, to close on September 2, 2014 at $31.00 per share.  However, the Company's stock price remained artificially inflated after this partial disclosure of fraud as analysts and investors were led to believe that the Company was better managing its credit business and improving its underwriting standards, stating that in the "[*l*]*onger term, we believe the changes necessary to optimize portfolio performance are in place*."

        (b)     The September 2, 2014 price decline was a direct result of the nature and extent of Defendants' fraud being revealed to investors and the market.  The timing and magnitude of the price decline in Conn's common stock negate any inference that the loss suffered by Lead Plaintiffs and the other Class members was caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' fraudulent conduct.  The economic loss (i.e., damages) suffered by Lead Plaintiffs and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the price of Conn's common stock and the subsequent significant decline in the value of Conn's common stock when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

239.    On December 9, 2014, Conn's issued a press release announcing its third quarter of fiscal 2015 financial results and withdrawing its fiscal 2015 earnings guidance.  The Company disclosed that its "[p]rovision for bad debts for the three months ended October 31, 2014 was $72.0 million, an increase of $49.4 million from the same prior year period."  Conn's also revealed that "[d]elinquency increased year-over-year across credit quality levels, customer groups, product categories, geographic regions and years of origination."  The Company acknowledged "that its credit operations forecasting has not been acceptably accurate" and

withdrew its earnings guidance for fiscal 2015 and stated it was not currently providing earnings guidance for fiscal 2016.

(a)     The market reacted quickly to the Company's December 9, 2014 earnings announcements.  On abnormally high trading volume of more than 9.0 million shares traded, the price of Conn's common stock fell $14.26 per share, *or 40.64%*, to close on December 9, 2014 at $20.83 per share.

(b)     The December 9, 2014 price decline was a direct result of the nature and extent of Defendants' fraud being revealed to investors and the market.  The timing and magnitude of the price decline in Conn's common stock negate any inference that the loss suffered by Lead Plaintiffs and the other Class members was caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' fraudulent conduct.  The economic loss (i.e., damages) suffered by Lead Plaintiffs and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the price of Conn's common stock and the subsequent significant decline in the value of Conn's common stock when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

## XII.   PRESUMPTION OF RELIANCE

240.   Lead Plaintiffs will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a)     Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)     The omissions and misrepresentations were material;

(c)     The Company's common stock traded in an efficient market;

(d)     The misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's common stock; and

(e)     Lead Plaintiffs and other members of the Class purchased or acquired Conn's common stock and/or call options, or sold/wrote Conn's put options between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

241.    At all relevant times, the market for Conn's common stock was efficient for the following reasons, among others:

(a)     As a regulated issuer, Conn's filed periodic public reports with the SEC;

(b)     Conn's regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services;

(c)     Conn's was followed by several securities analysts employed by major brokerage firm(s) including, but not limited to:  (1) Canaccord Genuity; (2) KeyBanc Capital Markets; (3) SunTrust Robinson Humprey; (4) Stephens Inc.; (5) Piper Jaffray; (6) Jefferies & Co.; and (7) Oppenheimer & Co. who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firm(s) and that were publicly available and entered the public marketplace; and

(d)     Conn's common stock was actively traded on an efficient market, the NASDAQ, where the Company's common stock trades under the ticker symbol "CONN."

242.    As a result of the foregoing, the market for Conn's common stock promptly digested current information regarding Conn's from all publicly available sources and reflected

such information in Conn's common stock.  Under these circumstances, all purchasers and acquirers of Conn's common stock and/or call options, or sellers or writers of Conn's put options during the Class Period suffered similar injury through their purchases or acquisitions of Conn's common stock and/or call options, or sales and writings of Conn's put options at artificially inflated prices, and the presumption of reliance applies.

243.    Further, to the extent that Defendants concealed or improperly failed to disclose material facts with regard to the Company and its operations, Lead Plaintiffs are entitled to a presumption of reliance in accordance with *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972).

## XIII.  INAPPLICABILITY OF STATUTORY SAFE HARBOR

244.    Defendants' verbal "Safe Harbor" warnings accompanying their oral forward-looking statements ("FLS") issued during the Class Period were ineffective to shield those statements from liability.

245.    Defendants are also liable for any false or misleading FLS pleaded because, at the time each FLS was made, the speaker knew the FLS was false or misleading, and the FLS was authorized and/or approved by an executive officer of Conn's who knew that the FLS was false. None of the historic or present tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by Defendants expressly related to, or stated to be dependent on, those historic or present tense statements when made.

**COUNT I**
**For Violations of Section 10(b) of the Exchange Act and**
**Rule 10b-5 Against All Defendants**

246.    Lead Plaintiffs repeat, incorporate, and reallege paragraphs 1 through 245 by reference.

247.    During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

248.    Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they:

(a)    employed devices, schemes, and artifices to defraud;

(b)    made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)    engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Lead Plaintiffs and others similarly situated in connection with their purchases or acquisitions of Conn's common stock and/or call options, or sales and writings of Conn's put options during the Class Period.

249.    Lead Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Conn's common stock and call options, and received artificially deflated premiums for puts sold or written.  Lead Plaintiffs and the Class would not have purchased or acquired Conn's common stock and/or call options, or sold/wrote Conn's put options at the prices at which they transacted, or at all, if they had been

aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

250.    As a direct and proximate result of these Defendants' wrongful conduct, Lead Plaintiffs and the other members of the Class suffered damages in connection with their purchases or acquisitions of Conn's common stock and/or call options, or sales or writings of Conn's put options during the Class Period.

**COUNT II**
**For Violations of Section 20(a) of the Exchange Act**
<u>**Against the Individual Defendants**</u>

251.    Lead Plaintiffs repeat, incorporate, and reallege paragraphs 1 through 250 by reference.

252.    The Individual Defendants acted as controlling persons of Conn's within the meaning of Section 20(a) of the Exchange Act.  By virtue of their positions and their power to control public statements about Conn's, the Individual Defendants had the power and ability to control the actions of Conn's and its employees.  In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and therefore is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.  By reason of such conduct, Defendants are liable pursuant to Section 20(a) of the Exchange Act.

<u>**PRAYER FOR RELIEF**</u>

WHEREFORE, Lead Plaintiffs pray for judgment as follows:

A.    Declaring this action to be a proper class action pursuant to Federal Rule of Civil Procedure 23;

B.    Awarding Lead Plaintiffs and the members of the Class damages and interest;

122

C.      Awarding Lead Plaintiffs' reasonable costs, including attorneys' fees; and

D.      Awarding such equitable, injunctive, or other relief as the Court may deem just and proper.

## JURY DEMAND

Lead Plaintiffs demand a trial by jury.


Dated: July 21, 2015

*/s/ Thomas R. Ajamie*
Thomas R. Ajamie, Texas Bar No. 00952400
AJAMIE LLP
Pennzoil Place - South Tower
711 Louisiana, Suite 2150
Houston, Texas  77002
Telephone: (713) 860-1600
Facsimile: (713) 860-1699
tajamie@ajamie.com

*Liaison Counsel*

Deborah Clark-Weintraub
Joseph P. Guglielmo
Donald A. Broggi
SCOTT+SCOTT, ATTORNEYS AT LAW, LLP
The Chrysler Building
405 Lexington Avenue, 40th Floor
New York, New York 10174
Telephone: (212) 223-6444
Facsimile: (212) 223-6334
dweintraub@scott-scott.com
jguglielmo@scott-scott.com
dbroggi@scott-scott.com

John T. Jasnoch
SCOTT+SCOTT, ATTORNEYS AT LAW, LLP
707 Broadway, Suite 1000
San Diego, CA 92101
Telephone: (619) 233-4565
Facsimile: (619) 233-0508
jjasnoch@scott-scott.com

James M. Hughes
David P. Abel
Christopher F. Moriarty
MOTLEY RICE LLC
28 Bridgeside Blvd.
Mt. Pleasant, SC 29464
Telephone: (843) 216-9000
Facsimile: (843) 216-9450
jhughes@motleyrice.com
dabel@motleyrice.com
cmoriarty@motleyrice.com

*Co-Lead Counsel*

Jonathan Gardner
Paul Scarlato
Christine M. Fox
LABATON SUCHAROW LLP
140 Broadway
New York, New York  10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
jgardner@labaton.com
pscarlato@labaton.com
cfox@labaton.com

*Additional Counsel for Lead Plaintiffs*

CERTIFICATE OF SERVICE

I certify that on the 21st of July 2015, a true and correct copy of the foregoing document was filed with the Clerk of the Court using the CM/ECF system which will send electronic notification of such filing to all counsel of record.

*/s/ Thomas R. Ajamie*
Thomas R. Ajamie, Texas Bar No. 00952400