<pre>
 1              UNITED STATES DISTRICT COURT
                SOUTHERN DISTRICT OF TEXAS
 2                    HOUSTON DIVISION

 3
     IN RE:                   *   4:14-CV-00548
 4                            *
                              *   8:20 A.M.
 5   CONN'S SECURITIES        *
     LITIGATION               *   JUNE 29, 2017
 6
               HEARING ON CLASS CERTIFICATION
 7        BEFORE THE HONORABLE KEITH P. ELLISON
                  Volume 1 of 1 Volume
 8
     APPEARANCES:
 9
     FOR THE PLAINTIFFS:
10   Mr. Jonathan Gardner
     Ms. Christine M. Fox
11   Labaton Sucharow
     140 Broadway
12   New York, New York 10005
     212-907-0700
13      and
     Ms. Deborah Clark-Weintraub
14   Mr. Max Schwartz
     Scott & Scott Attorneys at Law, LLP
15   230 Park Avenue
     17th Floor
16   New York, New York 10169
     212-223-6444
17      and
     Mr. James M. Hughes
18   Motley Rice, LLC
     28 Bridgeside Boulevard
19   Mount Pleasant, South Carolina  29464
     843-216-9000
20
     FOR THE DEFENDANTS:
21   Ms. Jennifer B. Poppe
     Vinson & Elkins
22   1001 Fannin Street
     Suite 2500
23   Houston, Texas 77002
     713-758-4464
24

25
</pre>

1                    **APPEARANCES (continued)**

2    **FOR THE DEFENDANTS:**
     Ms. Meriwether T. Evans
3    Vinson & Elkins
     2001 Ross Avenue
4    Suite 3700
     Dallas, Texas  75201
5    214-220-7700

6    Court Reporter:
     Laura Wells, RPR, RMR, CRR
7    515 Rusk, Suite 8004
     Houston, Texas 77002
8
     Proceedings recorded by mechanical stenography.
9    Transcript produced by computer-assisted transcription.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1 **PROCEEDINGS**

2          THE COURT:  Thank you.  Please sit down.  Sorry

3   for the delay in starting.  It's entirely my fault.

4      Okay.  I know you have just been through it with the

5   court reporter, but we'll go through it one more time.

6   Appearances of counsel in Conn's Securities Litigation,

7   starting with the plaintiffs.

8          MR. GARDNER:  Good morning, Your Honor.  Jonathan

9   Gardner with Labaton Sucharow for the plaintiffs.

10          MS. FOX:  Christine Fox, also with Labaton

11   Sucharow.

12          THE COURT:  Thank you.

13          MS. WEINTRAUB:  Good morning, Your Honor.

14   Deborah Clark-Weintraub with Scott & Scott for the

15   plaintiffs.

16          THE COURT:  Thank you.

17          MR. SCHWARTZ:  Good morning, Your Honor.  Max

18   Schwartz, also with Scott & Scott, for plaintiffs.

19          MR. HUGHES:  Good morning, Your Honor.  James

20   Hughes with Motley Rice for the plaintiffs, as well.

21          THE COURT:  Okay.  And then for the defendants.

22          MS. POPPE:  Good morning, Your Honor.  Jennifer

23   Poppe with Vinson & Elkins for the defendants.

24          MS. EVANS:  Good morning, Your Honor.  Meriwether

25   Evans, also with Vinson & Elkins, for the defendants.

1          THE COURT:  Welcome to both of you.

2      First, let me thank you for the papers, which were

3  well done.  In a difficult case like this I feel, as I

4  have said before, very gratified to have some of the

5  nation's best lawyers working on it.

6      Have you discussed among yourselves how you wish to

7  proceed?

8          MR. GARDNER:  We have not, Your Honor.  We are

9  happy to proceed in any manner.

10         THE COURT:  Well, it's your motion.  Do you need

11 -- does anybody need to make an opening statement or

12 anything?  I don't think it's necessary.

13         MS. POPPE:  No, Your Honor.  It was our

14 understanding we had about an hour.  Is that how much you

15 have --

16         THE COURT:  Well, that's how much we will start

17 with.  I can push -- I can push a little bit if we need

18 more time.  We have a preliminary injunction hearing

19 that's already gone on for eight days.  So they can't be

20 too possessive about courtroom time.

21         MR. GARDNER:  They have had their share.

22         THE COURT:  Yeah.  Yeah.  Nobody gives the judge

23 any respect.  They just go on and on.

24         MR. GARDNER:  Good morning, Your Honor.

25         THE COURT:  Good morning.

1          MR. GARDNER:  Jonathan Gardner for the

2    plaintiffs.

3        I don't know, Your Honor, if there is a particular

4    issue that you would like me to focus on.  Otherwise, I

5    can just run through it.

6          THE COURT:  Well, I think the -- the critical

7    issue is the fifth *Cammer* factor -- *Cammer* is

8    C-a-m-m-e-r -- whether or not it is necessary to establish

9    market efficiency or whether I would be making new law to

10   hold that.

11         MR. GARDNER:  We do cite, Your Honor, a couple of

12   cases that suggest that one particular *Cammer* factor does

13   not make or break the market efficiency analysis.

14         THE COURT:  In overall tests?

15         MR. GARDNER:  It is in overall tests.  In fact,

16   the Fifth Circuit in the *Unger* case specifically

17   criticized the district court judge for only analyzing

18   three of the *Cammer* factors, one of which was the fifth

19   *Cammer* factor; and the Court said that that's not a

20   sufficient analysis of market efficiency.

21       It looked -- I believe the *Unger* district court looked

22   at the cause and effect fifth *Cammer* factor, looked at the

23   volume and looked at the number of market makers; and

24   that's all that was in the analysis.

25       And the Fifth Circuit said that's not a sufficient

1  analysis of all of the *Cammer* factors and other factors.

2  I think *Unger* enumerated eight factors, three beyond the

3  *Cammer* court, and said that that is not even an exhaustive

4  list of an analysis of market efficiency.

5      And so, Your Honor, I think that they are just wrong

6  in suggesting to you that you can simply ignore all of the

7  other *Cammer* factors and factors in *Unger*.

8      And in this case, the record is clear, every single

9  one of those other factors, the average weekly trading

10  volume, the number of security analysts that followed the

11  company, whether market makers traded in the stock,

12  eligibility to file SEC Registration Form S-3 filings, the

13  market -- the company's market cap, the bid-ask spread for

14  the stock, the level of institutional traders that hold

15  stock -- and sophisticated institutions hold the majority

16  of the stock in Conn's during the class period -- and the

17  existence or lack of existence of autocorrelation, all of

18  those factors are important.

19      In fact, *Cammer* itself said, over a certain threshold,

20  average weekly trading volume gives you a presumption, a

21  strong presumption of market efficiency.  It's not just a,

22  you know, necessary factor that exists.  It's actually

23  proof of market efficiency.

24      And, you know, as the Supreme Court held in

25  *Halliburton*, the test of market efficiency is it is not

1  binary.  It's not yes or no.  It's a matter of proof.

2  It's a matter of degree and which is why they made the

3  presumption rebuttable.

4       So I start with the proposition that the defendants

5  urging for you to ignore all the other *Cammer* factors and

6  *Unger* factors is just wrong as a matter of law.  I think I

7  would suggest that you look at all of them.

8            THE COURT:  You are saying you don't look just at

9  the fifth *Cammer* factor or any one *Cammer* factor.  You

10  look at all of them.  But in any event, you have satisfied

11  the fifth one, too?

12            MR. GARDNER:  Exactly, Your Honor.  I can walk

13  through why we satisfy the fifth factor.  The fifth factor

14  generally we have put in -- we have put forward an expert

15  report in this case, Mr. Coffman's expert report.

16            THE COURT:  Yes.  Coffman is C-o-f-f-m-a-n.

17            MR. GARDNER:  He did an event study, which the

18  defendants don't challenge that that's the appropriate

19  methodology to testing cause and effect.

20       He analyzed earning days.  And in his report in a

21  footnote, I think Paragraph 55, he gives support for why

22  testing earning days is the appropriate way -- is an

23  appropriate way to test cause and effect.

24       So he took a completely objective set of dates,

25  earnings announcements where you would expect there to be

1    company specific news that comes out, the company is
2    announcing its prior quarter earnings, it's making
3    projections, it's talking to the market.  So that's a good
4    indicator of a day in which the market is learning
5    information about the company.
6        He then contrasted that through a statistical analysis
7    to days in which he did a search and found no news on the
8    company, no news reports, no filings from the company, no
9    analysts were talking about the company on those days; and
10   he identified 100 such non-news days.
11       He ran his event study, his regression analysis.  And
12   there is no dispute that the event study was run
13   appropriately.  They don't challenge the indexes he used
14   or his event study methodology.  And he found that on
15   9 of 9, 100 percent of the time the company announced
16   earnings, the stock price moved in a statistically
17   significant manner.  100 percent versus 8 percent.  8 out
18   of 100 on non-news days, the stock moved in a
19   statistically significant manner.  The difference between
20   8 percent and 100 percent is itself statistically
21   significant.
22       And you would expect, through the regression analysis
23   bell curve, that 5 percent of the time there would be
24   movement, unexplained statistically significant movement.
25   So the 8 percent is no different than what you would

1    expect through just normal stock price movements.

2         So the difference between 100 percent of the time on

3    news days versus 8 percent of the time on non-news days is

4    powerful empirical evidence of a cause and effect.

5              THE COURT:  Okay.  I've got you.

6              MR. GARDNER:  There is more analysis that he

7    does, the stock moves, changes in much higher volume, et

8    cetera.

9              THE COURT:  Let me hear from the defendants on

10   this.  My question for the defendants is:  Is there any --

11   is there any authority in the Fifth Circuit that the fifth

12   *Cammer* factor is necessary for a showing of market

13   efficiency?

14             MS. POPPE:  I am not aware of any case within the

15   Fifth Circuit holding what you just said there.

16             THE COURT:  Okay.

17             MS. POPPE:  The fifth *Cammer* factor is certainly

18   the most important of the five *Cammer* factors, and it is

19   the one that is more the direct test on efficiency.

20             THE COURT:  You don't disagree with counsel that

21   you look at all of them, at least five or eight, depending

22   on which list you look at?  You don't disagree that it's

23   an analysis of all of them, not just one of them, right?

24             MS. POPPE:  I don't disagree that courts often

25   look at all of them.  I would point out here one

1   interesting fact though.  In connection with the analysis

2   that they did on the options and the series of options,

3   the only factor that Mr. Coffman looked at was *Cammer*

4   factor five.  He did not analyze all of the others.

5          THE COURT:  Well, is the analysis for options

6   different from the analysis for common shares?

7          MS. POPPE:  Yes, it is.  They are traded in a

8   very different way.  There are not near as many of them.

9   Their volume is much less.

10         So, for example, the *Cammer* factor that looks at

11  volume of trading, if you were to look at that with

12  respect to options, it would be much less; and there are

13  different series of options, each with different strike

14  prices and different maturity dates that may be treated

15  very differently by the market.  So, yes, it's important

16  to analyze that separately.

17         The plaintiffs' expert did not have any authority that

18  he presented that would suggest that they are traded the

19  same or that they should be analyzed just the same; and in

20  fact, they are very different.

21         And our expert walks through why they are different,

22  walks through some of the different issues associated with

23  them and points out some of the issues associated with why

24  they may not be traded on such an efficient market.

25         So it's interesting here we have the plaintiff saying

1    you must look at all of them with respect to the market,

2    that common stock as a whole.  Look to all of them.  Don't

3    just focus on *Cammer* factor five, and it's okay if we

4    didn't do as good of a job there as we could have.

5        But then on the options, all they are looking at is

6    *Cammer* factor five.  You can't have it both ways.

7            THE COURT:  Okay.  In *In Re Enron Corporation,*

8    529 F.Supp.2d 644 at 754, the Court held that evidence

9    applying the *Cammer/Unger/Bell* factors -- and the way the

10   Court wrote it was *Cammer*, C-a-m-m-e-r, slash, Unger,

11   U-n-g-e-r, slash *Bell* -- evidence applying the

12   *Cammer/Unger/Bell* factors to stock is sufficient to

13   trigger the fraud-on-the-market presumption for claims

14   based on options.

15       And in another case, the *McIntire v. China Media

16   Express* -- McIntire is M-c-I-n-t-i-r-e -- the Court held

17   the market price for options is directly responsive...to

18   changes in the market price of the underlying stock and to

19   the information affecting that price.

20       So I don't know that it really is a separate analysis.

21           MS. POPPE:  Well, it could be done the exact same

22   way; and I'm not suggesting that option trading could

23   never be done on an efficient market.  But simply here,

24   the analysis that the plaintiffs' expert did was not

25   sufficient to meet their burden to show that the options

1    or even the common stock was traded on a sufficient

2    market.

3         And I don't mean to suggest that you could never get

4    there or that the *Cammer* factors would not be the

5    appropriate way to look at both but just simply that the

6    plaintiffs' expert here did not do enough to satisfy their

7    burden to show it.

8              THE COURT:  Okay.  Thank you very much.

9         Mr. Gardner.

10             MR. GARDNER:  Your Honor, one other point that

11   actually applies to both the common stock and the options

12   is there is no opinion from the defense side, from their

13   expert or otherwise, that the market for the common stock

14   or the options is inefficient.  They just simply try to

15   suggest, nitpick I would say.

16             THE COURT:  But it is your burden, isn't it?

17             MR. GARDNER:  It is our burden.  But generally,

18   if they felt strongly that the market was not efficient,

19   they would have come forward, I would submit, with an

20   expert report of their own suggesting for the following

21   reasons why the market is not efficient.

22        With respect to the options, Your Honor, I think that

23   Your Honor is right, the *Enron* decision that you quoted;

24   and I would just add to that that there is a Mr. Stulz,

25   the defendants' expert --

1          THE COURT:  Spell that for the court reporter.

2          MR. GARDNER:  S-t-u-l-z.  At Paragraph 39 of his

3  report he starts his discussion of options with the

4  admission that options are derivative of common stock, and

5  most courts find that that in and of itself is sufficient.

6       And Mr. Coffman went further.  He did test the

7  cause-and-effect relationship between options on news days

8  versus non-news days, and the statistics are just as stark

9  as they were for the common stock.

10      On earnings days, 8 of 9 call options, 89 percent,

11  moved in a statistically significant way versus 9 of 100

12  on non-news days.  So that's 9 percent versus 89 percent.

13      And on -- on put options, 9 of 9 times put options

14  moved in a statistically significant way on news days

15  versus 7 of 100, 7 percent.

16      So the difference between the options trading

17  statistically significant versus non-news days is strong

18  empirical evidence that the market for options was also

19  efficient.

20      He also did analysis of the absolute abnormal change

21  in the options on news days versus non-news days; and it

22  is again stark, 65 percent of call option.  The market

23  moved 65 percent on news days versus only 8 percent on

24  non-news days.

25      So there is a lot of information in Mr. Coffman's

1  report on options that make the point that the market is

2  efficient.

3      And some of the *Cammer* factors that apply to common

4  stock apply equally to options.  Number of analysts that

5  follow the stock, that's the same.  The market makers,

6  that analysis is the same.  So some of the *Cammer* factors

7  that he applied for the common stock apply with equal --

8  equal weight for the options, which is why most courts say

9  you don't need to do an independent analysis if the common

10  stock moves -- if the common stock is efficient, the

11  trading and the options is efficient.

12      THE COURT:  Just give me a brief primer on how

13  options are priced.  Is it, you think, responsive to what

14  is going on generally in the world of finance; or is it

15  entirely driven by the market price of the underlying

16  security in its pattern of increase and decrease?

17      MR. GARDNER:  I think it is predominantly

18  derivative of the common stock; and by saying that, what

19  I'm suggesting is --

20      THE COURT:  Bet on whether you are going to have

21  to put or hold -- put or sell, I'm sorry.

22      MR. GARDNER:  The information that's in the

23  market is driving the price of the stock, and it's driving

24  the price of the options.  People interpret that

25  information differently, which is why you have people

1   willing to buy and people willing to sell at different

2   prices.

3         But the underlying information in the market is

4   setting price, and it's the same information that is in

5   the market.  The analysts reports and what they are saying

6   about the stock, the information that the company is

7   providing to the market, all of that is factored into what

8   people are willing to buy and sell, whether it's common

9   stock directly or whether it's a derivative product such

10  as options or other esoteric securities.

11            THE COURT:  So do you think the efficiency of the

12  options market is linked directly to the efficiency of the

13  common share market?

14            MR. GARDNER:  I do.

15            THE COURT:  Okay.  Both sides make good

16  arguments, but I do believe I have to hold that plaintiffs

17  have satisfied the five *Cammer* factors as to both stock

18  and options.

19        So does that leave us -- we still have whether

20  plaintiffs are adequate class representatives and one of

21  the lead plaintiffs whether St. Paul is atypical.  Is it

22  time to turn to those?

23            MR. GARDNER:  Absolutely, Your Honor.  I just

24  want to -- your voice dropped off a little bit, and it was

25  an important point.  I just want to make sure I heard you

1  correctly that you said that the plaintiffs did, in fact,

2  satisfy the *Cammer* factors.

3         THE COURT:  Yes.  That's what I said.

4         MR. GARDNER:  Okay.  Thank you for that clarity.

5      So let me talk about the adequacy and typicality

6  arguments that the defendants make, and let me start with

7  the typicality argument that they make solely with respect

8  to St. Paul, one of the four institutional investors that

9  are seeking -- that are lead plaintiffs that are seeking

10  to be class representatives in this case.

11      The argument is that some of St. Paul's purchases

12  happened after certain corrective disclosures.  I should

13  point out, first, that those purchases took place in the

14  class period as defined.  So before the final two

15  corrective disclosures, St. Paul purchased some additional

16  shares.  They purchased the bulk of their shares before

17  the first two corrective disclosures, but they did

18  purchase some after the first two corrective disclosures

19  but before the final corrective disclosure.  And the

20  defendants' argument is that that makes them atypical

21  because they purchased after some revelation of the truth

22  was in the market.

23      The problem with that argument is that it runs

24  squarely into the Fifth Circuit decision in *Feder v.*

25  *Electric Data Systems Corporation*.

1          THE COURT:  Yeah, I saw that.

2          MR. GARDNER:  I think that ends the argument.

3   The Fifth Circuit clearly said that that argument does not

4   preclude a lead plaintiff from establishing typicality,

5   and that the rationale is that reliance on the integrity

6   of the market price -- and this is a quote from that

7   decision.

8      "The reliance on the integrity of the market price

9   prior to disclosure of the alleged fraud, i.e., during the

10  class period, is unlikely to defeat -- to be defeated by

11  post-disclosure reliance on integrity of the market.  This

12  seems particularly so after the stock price has been

13  corrected by the market's assimilation of the new

14  information."

15      And I think what the Fifth Circuit was driving at,

16  which is class members are allowed to continue purchasing

17  the company's stock after a correction.  St. Paul believed

18  and St. Paul's advisors believed that the fraud had

19  dissipated out of the stock and the stock price had

20  dropped, and they continued to purchase stock.  That

21  doesn't make them atypical.  In fact, I would say that

22  makes them typical.

23      I would submit, Your Honor, that most class members

24  likely continue to purchase or at least a great majority

25  of them.  It doesn't -- it doesn't render them atypical,

1    and it doesn't threaten to be a focus of the litigation at

2    trial.

3         The cases that the defendants rely upon I think are

4    easily distinguishable.  We do that in our brief.  The

5    *Rocco* case from the Southern District of New York had a

6    plaintiff in which the evidence showed that the plaintiff

7    had specific knowledge of a second fraud during the

8    purchasing of the stock.

9         That's a completely different scenario than what we

10   have here.  And so I think that that is -- that's an easy

11   argument to deal with, given the Fifth Circuit's

12   pronouncement in *Feder*.

13        With respect to adequacy, they make an adequacy

14   argument against all four of the lead plaintiffs.  I would

15   first point out that we have four institutional investors

16   seeking to be class representatives.  They each have

17   hundreds of millions, if not billions, of dollars in

18   assets.  They are sophisticated.  They have the resources,

19   and they have shown in this case that they are -- they

20   understand their fiduciary duties.  That's in the

21   deposition transcripts we cite.

22        They understand they are representing a class, and

23   they've engaged with counsel.  We have had regular updates

24   with them, discussions.  They've reviewed the pleadings

25   and the court filings.  They have done everything that is

1  necessary of a lead plaintiff to lead a securities class

2  action.  They have experience doing -- doing this.

3      I would suggest that, you know, the arguments that the

4  defendants make picking out little pieces of their

5  deposition transcripts where they didn't draft the

6  complaint, well, I don't know any client in any

7  litigation, securities litigation, breach of contract,

8  where the client drafts the complaint or drafts

9  declarations on their behalf.  That's what the lawyers do.

10     These are -- this is sophisticated complex litigation.

11 You need years and years of experience to be -- to draft

12 complaints and draft pleadings.  Clients are not in a

13 position to do those things.

14     So their focus on the fact that the client didn't

15 draft certain things, didn't make changes to the complaint

16 I think are really red herrings.

17     What is important are that these people have the

18 resources.  They are interested in representing the class.

19 They understand their fiduciary duties, and they are

20 prepared to be class representatives.

21     I think if Your Honor reads the deposition transcripts

22 that are in the record, there is overwhelming evidence in

23 there that each of these representatives understood the

24 case, they knew what the class period was, they knew who

25 the defendants were, they understood the basic claim in

1  the case and they testified that they understood their

2  fiduciary responsibilities.

3      As far as case law is concerned, I would simply point

4  Your Honor back to your own original decision in the *BP*

5  case, the original case in which you seemed to have no

6  difficulty in finding the institutional investors in that

7  case sophisticated.  And I believe you looked at the fact

8  that:  They were institutions.  They had the resources.

9  They had produced documents.  They were engaged

10 sufficiently.

11     So I think on the adequacy front we more than have

12 sufficient evidence in the record that each of these

13 institutional investors are adequate.

14         THE COURT:  Okay.  Thank you.  Thank you.

15         MS. POPPE:  Would you like me to go --

16         THE COURT:  Is there anything more -- before we

17 move on finally, is there anything more you would like to

18 say about the first issue, the predominance issue?  I just

19 find it -- I think you have made very good arguments in

20 your brief, but I think the case law is against your

21 client's position on this.

22     And I'm not talking to you.  Sit down.  I'm sorry.

23         MR. GARDNER:  I am sorry, Your Honor.  You scared

24 me there for a minute.

25         THE COURT:  I am sorry.  I thought you had left

1   the rostrum.

2          MS. POPPE:  With respect to your question about

3   market efficiency as a whole?

4          THE COURT:  Yes.

5          MS. POPPE:  I think everything that we have said,

6   we have said in the papers and I have said already.

7          THE COURT:  All right.

8          MS. POPPE:  I would say, though, that that

9   doesn't answer the question of whether we have

10  successfully rebutted the presumption of price impact.

11  That's a different question we haven't talked about yet.

12         THE COURT:  On price impact, I find that argument

13  a little bit hard to negotiate.  You fault Mr. Coffman

14  because his methodology supposedly failed to consider

15  whether any of the earnings days contained value relevant

16  news, and you even included days on which release of

17  earnings was announced.  I don't know how that could not

18  be value relevant news.

19         MS. POPPE:  Right.  And that, to me, really goes

20  more to the first initial question of is this an efficient

21  market --

22         THE COURT:  Okay.

23         MS. POPPE:  -- and not necessarily to the

24  separate question of was there, as *Halliburton II* said you

25  could, rebut the presumption by showing that there was no

1  price impact.

2      This is what Dr. Stulz really focused on in part -- in

3  a separate part of his opinion.  And I have -- if I may,

4  Your Honor, hand you --

5          THE COURT:  Hand it to Mr. Rivera.  Have you got

6  a copy for the other side?

7          MS. POPPE:  They already have one.

8          THE COURT:  Thank you.

9          MS. POPPE:  So the focus here is really about --

10  from a price impact standpoint really becomes much more

11  about was there an impact to the stock price in connection

12  with either, one, the misrepresentation or, two, the

13  corrective disclosure.

14      And in *Halliburton II*, in connection with considering

15  the underlying nature of the fraud-on-the-market theory,

16  the Supreme Court recognized that if the market is

17  efficient then there is a presumption of a

18  fraud-on-the-market theory.  But specifically said, that

19  presumption may be rebutted if there is no price impact.

20          THE COURT:  I understand that.  I'm with you on

21  that point.

22          MS. POPPE:  Okay.  And so do you want me to go

23  ahead and talk about the price impact issue now?

24          THE COURT:  Yeah.

25          MS. POPPE:  So in connection with price impact,

1    the issue here is the plaintiffs' theory is they made

2    statements on a certain day, three days in particular,

3    that caused the stock price to artificially increase.

4    That's the way they have alleged it in their complaint.

5              THE COURT:  Yeah.  Their most recent complaint.

6              MS. POPPE:  Right.  And in fact, it turns out, if

7    you actually look at the intraday stock pricing on those,

8    on two of the three days, it makes clear that the increase

9    actually happened before the earnings call where they

10   complain the statements at issue were made.

11        And so, in fact, the statements that they are

12   complaining about here on two of the three days it's clear

13   did not impact the price of the stock.  And, therefore,

14   according to *Halliburton II*, that is a way -- an adequate

15   way to rebut the presumption that there was a price impact

16   and that there was a quote-unquote fraud on the market,

17   which is what the whole market efficiency issue is about.

18        And so for -- with respect to April 3rd -- and if you

19   look at -- I think it's illustrative to look at -- and the

20   pages are sort of numbered on the side -- Page 3 of what I

21   handed you and Page 4, this is from the plaintiffs'

22   expert's report.  These charts are the intraday trading

23   charts for April 3rd and for December 5th, the two days

24   that we are challenging.

25        And if you look over on the right or on the left-hand

1   side of that chart you can see, for example, on Page 3,

2   the April 3rd chart you can see the stock price close the

3   previous day at $36.08.  Conn's issued a press release

4   before the market opened the next day, and the result of

5   that press release was that the opening price for Conn's

6   that day was 39.30.  So the price increase that they are

7   wanting to attribute to their alleged misstatements here

8   actually occurred before those statements were ever made.

9        And this is very similar to the Eighth Circuit opinion

10  in *Best Buy* where the Eighth Circuit and the underlying

11  court looked at this very issue and said the stock price

12  occurred --

13          THE COURT:  The stock price increase?

14          MS. POPPE:  Yes.  The stock price increase

15  occurred prior to what you are complaining about.  And if

16  there is no price impact from the statements themselves,

17  then you have effectively rebutted them.

18          THE COURT:  Well, I didn't see in your analysis

19  or Dr. Stulz's analysis any accounting for the -- whether

20  there was a statistically significant price decrease when

21  the truth was revealed.

22          MS. POPPE:  So that's an important question, and

23  you don't need to show both is our --

24          THE COURT:  Oh, really?

25          MS. POPPE:  -- is our position.  I can walk you

1    through why I don't believe *Halliburton II* requires you to

2    show both.

3        The plaintiffs cite in their case the Fifth Circuit

4    *Halliburton* opinion which preceded the Supreme Court

5    *Halliburton II* decision that I'm referring to.  In that

6    opinion, the Fifth Circuit does make reference, when it

7    was talking about loss causation, to looking at both.

8        But the Supreme Court *Halliburton II* decision does not

9    say that.  In fact, if you look at Page 6 of what we

10    handed out, this is a quote from *Halliburton II*.

11        "Basic itself made clear that the presumption was just

12    that and could be rebutted by appropriate evidence,

13    including evidence that the asserted misrepresentation or

14    its correction --" it doesn't say both "-- or its

15    correction did not affect the market price of the

16    defendants' stock."

17        And the Court goes on to talk about a hypothetical

18    example of looking at this, and this hypothetical is on

19    Page 2415 of the opinion.  And in that hypothetical,

20    again, the Court is really only talking about what

21    happened on the day the misrepresentation was made.

22        THE COURT:  So you say that even after a

23    clear-the-air disclosure, this is what we should have said

24    earlier, no matter how much the stock decreases, that

25    doesn't help with the analysis of price impact?

1          MS. POPPE:  No.  Yes, exactly.  I am saying that

2     you can rebut the presumption, the fraud-on-the-market

3     theory presumption, by showing no price movement either on

4     the day of the alleged misrepresentation or on the date of

5     corrective disclosure.  You don't have to show both.

6          THE COURT:  No.  I --

7          MS. POPPE:  Did I misunderstand your question?

8          THE COURT:  No.  You have got the question right.

9     Let me see just a second.

10          MS. POPPE:  I can continue to walk you through

11     why.

12          THE COURT:  No.  Let me just ask you about one

13     case, *Erica, E-r-i-c-a, P as in Paul, John, J-o-h-n, Fund*

14     *v. Halliburton* says -- it says, "To successfully prove a

15     lack of price impact, defendants would, quote, be required

16     to demonstrate both that the stock price did not increase

17     when the misrepresentation was announced and that the

18     price did not decrease when the truth was revealed."

19          So is there some tension in the *Halliburton* cases?

20          MS. POPPE:  Yes.  In fact, that case is what then

21     went up to the Supreme Court --

22          THE COURT:  Yeah.  It got vacated.  I know.

23          MS. POPPE:  -- and was vacated; and the Supreme

24     Court did not say you have to do both.

25          And the Eighth Circuit has agreed with that

*Laura Wells, CRR, RDR*

1    interpretation and held you do not need to do both.

2              THE COURT:  But -- okay.  But on the point -- on

3    the point that we're talking about, isn't -- irrespective

4    of the Eighth Circuit, isn't the Fifth Circuit law that

5    you have to demonstrate both?

6              MS. POPPE:  No, Your Honor, I don't believe so,

7    because that opinion that the Fifth Circuit wrote

8    there then went up --

9              THE COURT:  It vacated but not on that point, did

10   it?

11             MS. POPPE:  Yes, on this very point.  This is the

12   very issue that the Supreme Court decided:  Can you and

13   how can you rebut the presumption for fraud on the market?

14             THE COURT:  That just seems remarkable that you

15   reveal I have lied in the past and the market tanks and

16   plaintiffs are without a cause of action.  That really

17   seems like a remarkable statement.

18             MS. POPPE:  Well, there are lots of elements to a

19   10b-5 case here, including an injury.

20             THE COURT:  Yeah, I know.

21             MS. POPPE:  Their whole case is based on the idea

22   that the statement artificially inflated the value of the

23   stock.  That's their allegation it was artificially

24   inflated.

25        It turns out it was not artificially inflated here.

 1  The market didn't care.  And if the market didn't care,

 2  then there is no lawsuit.  There is no injury.  There is

 3  no -- there is no damage.

 4      Now, what happened down the road and those stock price

 5  drops, there could be lots of reasons for those.

 6          THE COURT:  Well, of course there can.  Of course

 7  there can.  There could be lots of reasons that the stock

 8  didn't increase when the misrepresentations were made,

 9  such as bad news elsewhere in the world or bad news

10  elsewhere in the economy.  That's one reason these cases

11  are hard.

12      But I think I disagree with your client on the -- on

13  the consequences of a decline after a misrepresentation

14  was corrected.

15          MS. POPPE:  And I don't see that the Fifth

16  Circuit has revisited this.  I think there are some

17  district court cases that have said what you've just said,

18  you need to show both.

19      I think the Eighth Circuit -- I think Judge Lynn, when

20  *Halliburton* went back down, looked at simply just one side

21  of it.  She didn't look at both sides of it.

22      I think this is an open question within the Fifth

23  Circuit how to interpret it; but my opinion is that the

24  *Halliburton II* case makes clear what the Supreme Court's

25  intention is.  You can decide one or the other.  You don't

 1 | need to decide both.

 2 | THE COURT:  Okay.  Let's talk a little bit about

 3 | damages on a class-wide basis.

 4 | MR. GARDNER:  Your Honor, before can I -- I

 5 | haven't had a chance to talk about price impact.  Do you

 6 | want me to respond before you move on?

 7 | THE COURT:  That's fair.  That's the way we have

 8 | been going.  We have been going that way, kind of an

 9 | iambic pattern, first one and then the other.

10 | MS. POPPE:  And we will at some point -- because

11 | there is an important point I want to make as it relates

12 | to the length of the class period.

13 | THE COURT:  Yeah.  Right.  We'll talk about that.

14 | MS. POPPE:  Okay.

15 | THE COURT:  For those who are here on the prison

16 | case, we're not going to start at 10:00.  I'm sorry.  It

17 | will be at least 10:30.  I am sorry.  I apologize.

18 | MS. POPPE:  Your Honor, I'm sorry.  One more

19 | thing.  Should I go ahead and address adequacy and

20 | typicality or should I wait until later?

21 | THE COURT:  No.  We'll come back to that.  You

22 | will have another chance.  We'll stay here until the earth

23 | looks flat if we need to.  Don't worry.

24 | MR. GARDNER:  Sorry, Your Honor.  So let me -- I

25 | can be pretty brief on the price impact point.  I just --

1   the demonstrative, I just didn't want my silence to go as

2   we -- I don't have a problem with her handing it up.  We

3   don't agree that it's accurate in certain respects.

4          THE COURT:  I know you don't.  You don't have to

5   burden that point.  I know you don't.

6          MR. GARDNER:  Okay.  I didn't want to --

7          THE COURT:  I know you didn't want to acquiesce

8   -- your silence to be construed as acquiescence.  I

9   understand.

10         MR. GARDNER:  Thank you, Your Honor.

11     So with respect to the price impact point, I think

12  Your Honor has it exactly correct.  That is, it is the

13  defendants' burden, they don't dispute that, to prove a

14  lack of price impact.  They have to prove both a lack of

15  price movement on the misrepresentation and --

16         THE COURT:  What is your authority for that?  We

17  seem to have a disagreement about whether the Fifth

18  Circuit law on that was vacated.

19         MR. GARDNER:  Two things, Your Honor.  The Fifth

20  Circuit decision in *Halliburton,* which you quoted, was not

21  vacated on that ground.

22         THE COURT:  I didn't think so, but we have a

23  disagreement on that.

24         MR. GARDNER:  I'll point you to a recent

25  decision.  It's actually a report and recommendation by

*Laura Wells, CRR, RDR*

1   Judge Mitchell in the Eastern District of Texas, which has
2   been adopted and approved by Judge Schroeder of that
3   court.
4       And the magistrate judge's decision -- and I'll just
5   quote it -- says price -- and this is post the Supreme
6   Court decision.  This is from 2016.  And Judge Schroeder's
7   decision was signed on March 8th of 2017.  It is a very
8   recent decision out of district court -- district court in
9   the Fifth Circuit.
10      The magistrate judge's opinion says, and I'm quoting,
11  "Price impact can be shown either by an increase in price
12  following a fraudulent public statement or a decrease in
13  price following a revelation of the fraud."  Citing *Erica*
14  *P. John Fund, Inc. v. Halliburton*, Fifth Circuit decision,
15  718 F.3rd 423.  Vacated and remanded on other grounds by
16  134 Supreme Court 2398.
17      So at least these two judges interpret it the way that
18  you do, which is it was vacated on other grounds.
19      That -- how you go about rebutting price impact, the
20  Supreme Court didn't opine on in *Halliburton*.  And the
21  decision on remand in *Halliburton* -- this is now coming
22  back from the Supreme Court, and the citation there is 309
23  F.R.D. 251 -- says "Under price impact,
24  fraud-on-the-market securities litigation typically
25  focuses on a price change at the time of a corrective

1   disclosure; and if the particular disclosure causes the

2   stock price to decline at the time of disclosure, then the

3   misrepresentation must have had -- must have made the

4   price higher than it would have otherwise been without the

5   misrepresentation."

6            THE COURT:  I'm going to have to -- I'm going to

7   have to --

8            MR. GARDNER:  So I think there is ample

9   support --

10            THE COURT:  I think I'm going to have to reject

11   Conn's position on this.  It was well argued.  I

12   appreciate that.  At least at this stage, I have to go

13   with the plaintiff.

14        Maybe we are -- I am wrong about this, but I think the

15   Fifth Circuit will be able to tell me.  And there may be

16   intervening law from the Fifth Circuit before we get to

17   trial.

18            MR. GARDNER:  Let me -- let me give you a little

19   more comfort; and that is, I would submit all of the

20   circuit courts that have looked at this seriously have

21   concluded similarly that price impact can be shown either

22   by the increase after the misrepresentation or the

23   decrease.

24        The Second Circuit in this *China Media Express* case;

25   the Seventh Circuit *Glickenhaus* case; the Ninth Circuit in

1   a case -- I don't know the citation, but I can get it for

2   you -- the Eleventh Circuit in the *FindWhat* case, I mean,

3   all those decisions support the position that Your Honor

4   is articulating.

5        And it makes perfect sense because, as you indicated,

6   you don't expect there to be a price increase every time a

7   defendant makes a misrepresentation to the market.   There

8   are certain statements --

9        THE COURT:   The market doesn't know it.   The

10   market doesn't know it's a misstatement.

11        MR. GARDNER:   Doesn't know it's a misstatement.

12   Plus, certain statements, like the ones we have in this

13   case, are designed to maintain a price.   In other words,

14   everything is going well, when the company knows

15   everything is not going well.

16        THE COURT:   I'm satisfied on this point.

17        MR. GARDNER:   And *Best Buy* -- just so the record

18   is clear, *Best Buy* is easily distinguishable, the Eighth

19   Circuit decision.   There are three things that plaintiffs'

20   expert admitted in that case, one of which was the

21   plaintiff admitted that there was no price impact.   That's

22   an admission by the expert.   So we, obviously, don't have

23   that here.

24        And the news that came out before the stock, you know,

25   the press release that came out that caused the stock to

1   go up in that case was virtually identical to the

2   information that came out in the earnings call.  And so

3   there was no different -- no difference in the statements,

4   and the statements in the press release were just found

5   not to be misrepresentations because they were protected

6   by the safe harbor.

7        So the statements that caused the movement were not

8   actionable.  The statements that came out later were

9   actionable, but they were the same -- virtually the same

10  statements.

11            THE COURT:  Okay.

12            MR. GARDNER:  That's completely not the case

13  here.

14            THE COURT:  Thank you.

15       Ms. Poppe, you wanted some more time -- or you wanted

16  some time on the issue of adequacy of representation.

17            MS. POPPE:  Your Honor, our positions with

18  respect to adequacy, there are certain parts of it that

19  are stand-alone.  There are also certain parts of it that

20  are directly tied to the issue of the length of the class

21  period.  So it may help --

22            THE COURT:  Let's start with whether the

23  representatives are okay.  Then we'll talk about the

24  expanse of the period.

25            MS. POPPE:  Sure.  So from an adequacy

1  standpoint, this is one of those cases where it is lawyer

2  driven.  These were --

3           THE COURT:  But I do think that's true in most

4  cases.  I really do.  I mean, surely your firm does a lot

5  of drafting of declarations for clients.  It may be an

6  unlovely fact; but I think it is a commonplace, isn't it?

7           MS. POPPE:  It is certainly a commonplace, yes,

8  that the lawyers do a lot of drafting.  This here goes to

9  an extreme though.  These cases were brought to the

10  plaintiffs who would not have even known of their

11  existence through monitoring agreements and other types of

12  arrangements with these law firms.

13      And everything about the case that is here, from top

14  to bottom, has been done just by the lawyers with no

15  supervision, no insight.  I'm not suggesting that the

16  plaintiffs should be drafting, doing initial drafts or

17  anything like that; but I am suggesting that they need to

18  be knowledgeable enough about the case and involved enough

19  to exercise and comply with their fiduciary obligations to

20  the class as a whole, not simply cede all responsibility

21  to the lawyers.  That is not consistent with their burden

22  to demonstrate that they are adequate or be adequate class

23  representatives here.

24      And like I said, I think there is a spectrum here; and

25  it may be that the lawyers are allowed to do virtually

 1   everything.  But they aren't allowed to do everything.
 2   The clients do need to be involved.  And here they just
 3   really haven't been involved.
 4        THE COURT:  Well, they did admit they didn't
 5   draft their declarations, did not review drafts of
 6   previous versions of the complaint, had not attended the
 7   hearing.
 8        MS. POPPE:  And some of them knew more than
 9   others.
10        THE COURT:  But isn't it true that, unlike in the
11   cases that Conn's relies on, plaintiffs were able to
12   explain the general theory of the case, knew that the
13   Court had sustained the original complaint but not all the
14   misstatements, knew defendants by name and title?
15      I mean, *Enron* was the -- they were unable to name or
16   even recognize the names of a large number of the parties,
17   despite the substantial publicity about Enron's collapse,
18   in the documents sent to them by counsel.  Thus, there is
19   no surprise they could not articulate specific facts about
20   the defendants' involvement that would support their vague
21   allegations of fraud.
22      That's a different kettle of fish, isn't it, really?
23        MS. POPPE:  To a certain extent, I think some of
24   the plaintiffs were more knowledgeable than others.  I
25   will give them that.

 1         Let me cite some examples.  None of them could even
 2    say that they had reviewed drafts of the complaints before
 3    they were filed.  That they studied up for their
 4    deposition and could tell you the names of the defendants
 5    is not good enough.  They need -- they need to be involved
 6    throughout the whole process.  And there is nothing here
 7    showing that they have been involved, that they have been
 8    paying attention, that they have been monitoring.
 9         This, to me, is very much like the *Kosmos* case out of
10    the Northern District of Texas.  Judge Boyle looked at
11    some of these very same issues with respect to adequacy;
12    and the Court there noted that while it's true that courts
13    at times have noted that cases -- and those were
14    Sections 11 and 12 Securities Act cases but similar -- are
15    especially amenable to class certification and resolution.
16    It does not follow that a Court should relax its
17    certification analysis or presume a requirement for
18    certification is met merely because the claims fall within
19    that category.
20         And here it is clear that what is going on is this is
21    the lawyers found this case -- and Judge Boyle in that
22    case also looked at the monitoring agreement issue.  The
23    lawyers found these cases.  The lawyers have done all the
24    work with very little supervision.
25              THE COURT:  Okay.  Thank you very much.

1          MS. POPPE:  Do you want me to address, also, the

2    typicality piece?

3          THE COURT:  On the class period?  Okay.  Go

4    ahead.  The typicality piece, that's fine.

5          MS. POPPE:  And I'll hold off on doing that until

6    we talk about the length of the class period as a whole.

7          THE COURT:  All right.

8          MS. POPPE:  The other issue I think that is

9    important to talk about in whatever order you would like

10   is the damages model that needs to be done.

11         THE COURT:  Well, okay.  Let's take that up.  On

12   the disaggregation point, I just wonder if that's an issue

13   for us at this stage.  I mean, I think Mr. Coffman's

14   report is sufficient at this stage.  Loss causation really

15   is not appropriate for resolution in a class certification

16   stage.

17      Coffman opines his out-of-pocket methodology is fully

18   capable of disaggregating the confounding effects that

19   plaintiffs have identified.  It is somewhat flexible so

20   that -- it is sufficiently flexible so that it is capable

21   of being adjusted.

22      And, you know, as I said in *BP*, plaintiffs need to at

23   this class certification stage present a legally viable,

24   internally consistent and truly class-wide approach to

25   calculating damages.

1      And I thought defendants really conceded that a

2  full-blown damages model was not required at this stage.

3          MS. POPPE:  That's right.  A full-blown damages

4  model is not required, but you do need to show that

5  damages can be calculated on a class-wide basis and in a

6  way that is consistent with their theory of liability.

7      And here, Coffman's analysis simply did not -- simply

8  did not do that at all.  In fact, the original report that

9  he wrote doesn't even talk about the theory of liability

10  or in any way, shape or form attempt to tie the two

11  together.  It's just -- it's just simply not efficient to

12  even make the showing that needs to be made now.

13      And the analysis in *BP*, to a certain extent, was very

14  similar where we raised issues the same way the defendants

15  in *BP* raised issues that the -- that the proffered theory

16  and methodology did not address.

17      And Coffman had the opportunity to provide some

18  additional analysis.  He submitted an entire other report.

19  He doesn't go into any more detail with respect to the

20  issues that were raised.

21      You know, the fact that a vast majority of the

22  misstatements that they have alleged have been dismissed

23  by this court, he doesn't address that.  He dismisses it

24  as merely a hypothetical.  That's not a hypothetical.

25  That's happened.  He doesn't address that.

1      He doesn't address the fact that there are different

2  statements and what may or may not happen with respect to

3  those different statements.

4      He doesn't address here that there will be undeniably

5  other things, at a minimum, that contributed to those

6  stock price drops, may have completely caused them.

7      If you look at and you add up the amount of the four

8  stock price drops -- and again, now we're getting into

9  questions of the length of the class period that needs to

10  be talked about separate.  But if you add up all four of

11  them, which is the plaintiffs' theory, it exceeds the

12  value of Conn's stock on the first day of the class period

13  by over $20, by over 50 percent.

14          THE COURT:  Okay.

15          MS. POPPE:  He doesn't address any of these

16  things or even touch on them.  He gives them very short

17  shrift.  He needs to do more than he has done at this

18  point and not simply say I will do it later.

19          THE COURT:  Okay.  All right.  Let me hear from

20  the other side.  Thank you very much.

21          MR. GARDNER:  Thank you, Your Honor.

22      So damages, I think Your Honor is right on in

23  analogizing this to your decision in *BP* in which

24  Mr. Coffman was the expert there.

25          THE COURT:  He was.

1          MR. GARDNER:  And you certified the post-spill

2    class because Mr. Coffman articulated that there was a

3    common methodology, out-of-pocket damages driven by an

4    event study methodology, that can be employed across the

5    board for all class members, which makes it a common

6    question.

7          The Fifth Circuit decision in *BP* recognized that; and

8    I'm quoting from the Fifth Circuit decision saying,

9    "Coffman also concludes that his methodology could be

10   easily updated to remove inflation if a specific

11   disclosure were eliminated, the misstatements occurred

12   later or confounding information reduced the relevant

13   amount for one of the disclosures.  In essence, the model

14   would allow for the removal of one of the purported

15   corrective steps reducing the total amount of inflation

16   and the economic loss accordingly."

17         In other words, there is a methodology that can be

18   applied across the class, which is what the issue at class

19   certification is.

20         I know defense counsel says at the beginning of her

21   presentation that a full-blown damage analysis is not

22   required.  Then she goes on in her arguments to suggest

23   that that's, in fact, exactly what the plaintiffs would

24   have to do to satisfy her standards.

25         She talks about disaggregating confounding

1   information, isolating the impact of risks and calculating

2   damages.  That's for the expert stage of this case which

3   follows merits discovery.

4        That's not a class certification issue.  And, in fact,

5   that would run afoul of two Supreme Court decisions.  It

6   would run afoul of the *Halliburton* Supreme Court decision,

7   which clearly said plaintiffs are not required to prove

8   loss causation.  Whether or not a corrective disclosure is

9   corrective and how you parse out the different pieces of

10  information, that is all loss causation.  Those are common

11  questions that the Supreme Court has said are not

12  appropriate to delve into, not necessary at class

13  certification because the class rises and falls together

14  on those questions.

15       Some of their other arguments I would submit -- and I

16  think we'll get to this a little bit more when we get to

17  their arguments on the length of the class period.  But

18  their other arguments run afoul of the Supreme Court

19  decision in *Amgen*, which simply said that proof of

20  materiality is not necessary at class certification

21  because those issues rise and fall together.

22       So I would -- I would submit, Your Honor -- well, let

23  me make one point because the real case that they are

24  relying upon here is *Comcast*, the Supreme Court decision

25  in *Comcast,* which was an antitrust decision.  And my

 1  analysis of *Comcast* is that really to the extent it

 2  applies to securities cases, it applies when you have

 3  multiple theories of liability.

 4      In *Comcast* you had, I think, four or five different

 5  theories of liability, of antitrust liability.  The Court

 6  dismissed four of them, left only one.  And the damage

 7  analysis didn't distinguish between those different

 8  theories of liability, which got the plaintiffs in trouble

 9  in that case.

10      Similarly, in *BP*, Your Honor is very familiar with the

11  pre-class period damage analysis, one, the plaintiffs

12  admitted it was a consequential approach, not an

13  out-of-pocket approach; but Your Honor I don't think had

14  difficulty accepting that consequential damages would have

15  been okay.

16      The problem they ran into is they interjected

17  individual questions.  Your Honor's decision said that you

18  had to gauge each plaintiff's risk tolerance because that

19  was the theory of liability in the case.  Once you

20  interject individual issues, you no longer can certify the

21  class.

22      So I would submit, when you are analyzing this, the

23  thing to keep in mind is:  Are these common questions or

24  are these individual questions?  Do these implicate loss

25  causation, which are common questions?  In which case,

1  that's something we deal with down the road and not today.

2          THE COURT:  Thank you.

3          MR. GARDNER:  Thank you, Your Honor.

4          THE COURT:  Do you want another turn at bat on

5  that issue or have you said everything?

6          MS. POPPE:  I'll just make one clarification on

7  that.

8          THE COURT:  Yes.

9          MS. POPPE:  It is not our position that they need

10 to do a full-blown damages model at this point in time.

11         THE COURT:  Okay.

12         MS. POPPE:  It is simply our position that they

13 need to articulate how a damages model would take into

14 account all of these relevant issues, and they have not

15 even begun to try to do that.  They have just dismissed

16 them.

17         THE COURT:  Okay.  Let's turn to the class period

18 then.  Do you want to argue that, Mr. Gardner; or do you

19 want somebody else to do that?

20         MR. GARDNER:  I'm happy to do it, Your Honor.

21     So the class period argument, they make two arguments.

22 One, they argue that the class period should not begin

23 until September 5th because they argue that the April 3rd,

24 2013, misrepresentations had no price impact on the stock.

25 That's the same argument we argued earlier.

1    They say since there is no price impact, there are no

2  misrepresentations.  We can't start the class period until

3  later.  I don't think we need to belabor that point.  The

4  argument is the same, in which the argument is in order to

5  prove a lack of price impact, they need to do it both at

6  the time of the misrepresentation and at the time of the

7  corrective disclosure.

8    They haven't even addressed the corrective disclosures

9  at all; and therefore, their proof and their argument that

10  there is no price impact on April 3rd I think fails for

11  the same reasons we went through before.  So that's the

12  same argument we have already had.

13    The other argument they make is the end of the class

14  period.  Their argument there goes that the class period

15  should end on February 20th, 2014, because we somehow

16  admitted in an earlier pleading iteration that that was

17  when the full truth came out to the market; and therefore,

18  nobody beyond that could have -- could have purchased

19  stock and been damaged.

20    The problem with that is it's twofold.  It essentially

21  is saying that the final two corrective disclosures, the

22  two corrective disclosures that come in at the end of 2014

23  are not corrective.  They don't correct anything.  They

24  don't correct any of the misrepresentations that are still

25  viable in this case.  And that is problematic on two

 1   fronts.

 2        Again, that's a loss causation question.  And I

 3   believe Your Honor in your earlier decision said that

 4   class certification is not the appropriate time to analyze

 5   whether a corrective disclosure is corrective and whether

 6   a corrective disclosure should or shouldn't be in the

 7   case.  That is not a class certification issue.  That's an

 8   expert issue down the road.  It's a loss causation issue.

 9        They are also arguing a version of the truth on the

10   market, which is they are saying as of February 20th --

11             THE COURT:  Fraud on the market or --

12             MR. GARDNER:  Truth on the market.  Truth on the

13   market is a defense --

14             THE COURT:  I see.  Okay.

15             MR. GARDNER:  -- that the defendants have the

16   burden of proving.  Essentially, it says at a certain day

17   there was enough information in the market that nobody who

18   purchased after that period could have been fooled.  The

19   truth was known.  And, therefore, if the truth was known,

20   fraud doesn't go any further.

21        The problem with the truth-on-the-market argument that

22   they are making is that they are essentially saying that

23   there is no materiality in that part of the class period,

24   and that runs afoul of the *Amgen* decision I talked about

25   earlier.

 1        Our position is that these are all questions that come

 2   later.  What we are saying is there were

 3   misrepresentations that Your Honor held to be actionable

 4   that inflated the stock -- artificially inflated the stock

 5   or maintained an artificial level of inflation in the

 6   stock.

 7        That dissipated over four corrective disclosures.  So

 8   until you get to the final corrective disclosure, there is

 9   still inflation caused by those misrepresentations.  So

10   anybody who purchased in that period is damaged by that

11   inflation.

12             THE COURT:  Okay.  All right.

13             MR. GARDNER:  And the last point is, you know,

14   their whole argument that we somehow have admitted that

15   the full truth came out in February I think is -- I think

16   is nonsensical in the following sense.  We filed a

17   complaint in 2014 before --

18             THE COURT:  Yeah.  I understand.

19             MR. GARDNER:  -- those corrective disclosures

20   came out.  How -- we couldn't have possibly known them.

21   They didn't exist.

22             THE COURT:  I understand that.  Okay.  Ms. Poppe.

23             MS. POPPE:  Your Honor, I do think this is a

24   unique circumstance here, given the facts here and the

25   plaintiffs' particular role and admission of knowledge and

1    how that relates to their claim and how this case is a

2    case in which the Court can and should look at the length

3    of the class period.

4         As you will recall and as plaintiffs' counsel just

5    mentioned, they filed the lawsuit originally claiming that

6    there had been misrepresentations and that there were two

7    stock drops that reflected their damages.  And then the

8    first -- the first page of that handout I gave you shows

9    the timeline of this.

10        And then there were two subsequent significant stock

11   drops down the road when Conn's released information about

12   its earnings that the market didn't like.  And the

13   plaintiffs are attempting to link those two stock drops

14   all the way back to the statements that were made

15   significantly before they even filed the lawsuit.

16        And it is possible, certainly permissible, and in my

17   opinion extremely appropriate here, to really look at what

18   the plaintiffs are alleging and whether they should be

19   entitled to double the size of their class period, double

20   the size of their damages model in sort of the interim

21   value of this case by --

22             THE COURT:  But wasn't there significant

23   disclosure on December 9th of 2014?

24             MS. POPPE:  You mean September 2nd, 2014?

25             THE COURT:  December 9th.

1          MS. POPPE:  Oh, sorry.  Yes, December 9th.  There
2     were statements that Conn's made about its earnings.  The
3     question is could those statements have possibly -- to the
4     plaintiffs, who are the plaintiffs in this lawsuit -- have
5     influenced their beliefs about the -- what they claim to
6     be false statements months ahead of time.
7          And courts do look at this very issue.  This is not
8     simply us trying to make a loss causation argument now.
9     It is not us attempting to make a truth-on-the-market
10    argument now.  We are talking about what the plaintiffs
11    admitted they knew before that ever happened.
12         And one of the cases that we cite, the *LTV Securities*
13    *Litigation* case out of the Northern District of Texas, I
14    mean, the Court looked at this very question of what
15    should the end of the class period be and looked and said
16    when it's clear the plaintiffs are no longer relying on
17    those statements, that's when the class period needs to
18    end.
19         And even the plaintiffs cite this -- the *Countrywide*
20    case --
21         THE COURT:  Yeah.
22         MS. POPPE:  -- and argue that that stands for the
23    proposition that you shouldn't look at that.
24         Well, the Court in *Countrywide* acknowledged that a lot
25    of courts do look at the very issue here of:  Is there a

1  substantial question of fact about when this should end?

2       If there is a substantial question of fact, then the

3  courts say at that point you need to give them the benefit

4  of the doubt and let this play out.

5       But if there is not a substantial question of fact --

6  and here I submit there is not, and I'll walk through that

7  in a minute.  If there is not a substantial question of

8  fact, then it's appropriate to cut the class period short

9  and not give the plaintiffs a huge class period that they

10 will never be able to prove that they haven't even

11 attempted to justify right now.

12      And here again, I'm not making a loss causation

13 argument.  I'm not making a truth-on-the-market argument

14 right now.  Here what I'm talking about is what the

15 plaintiffs admitted that they knew.

16      They admitted that they knew and in each of their

17 depositions they confirmed they believed it at the time

18 that they knew as of February 20th, 2014, that the 13

19 alleged misstatements that they claim to be part of this

20 case, they say they had stopped relying on them at that

21 point in time.  They were alleging them to be false as of

22 February 20th, 2014.

23      Now, the plaintiffs had originally attempted to

24 increase their class period by alleging a whole bunch of

25 additional misrepresentations that supposedly happened

1  after February 20th, 2014; and Your Honor dismissed all of
2  those.  But they still want the benefit of those two large
3  stock drops.

4       THE COURT:  I understand.  I understand.  Okay.
5  Thank you.

6       Do you want to say anything further?

7            MR. GARDNER:  Just two minutes, Your Honor.

8            THE COURT:  Okay.

9            MR. GARDNER:  I would say that counsel is
10  articulating exactly a loss causation issue when she says
11  that the question is whether you can link these alleged
12  corrective disclosure dates back to the misrepresentation.
13  Linking the disclosures to the fraud is loss causation.
14  That's the essence of loss causation.  Not appropriate at
15  this stage.

16       Again, Your Honor, she is trying to hold us to
17  admissions in a pleading where the future alleged
18  corrective disclosures hadn't even occurred yet.  We filed
19  that complaint on July 21st, 2014.  The two additional
20  corrective disclosures come on September and December of
21  that year.

22       So the issue of whether or not those are corrective,
23  we'll get to it.  That's loss causation.  And the class
24  rises and falls together on that question.  There is no
25  individual issue there.  So there is no reason to do that

 1  now.

 2       The case that she cites -- and, you know, it's not

 3  appropriate to do it; but the fact of the matter is the

 4  final two corrective disclosures -- and this is in the

 5  complaint -- do link.  They talk about credit segment

 6  problems and underwriting issues, et cetera.  So there is

 7  a link, and we'll prove it when we get to summary judgment

 8  and to trial.

 9       The last point, Your Honor, is she cites -- counsel

10  cites to this *LTV Securities Litigation*.  That decision

11  was in 1980.  That's three decades before *Halliburton* was

12  decided by the Supreme Court saying loss causation is not

13  necessary at class certification.

14       Thank you, Your Honor.

15            THE COURT:  Okay.  One more time.

16            MS. POPPE:  One more point on this.  And I submit

17  for all the reasons that you can and should shorten the

18  class period on this basis alone.

19       The other issue that would arise here, though, is if

20  the plaintiffs want to pursue a case based on people that

21  bought and sold stock after February 20th, 2014, they are

22  atypical and not appropriate class representatives to do

23  that because of their admitted knowledge and the unique

24  defenses that they would face as a result of that.

25       So in addition to it should be shortened for

 1  everybody, at a minimum it needs to be shortened for them
 2  such that they would not be typical representatives after
 3  that date.
 4          THE COURT:  But have they said -- since the
 5  December 2014 disclosures were made, have they said that
 6  they knew in advance everything that was revealed on
 7  December 9th, 2014?
 8          MS. POPPE:  Yes.  If I understand your question,
 9  yes.  They have admitted that they knew that the
10  statements they claim were false, that they admitted that
11  they knew they were false and exactly why.
12          THE COURT:  But did they know this as to the
13  statements that Conn's made on December 9th, 2014?  How
14  could they know in advance that -- of the content of the
15  disclosures, the corrective disclosures made on
16  December 9th, 2014?
17          MS. POPPE:  Well, I guess that gets to the
18  question of whether those are corrective disclosures or
19  not.  To me, the analysis should be did they -- did they
20  know that the statements that they allege to be false,
21  which we by the way disagree were ever false; but it's
22  their position they were false.
23          THE COURT:  Yeah.
24          MS. POPPE:  The very basis for what they said,
25  they said Conn's was underwriting credit for customers who

 1   had FICO scores below 500; and they said in the summer of

 2   2014 that's not true.  We know -- they put it in their

 3   pleading -- that is not true.  Conn's -- they allege

 4   Conn's was underwriting customers below 500 and that it

 5   was not true and they said that 500 was their lower

 6   threshold.

 7        They allege all of those things.  The very basis for

 8   it, which is their confidential witness allegations, those

 9   never really changed.  They never really say we have now

10   learned more.  We have learned additional facts.  There

11   are additional things that would tie those statements to

12   what happened later.

13        Their confidential witness allegations -- and we put a

14   red line attached to our response that shows the version

15   of the confidential witness allegations that they filed in

16   2014 and then the subsequent one.  Those don't change.

17        So their whole theory is based on what happened in the

18   very first part of the class period, late 2012, early

19   2013, what happened at that point in time until 2013.

20   They are not really complaining about anything that

21   happened later.

22        Most importantly, they are acknowledging that they

23   knew that those things -- at least in their opinion those

24   statements were not true.

25             THE COURT:  On that limited point, let me hear

1    from the plaintiffs.

2         MR. GARDNER:  Thank you, Your Honor.  Two points.

3    One, post *Halliburton* Supreme Court decision, they don't

4    have -- they don't cite to a single case that has allowed

5    or the court has truncated a class period on this basis.

6         We have cited a number of them in our brief in which

7    the courts say that this isn't appropriate to do, whether

8    a corrective disclosure is corrective or not, et cetera.

9         So I don't think they have any case law support for

10   this proposition.

11        But this -- I think they made this point in a

12   footnote, this adequacy argument with regard they

13   apparently are -- well, let me not be pejorative.  The

14   argument about adequacy, typicality is really a loss

15   causation argument in disguise.

16        But let me address it because the only way to actually

17   address it is to dive into the four alleged corrective

18   disclosures and determine what additional information came

19   out on the final two corrective disclosures.

20        THE COURT:  We don't need to do that.

21        MR. GARDNER:  The point is there is new

22   information that came out.  The market wasn't aware that

23   there was still truth to come out.  This price was still

24   inflated.

25        THE COURT:  Okay.  All right.  I've got it.

1      I'm going to have to reject Conn's position here

2  again.  I think what was said prior to December 9th, 2014,

3  as to whether they knew all the -- all the negative

4  information I think can't be binding because there was a

5  further disclosure made.

6      Secondly, the Fifth Circuit in *Feder, F-e-d-e-r, v.*

7  *Electronic Data Systems* said that reliance on the

8  integrity of the market prior to disclosure of alleged

9  fraud is unlikely to be defeated by post-disclosure

10  reliance on integrity of the market.  So purchasing the

11  stock after the fraud is revealed doesn't necessarily

12  destroy typicality.

13      So I am going to -- I am going to grant certification

14  of the class.  I appreciate arguments on both sides.  And,

15  of course, we're still far away from plaintiffs having won

16  the case.  I think all the arguments made by Conn's were

17  made better than I could have made them, but I am afraid I

18  cannot -- I cannot acquiesce in Conn's position.

19      Thank you all very much.

20          MR. GARDNER:  Thank you, Your Honor.

21          THE COURT:  We've got the schedule to worry

22  about, don't we?  I guess I'll grant the extension.  I try

23  to get cases to trial faster than this.

24          MR. GARDNER:  I appreciate that, Your Honor.

25          THE COURT:  Let's find a trial date in -- I think

1  it's January or February of 2019, right?

2          MR. GARDNER:  I don't have the schedule in front

3  of me; but that sounds about right, yes.

4          THE COURT:  You propose a deadline for -- oh, no.

5  No.  No.  Never mind.  Excuse me.  Dispositive motion

6  deadline you put in April; is that right?

7          MR. GARDNER:  Yes.  April 16th, I believe.

8          THE COURT:  Well then any time after July of --

9  any time after July 16th of 2018.  I'm sorry.  I misread

10  it.

11          MR. GARDNER:  I think the last thing we have on

12  here is October 10th of 2018.

13          THE COURT:  Well, October 10th is normally --

14  that -- you shouldn't need that much time to file motions

15  in limine.  All I care -- all I require in a joint

16  pretrial order is motions in limine, a list of exhibits, a

17  list of witnesses and objections to either.  That's all I

18  want.

19          MR. GARDNER:  Okay.

20          MS. POPPE:  Your Honor, if it would help, we

21  could confer on dates that would work.

22          THE COURT:  Okay.  You want to confer.  That's

23  fine.  I'll wait to hear from you.  That's fine.

24          MR. GARDNER:  We'll move that date up, which is

25  what I'm hearing, Your Honor.

1           THE COURT:  Thank you.  Normally that date is one
2    week in advance of trial.
3           MR. GARDNER:  Okay.  Thank you, Your Honor.
4        *(Proceedings concluded at 10:38 a.m.)*
5    *Date: July 4, 2017*
6                   **COURT REPORTER'S CERTIFICATE**
7        *I, Laura Wells, certify that the foregoing is a*
8    *correct transcript from the record of proceedings in the*
9    *above-entitled matter.*
10
11                        */s/ Laura Wells*
12                   *Laura Wells, CRR, RMR*
13
14
15
16
17
18
19
20
21
22
23
24
25