

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

|  | |  |
|---|---|---|
| IN RE CONN'S, INC. SECURITIES LITIGATION | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | MASTER FILE NO. 4:14-CV-00548 (KPE)<br><br>CLASS ACTION |

**CLASS REPRESENTATIVES' UNOPPOSED MOTION FOR
PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT**

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

Table of Authorities ................................................................................................. ii

PRELIMINARY STATEMENT AND SUMMARY OF ARGUMENT ........................................1

NATURE OF THE ACTION ................................................................................................3

HISTORY OF THE LITIGATION .........................................................................................5

SETTLEMENT NEGOTIATIONS .........................................................................................9

ARGUMENT ................................................................................................................11

I.    THE PROPOSED SETTLEMENT MERITS PRELIMINARY APPROVAL .................11

      A.    The Standard for Preliminary Approval ................................................11

      B.    There Are No Obvious Deficiencies or Reasons to Doubt the Settlement's
            Fairness .................................................................................................12

      C.    The Settlement Is Well Within the Range of Reasonableness...............14

      D.    The Settlement Treats All Class Members Fairly and Does Not Improperly
            Grant Preferential Treatment to Class Representatives or any Segment of
            the Class ................................................................................................16

      E.    The Settlement Does Not Excessively Compensate Class Counsel .....17

II.   THE PROPOSED NOTICE PLAN AND FORMS SHOULD BE APPROVED ..............18

III.  PROPOSED SCHEDULE OF EVENTS .........................................................20

CONCLUSION................................................................................................21

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Billitteri v. Sec. Am., Inc.*,
  No. ML 10-2145 DOC, 2011 WL 3586217 (N.D. Tex. Aug. 4, 2011) ..................................12

*Cotton v. Hinton*,
  559 F.2d 1326 (5th Cir. 1977) ....................................................................................11

*Di Giacomo v. Plains All Am. Pipeline*,
  No. Civ.A.H.-99-4137, Civ.A.H-99-4212, 2001 WL 34633373 (S.D. Tex.
  Dec. 19, 2001).................................................................................................................17

*In re Heartland Payment Sys., Inc. Customer Data Sec. Breach Litig.*,
  851 F. Supp. 2d 1040 (S.D. Tex. 2012) ...............................................................................12

*In re Katrina Canal Breaches Litig.*,
  628 F.3d 185 (5th Cir. 2010) ..............................................................................................18

*McNamara v. Bre-X Minerals, Ltd.*,
  214 F.R.D. 424 (E.D. Tex. 2002)....................................................................................1, 11

*In re OCA, Inc. Sec. & Derivative Litig.*,
  No. 05-2165, 2008 WL 4681369 (E.D. La. Oct. 17, 2008) ........................................... *passim*

*In re Pool Prods. Distrib. Mktg. Antitrust Litig.*,
  310 F.R.D. 300 (E.D. La. 2015)...........................................................................................14

*Schwartz v. TXU Corp.*,
  No. 02-cv-2243, 2005 WL 3148350 (N.D. Tex. Nov. 8, 2005) .......................................18, 19

*Slipchenko v. Brunel Energy, Inc.*,
  Civil Action No. H-111465, 2015 WL 338358 (S.D. Tex. Jan. 23, 2015).............................14

**Docketed Cases**

*In re Bank of New York Mellon Forex Transactions Litig.*,
  No. 12-md-2335- LAK (S.D.N.Y.)........................................................................................20

*In re Merck & Co., Inc. Vytorin/Zetia Securities Litig.*,
  No. 08-cv-2177 (D.N.J.) ......................................................................................................20

*In re Schering-Plough Corp./ENHANCE Securities Litigation*,
  No. 08-cv-397 (D.N.J.) ........................................................................................................20

**Statutes**

15 U.S.C. § 78u-4(a)(4) ................................................................................................16

15 U.S.C. § 78u-4(a)(7)(A)-(F)....................................................................................19

**Rules**

Fed. R. Civ. P. 23.............................................................................................1, 2, 18, 19

Fed. R. Civ. P. 23(c)(2)..............................................................................................18

Fed. R. Civ. P. 23(e) ...............................................................................................2, 12

Fed. R. Civ. P. 23(f).......................................................................................................9

Fed. R. Civ. P. 30(b)(6)..........................................................................................9, 13

Class Representatives Laborers Pension Trust Fund – Detroit and Vicinity ("Detroit"), Connecticut Carpenters Pension Fund and Connecticut Carpenters Annuity Fund (collectively, "Connecticut"), St. Paul Teachers' Retirement Fund Association ("St. Paul"), and Universal Investment Gesellschaft m.b.H. ("Universal," together with Detroit, Connecticut, and St. Paul, "Class Representatives" or "Lead Plaintiffs"), on behalf of themselves and all members of the certified Class, respectfully submit this unopposed motion, pursuant to Rule 23 of the Federal Rules of Civil Procedure, for entry of the Parties' agreed-upon Order Granting Preliminary Approval of Class Action Settlement, Approving Form and Manner of Notice, and Setting Date for Hearing on Final Approval of Settlement ("Preliminary Approval Order"), which is attached to Class Representatives' Motion as Exhibit A.[1]

## PRELIMINARY STATEMENT AND SUMMARY OF ARGUMENT

The Parties have reached a proposed settlement of this securities class action (the "Action") for a total of $22,500,000 in cash (the "Settlement Amount") that, if approved by the Court, will resolve all claims asserted, or that could have been asserted, against Defendants in the Action.  Class Representatives now request that the Court preliminarily approve the proposed Settlement.  As explained herein, Class Representatives respectfully submit that the Settlement warrants preliminary approval given that it is the result of arm's-length negotiations by experienced counsel overseen by a well-respected mediator and represents a favorable recovery that falls well within the range of possible approval.  Preliminary approval is, therefore, appropriate.  *See, e.g.*, *McNamara v. Bre-X Minerals, Ltd.*, 214 F.R.D. 424, 430 (E.D. Tex. 2002) ("If the preliminary evaluation of the proposed settlement does not disclose grounds to doubt its

---

[1] All capitalized terms that are not otherwise defined herein shall have the same meaning as those provided in the Stipulation and Agreement of Settlement, dated as of June 13, 2018 (the "Stipulation"), filed concurrently herewith as Exhibit B to Class Representatives' Motion.

fairness or other deficiencies . . . and appears to fall within the range of possible approval, the court should direct that notice under Rule 23(e) be given to the class members of a formal fairness hearing").

Entry of the proposed Preliminary Approval Order will begin the process of considering final approval of the proposed Settlement by authorizing notice of the Settlement's terms and conditions be sent to investors who are believed to be members of the Class.  After a motion seeking approval of the Settlement is filed with the Court, a final approval hearing (the "Settlement Hearing") will be conducted so that the Parties and Class Members may present arguments and evidence for and against the Settlement, and the Court will then make a final determination as to whether the Settlement is fair, reasonable, and adequate.

To facilitate this process, the proposed Preliminary Approval Order will, among other things:  (i) preliminarily approve the Settlement on the terms set forth in the Stipulation; (ii) approve the form and content of the Notice, Claim Form, and Summary Notice attached as Exhibits 1, 2 and 3, respectively, to the Preliminary Approval Order; (iii) find that the procedures for distribution of the Notice and Claim Form and publication of the Summary Notice provided in the Preliminary Approval Order constitute the best notice practicable under the circumstances and comply with due process, Rule 23 of the Federal Rules of Civil Procedure, and the Private Securities Litigation Reform Act of 1995 ("PSLRA"); (iv) set the procedures for objecting and seeking exclusion from the Class; and (v) set a date and time for the Settlement Hearing, at which the Court will consider final approval of the Settlement, the Plan of Allocation for the Settlement proceeds, and Class Counsel's application for attorneys' fees and expenses, including reimbursement of costs and expenses (including lost wages) to Class Representatives pursuant to the PSLRA.

## <u>NATURE OF THE ACTION</u>

Conn's is a retailer of home appliances, furniture and mattresses, consumer electronics, and home office equipment that markets its products by offering flexible financing. The Company provides in-house credit options for its mostly subprime customers and operated approximately eighty retail locations in ten states during the Class Period.

Class Representatives allege that, unbeknownst to investors, in late 2012 and 2013 Conn's significantly lowered its underwriting standards in all of its stores in an effort to increase retail sales. This was allegedly part of Conn's growth strategy—pushing larger ticket items onto customers who had little or no ability, or willingness, to pay. At the same time, Class Representatives allege that the Company dispensed almost entirely with its credit verification requirements (income, employment, and address verifications), resulting in significant amounts of customer fraud. Defendants disguised the Company's loosened credit standards under the umbrella of something called a "custom scoring" model, which allowed Conn's to grant credit to customers with much lower FICO scores. When this strategy predictably fueled an increase in delinquencies and bad debts, Class Representatives allege that Defendants hid the truth, insisted that Conn's underwriting standards were essentially unchanged, and claimed that Conn's poor results were caused by a series of one-off events—a faulty computer conversion, too few collections personnel, and particularly cold weather which kept its customers from coming into stores to pay their bills.

Plaintiffs allege that the truth about the unsustainable manner in which Conn's was growing its retail business and the threats to its financial prospects posed by the credit losses resulting from its loose lending practices came to light through a series of partial disclosures that allegedly began on September 5, 2013. On that day, Conn's reported lower-than-expected quarterly earnings for the second quarter of FY 2014 (which ended on July 31, 2013), due to

disappointing performance in its credit segment.   Defendants falsely blamed "short-term execution issues in [Conn's] collection operations" for the earnings-miss, a portion of which the Company claimed was caused by implementation issues with a software upgrade.   In addition, Defendants falsely assured investors that Conn's had implemented corrective actions and that "negative delinquency trends rapidly reversed."   Despite these assurances, Conn's stock price dropped 11.6% on this news.

Additional information about Conn's exposure to bad debt was allegedly partially revealed on February 20, 2014, when the Company announced disappointing preliminary results for the fourth quarter of FY 2014 (which ended on January 31, 2014), as well as a downward revised outlook for FY 2015.   Conn's attributed its poor performance to several factors, including the effect of an increased provision for bad debt that was expected to exceed previously issued FY 2014 guidance.   The Company explained that the provision was required because of higher-than-expected receivable charge-offs and delinquency rates in December 2013 and January 2014.   Conn's stock price fell by 42.85%.

The Company's exposure to bad debt was then allegedly further partially disclosed on September 2, 2014, when Defendants announced disappointing financial results for the second quarter of FY 2015 (which ended on July 31, 2014).   Conn's Credit Segment provision for bad debts on an annualized basis had grown to 13.9% of the average outstanding portfolio balance. These results allegedly revealed that the Company was continuing to suffer losses from customer loans made with lowered underwriting standards and poor verification practices that had been strengthened only in part and belatedly.   Rather than acknowledge the real reasons for these results, Defendant Wright stated:   "Tighter underwriting and better collections execution did not offset deterioration in our customer's ability to resolve delinquency," and that "we haven't

identified any internal factor causing the increase in delinquency."  Conn's stock price fell by 30.85%.

The full truth was allegedly revealed on December 9 and 10, 2014.  On December 9 Conn's issued a press release announcing its financial results for the third quarter of FY 2015 (which ended on October 31, 2014).  First, the Company revealed that the Credit Segment provision for bad debts for 3Q2015 was $72 million – more than twice the projected expense of $31 million.  This was largely a result of the yet-to-be-reserved-for losses for charge-offs of loans originating in FY 2014.  Second, the Company "recognize[d] that its credit operations forecasting has not been acceptably accurate" and withdrew its earnings guidance for FY 2015, stating that it was not currently providing earnings guidance with respect to FY 2016.  Third, the Company announced the resignation of its Chief Financial Officer, Brian Taylor, effective immediately.  Finally, on December 10, 2014 Conn's reported that "[t]he Company received a voluntary request for information dated November 25, 2014 from the Fort Worth Regional Office of the [U.S. Securities and Exchange Commission ("SEC")]" and that "[t]he information request generally relates to the Company's underwriting policies and bad debt provisions."  In response to these alleged disclosures, the Company's share price fell by more than 40%.

## HISTORY OF THE LITIGATION

This securities fraud class action was commenced with the filing of a complaint on March 5, 2014.  ECF No. 1.  Following briefing and a stipulation, and pursuant to the PSLRA, the Court entered an Order appointing Detroit, Connecticut, St. Paul, and Universal as Lead Plaintiffs for the proposed class, approving Lead Plaintiffs' selection of Motley Rice LLC ("Motley Rice") and Scott+Scott Attorneys at Law LLP ("Scott+Scott") as Lead Counsel, and consolidating related securities class actions into the litigation, *In re Conn's, Inc. Securities Litigation*, Master File No. 14:14-CV-00548.  ECF No. 26.

On behalf of the Class, Lead Counsel conducted a thorough and far reaching investigation to support the allegations in the Consolidated Amended Action Complaint for Violations of Federal Securities Laws (the "First Amended Complaint").  That investigation included, among other things, a review and analysis of:  (i) documents filed publicly by the Company with the U.S. Securities and Exchange Commission ("SEC"); (ii) publicly available information, including public reports and news articles, concerning Conn's; (iii) research reports issued by financial analysts concerning the Company; (iv) economic analyses of securities movement and pricing data; and (v) transcripts of investor calls with Conn's senior management. Lead Counsel also analyzed witness interviews from former Company employees.

On July 21, 2014, Lead Plaintiffs filed the First Amended Complaint (ECF No. 37), asserting claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder.  In general, the First Amended Complaint alleged, among other things, that Defendants violated the federal securities laws by making materially false or misleading statements and omitting material information that Conn's had dramatically loosened its lending policies and underwriting guidelines, contrary to its assurances to investors, and had allowed non-creditworthy customers to receive substantial lines of credit at Conn's retail locations, thereby exposing the Company to high amounts of bad debt and increased collections risks.  The First Amended Complaint further alleged that the price of Conn's' publicly traded common stock was artificially inflated as a result of Defendants' allegedly false and misleading statements, and declined when the truth was revealed.

On September 4, 2014, Defendants filed a motion to dismiss the First Amended Complaint.  ECF No. 48.  In response, Lead Plaintiffs filed a motion to file a Second Consolidated Amended Complaint for Violations of Federal Securities Laws, to expand the end

date of the Class Period to account for factual developments since the filing of the First Amended Complaint.  ECF No. 54.  The Court granted Lead Plaintiffs' motion on October 15, 2014 (ECF No. 55) and Lead Plaintiffs filed the Second Consolidated Amended Complaint for Violations of Federal Securities Laws (the "Second Amended Complaint") on October 29, 2014 (ECF No. 56).

On December 12, 2014 plaintiff Eric Pittel filed a complaint in Case No. 4:14-cv-3548 (the "Pittel Complaint"), alleging that Conn's and several of its officers made misrepresentations and omissions in violation of the federal securities laws, including the recent disclosures noted by Lead Plaintiffs.  On December 22, 2014, plaintiff Martin Indik filed a complaint in Case No. 4:14-cv-3660 ("the Indik Complaint").  The Indik Complaint made substantially the same allegations as the Pittel Complaint.

On December 15, 2014, Defendants moved to dismiss the Second Amended Complaint. ECF No. 62.  On December 23, 2014, Lead Plaintiffs moved to consolidate the Pittel Complaint and the Indik Complaint into this Action.  ECF No. 64.  Lead Plaintiffs then filed their opposition to Defendants' motion to dismiss the Second Amended Complaint on January 29, 2015.  ECF No. 69.  Defendants filed a reply memorandum of law in support of their motion to dismiss on March 2, 2015.  ECF No. 73.  On March 31, 2015, the Court granted Lead Plaintiffs' motion to consolidate the Pittel Complaint and the Indik Complaint, which was so ordered on April 10, 2015.  ECF No. 87.

On April 10, 2015, Lead Plaintiffs filed a Third Consolidated Amended Complaint for Violations of Federal Securities Laws (the "Third Amended Complaint").  ECF No. 86.  On April 20, 2015, Defendants filed a supplemental memorandum of law in support of their pending motion to dismiss to address the new allegations in the Third Amended Complaint (ECF No. 89),

which Lead Plaintiffs opposed on April 27, 2015 (ECF No. 90).  Defendants filed a reply memorandum in further support of their motion on May 4, 2015.  ECF No. 91.  On June 30, 2015, the Court held a hearing on Defendants' pending motion to dismiss and granted Lead Plaintiffs 21 days to file a further amended complaint.

Lead Plaintiffs filed a Fourth Consolidated Amended Complaint for Violations of the Federal Securities Laws (the "Fourth Amended Complaint") on July 21, 2015.  ECF No. 104. Defendants filed a motion to dismiss the Fourth Amended Complaint on August 28, 2015 (ECF No. 107), which Lead Plaintiffs opposed on October 5, 2015 (ECF No. 108).  Defendants filed a reply memorandum of law in further support of their motion on October 26, 2015.  ECF No. 109. The Court heard oral argument on Defendants' motion on March 25, 2016, and March 29, 2016. ECF No. 125.  During oral argument, the Court granted in part and denied in part Defendants' motion to dismiss.  The Court filed an Order to that effect on May 5, 2016.  ECF No. 125.

Following the Court's ruling on Defendants' final motion to dismiss, on May 5, 2016, Defendants filed a Motion to Certify for Immediate Appeal and to Stay Proceedings.  ECF No. 126.  Lead Plaintiffs opposed Defendants' motion on May 26, 2016 (ECF No. 131) and Defendants filed a reply in support of their motion on June 6, 2016 (ECF No. 132).  The Court denied Defendants' motion on June 10, 2016.  ECF No. 133.

On November 10, 2016, Lead Plaintiffs filed their motion for class certification, which included a report by Lead Plaintiffs' expert on market efficiency.  ECF No. 145.  On February 13, 2017, Defendants filed their opposition to the motion (ECF No. 148), and on June 10, 2016, Lead Plaintiffs filed their reply memorandum of law (ECF No. 153).  The Court heard argument on Lead Plaintiffs' class certification motion on June 29, 2017, and granted Lead Plaintiffs' motion that same day, certifying the Class, appointing Lead Plaintiffs as Class Representatives,

and appointing Motley Rice and Scott+Scott as Class Counsel.  ECF No. 159.  Defendants appealed the Court's ruling to the United States Court of Appeals for the Fifth Circuit under Rule 23(f), which docketed the appeal as *Laborers Pension Trust Fund Detroit and Vicinity, et al. v. Conn's, Inc., et al.*, No. 17-20525.  At the time the Parties agreed to settle this Action, Defendants' appeal remained pending.

In connection with discovery, the Parties served document requests both on each other as well as on non-parties and conducted numerous meet and confers to come to agreement on the scope of production, search terms, and custodians, among other things.  Plaintiffs' Counsel reviewed and analyzed approximately 661,000 pages of documents produced by Defendants and approximately 28,000 pages of documents produced in response to third-party subpoenas. Plaintiffs' Counsel also took nine depositions of current and former Conn's employees and a deposition of a FICO employee who performed work for the Company.  In addition, Plaintiffs' Counsel defended the depositions of a representative of each of the Lead Plaintiffs pursuant to Rule 30(b)(6), and defended the deposition of Lead Plaintiffs' market efficiency expert. Plaintiffs' Counsel consulted with experts on damages, loss causation, and market efficiency issues, as well as industry experts on underwriting issues.

## SETTLEMENT NEGOTIATIONS

Beginning in the Spring of 2017, while simultaneously litigating the Action, the Parties engaged Robert A. Meyer, Esq. of JAMS, an experienced mediator with considerable knowledge and expertise in the field of securities class actions, to assist them in exploring a potential negotiated resolution.  Following an exchange of mediation statements and exhibits, the Parties met with Mr. Meyer on May 3, 2017 in an attempt to reach a settlement in a full-day mediation. The mediation session did not result in an agreement to settle the Action.  The Parties submitted additional mediation materials and met with Mr. Meyer for a second full-day mediation session

on June 14, 2017.  Over the course of the next several months, the mediator conducted further discussions with the Parties in an effort to assist them in coming to a resolution of the Action. After numerous further communications on the issues of liability and damages and the submission of supplemental materials, on January 23, 2018, the Parties and Mr. Meyer attended a third mediation session.  Following the mediation, Mr. Meyer continued to assist the Parties in coming to a resolution and on February 27, 2018 Mr. Meyer made a mediator's proposal to settle the Action for $22.5 million.  On March 7, 2018, the Parties accepted the mediator's proposal. The Parties subsequently negotiated the Stipulation, which details the terms and conditions of the Settlement, including, among other things, a release of all claims asserted, or that could have been asserted, against Defendants in the Action in return for the cash payment by or on behalf of Defendants of $22,500,000 for the benefit of the Class.[2]

In light of the significant benefit achieved for the Class, the substantial costs and risks of continuing litigation through the class certification appeal, trial and additional appeals, and the fact that the proposed Settlement is the result of arm's-length negotiations by experienced counsel overseen by a well-respected mediator, it is respectfully submitted that the Settlement warrants preliminary approval so that notice may be provided to the Class.

---

[2] In connection with the Settlement, the Parties have also entered into a Confidential Supplemental Agreement Regarding Requests for Exclusion, dated June 13, 2018 ("Supplemental Agreement").  *See* Stipulation ¶ 37.  The Supplemental Agreement sets forth the conditions under which Defendants have the option, which must be exercised unanimously, to terminate the Settlement in the event that requests for exclusion from the Class exceed certain agreed-upon criteria stated in the Supplemental Agreement (the "Termination Threshold").  As is standard practice in securities class actions, the Supplemental Agreement is not made public to avoid incentivizing the formation of a group of opt-outs for the sole purpose of leveraging the Termination Threshold to exact an individual settlement.  Pursuant to its terms, the Supplemental Agreement may be submitted to the Court *in camera* or under seal.

## ARGUMENT

## I.   THE PROPOSED SETTLEMENT MERITS PRELIMINARY APPROVAL

### A.   The Standard for Preliminary Approval

Courts have long recognized a strong policy and presumption in favor of class action settlements.  *See, e.g.*, *Cotton v. Hinton*, 559 F.2d 1326, 1331 (5th Cir. 1977) (noting an "overriding public interest in favor of settlement," "[p]articularly in class action suits").  District court review of a class action settlement proposal is a two-step process.  Newberg on Class Actions §13:12 (5th ed. 2015).  The first step is a preliminary, pre-notification determination of whether "notice of the proposed settlement should be sent to the class."  *Id*. at § 13:13.  In the first step, the Court makes a preliminary evaluation of the fairness of the settlement before directing that notice be given to the class.  At this preliminary approval stage, the standards are more relaxed than those applied to a motion for final approval.  *See In re OCA, Inc. Sec. & Derivative Litig.*, No. 05-2165, 2008 WL 4681369, at *11 (E.D. La. Oct. 17, 2008) ("As this motion is for *preliminary* approval of a class action settlement, the standards are not as stringent as those applied to a motion for final approval." (citations omitted)).

A court will ordinarily grant preliminary approval when, as here, "the proposed settlement discloses no reason to doubt its fairness, has no obvious deficiencies, does not improperly grant preferential treatment to class representatives or segments of the class, does not grant excessive compensation to attorneys, and appears to fall within the range of possible approval."  *Id.*; *see also McNamara*, 214 F.R.D. at 430 ("[i]f the preliminary evaluation of the proposed settlement does not disclose grounds to doubt its fairness or other deficiencies . . . and

appears to fall within the range of possible approval, the court should direct that notice under Rule 23(e) be given to the class members of a formal fairness hearing").[3]

Class Representatives request only that the Court take the first step in the settlement approval process and grant preliminary approval of the Settlement so that notice of the Settlement may be given to the Class.  As summarized below, and as will be detailed further in a subsequent motion for final approval of the Settlement, this Settlement is well within the range of possible approval, and therefore warrants preliminary approval.

**B.    There Are No Obvious Deficiencies or Reasons to Doubt the Settlement's Fairness**

There is no doubt the Settlement was fairly and honestly negotiated.  Courts recognize "a presumption of fairness, adequacy, and reasonableness may attach to a class settlement reached in arm's length negotiations between experienced, capable counsel after meaningful discovery." *In re Heartland Payment Sys., Inc. Customer Data Sec. Breach Litig.*, 851 F. Supp. 2d 1040, 1063 (S.D. Tex. 2012); *In re OCA*, 2008 WL 4681369, at *11 (finding no obvious deficiencies when parties arrived at the agreement after mediation and when the parties engaged in extensive discovery); *Billiteri v. Sec. Am., Inc.*, No. ML 10-2145 DOC (RNBx), 2011 WL 3586217, at *10 (N.D. Tex. Aug. 4, 2011) ("settlement diligently negotiated after a long and hard-fought process that culminated in ultimately successful mediation").

As noted above, the Settlement was achieved only after extensive arm's-length discussions involving an experienced mediator with considerable knowledge and expertise in the field of securities class actions.  As part of those discussions, Plaintiffs' Counsel and Defendants'

---

[3] At the final approval hearing, the Court will have before it extensive papers submitted in support of the proposed Settlement and will be asked to make a determination as to whether the Settlement is fair, reasonable, and adequate under all of the circumstances.  At this juncture, however, Class Representatives request only that the Court grant preliminary approval of the Settlement.

Counsel prepared and presented submissions concerning their respective views regarding the merits of the litigation, including the evidence adduced during the course of discovery, Defendants' defenses, and issues related to class-wide damages.   Counsel and the mediator engaged in three full-day, in-person mediation sessions, along with several months of formal discussions, until eventually agreeing to accept the mediator's proposal to settle the Action for $22.5 million, and then worked over the subsequent weeks to finalize the Stipulation and associated documents.

Moreover, the Parties reached the Settlement only after vigorously litigating the Action, conducting substantial discovery, and consulting with multiple experts.   As noted above, Class Representatives conducted an extensive investigation, which included interviews with numerous former Conn's employees and a thorough review of publicly available information; briefed Defendants' motions to dismiss; successfully moved for class certification; engaged in extensive discovery including the review and analysis of approximately 661,000 pages of documents produced by Defendants and approximately 28,000 pages of documents produced from third-parties; took nine depositions of current and former Conn's employees as well as deposition of a corporate representative under Rule 30(b)(6); defended depositions of Class Representatives' Rule 30(b)(6) designees and a market efficiency expert; consulted with damages, accounting, and industry experts; and had the benefit of mediation submissions by Defendants setting forth their arguments on liability and damages.   As a result, Class Representatives and Class Counsel had a well-grounded basis for assessing the strengths and weaknesses of the Class's claims and Defendants' defenses when they agreed to settle the Action.   All of these circumstances support preliminary approval.   *See, e.g.*, *In re OCA*, 2008 WL 4681369, at *11 (preliminarily approving

settlement reached after three years of litigation and extensive discovery); *In re Pool Prods. Distrib. Mktg. Antitrust Litig.*, 310 F.R.D. 300, 315 (E.D. La. 2015) (same).

Accordingly, the Settlement is a product of informed, fair, and honest negotiations among experienced counsel, following extensive discovery, and is deserving of preliminary approval.

## C.    The Settlement Is Well Within the Range of Reasonableness

Defendants have agreed to settle this Action for $22,500,000 in cash.   In evaluating whether this amount falls within the range of reasonableness, the Court should consider "whether the settlement's terms fall within a reasonable range of recovery, given the likelihood of the plaintiffs' success on the merits." *Slipchenko v. Brunel Energy, Inc.*, Civil Action No. H-11-1465, 2015 WL 338358, at *11 (S.D. Tex. Jan. 23, 2015) (citation omitted).

Although Class Representatives and their counsel believe their case to be meritorious, they acknowledge that Defendants advance several substantial arguments concerning liability and damages.  First, even though the Court sustained the claims alleged in the Fourth Amended Complaint and certified the Class, the Court's ruling on class certification is currently on appeal. One of the key challenges by Defendants in the appeal is whether the Class Period is overbroad, an issue that would impact the extent of the Class's damages, if any.   Second, pursuing the Class's claims through summary judgment and trial would pose significant risks and uncertainty. With respect to liability, Class Representatives would have faced significant hurdles in proving that certain of Defendants' statements about Conn's underwriting standards were materially false and misleading in light of Defendants' expected argument that Conn's disclosed the various factors it took into account in making their credit determinations and further disclosed that it frequently changed these criteria.  According to Defendants, changes in the Company's credit standards did not cause its credit losses.  Further, Defendants would have vigorously argued that

14

the adjustments Conn's did make did not have a statistically significant impact on Conn's overall credit portfolio and Defendants' statements were thus immaterial.

Third, Class Representatives would have also faced meaningful challenges in proving that Defendants acted with the required intent to defraud or severe recklessness necessary to establish Defendants' scienter.  Specifically, Defendants would have argued, among other things, that at the times that they made their statements, Defendants honestly believed that Conn's credit problems were the result of computer systems issues, personnel problems, and macro-economic factors beyond their control; and that the Company's outside auditors approved their credit reserves.

Fourth, even if the hurdles to establishing liability were overcome, Defendants would have argued that the Class Period cannot extend past February 20, 2014, as the truth regarding each of the statements upheld by the Court had already been disclosed to the market as of that date.  Defendants also contended that Plaintiffs' damages expert had failed to adequately remove confounding information from his calculation of damages.

Furthermore, to succeed, Class Representatives would have had to prevail at multiple additional stages in the litigation – a motion for summary judgment and trial and, even if Class Representatives prevailed on those, in an appeal that was likely to follow.  At each of these stages, there would be significant risks attendant to the continued prosecution of the Action, and there was no guarantee that further litigation, which would have involved additional significant expense and delay, would have resulted in a higher recovery, or any recovery at all.  And, finally, it is unlikely that Conn's or the Individual Defendants could pay a judgment should Plaintiffs prevail in full on their broadest claims for relief.

The Settlement avoids all of these risks and achieves a fair and adequate result without the need for prolonged and uncertain litigation.  Even assuming that Class Representatives overcame all the liability obstacles noted above, which was far from certain, the Settlement represents a substantial percentage of the estimated recoverable damages at trial and is well within the range of reasonableness.  *See, e.g.*, *In re OCA*, 2008 WL 4681369, at *12 (preliminarily approving settlement and noting that "in light of OCA's financial condition and the numerous defenses to plaintiffs' claims, the $6.5 million settlement . . . appears to be within a reasonable range for approval").  Indeed, it is well above the $6 million median settlement amount in securities cases in 2017.  *See*, *Recent Trends in Securities Class Action Litigation: 2017 Full-Year Review*, by Stefan Boettrich and Svetlana Starykh, (NERA 2018), at 30. http://www.nera.com/publications/archive/2018/recent-trends-in-securities-class-action-litigation--2017-full-y.html.

**D.      The Settlement Treats All Class Members Fairly and Does Not Improperly Grant Preferential Treatment to Class Representatives or any Segment of the Class**

The Settlement does not improperly grant preferential treatment to either Class Representatives or any segment of the Class.  Rather, all members of the Class, including Class Representatives, will receive an allocation of the Net Settlement Fund pursuant to a Plan of Allocation, prepared by Class Counsel with the assistance of a consulting damages expert that will be presented to the Court for approval.[4]

---

[4] In connection with Class Counsel's application for an award of attorneys' fees and litigation expenses, Class Representatives may seek reimbursement of their reasonable costs and expenses (including lost wages) directly related to their participation in the Action.  Reimbursement of Class Representatives' costs and expenses is explicitly contemplated by the PSLRA.  *See* 15 U.S.C. § 78u-4(a)(4) (limiting a class representative's recovery to an amount "equal, on a per share basis, to the portion of the final judgment or settlement awarded to all other members of the class," but also providing that "[n]othing in this paragraph shall be construed to limit the

At the final Settlement Hearing, the Court will be asked to approve the proposed Plan of Allocation for the Net Settlement Fund, which is set forth in full in the Notice.  Here, the proposed Plan of Allocation is based on Class Representatives' allegations that the price of Conn's common stock was artificially inflated during the Class Period as a result of Defendants' alleged materially false and misleading statements and omissions, and that the inflation was removed in reaction to a series of public disclosures that partially corrected the alleged misrepresentations and omissions.  The proposed Plan of Allocation provides formulae for calculating the recognized claim of each Class Member, based on each such person's purchases and sales of Conn's common stock, call options, and/or put options during the Class Period.[5]

### E.      The Settlement Does Not Excessively Compensate Class Counsel

The proposed Settlement does not grant excessive compensation to Class Counsel.  As an initial matter, the reasonableness of attorneys' fees will be decided by the Court after Class Counsel files a motion for attorneys' fees and expenses, and is not at issue on this motion.  *See In re OCA*, 2008 WL 4681369, at *14 (explaining that "[a]t the final approval stage" the court will apply applicable federal standards to determine whether to approve attorneys' fees).

In connection with Class Counsel's Fee and Expense Application, Class Counsel will seek no more than 20% of the Settlement Amount, an amount that is below the percentages that courts in the Fifth Circuit approve in securities class actions with comparable recoveries.  *See, e.g.*, *Di Giacomo v. Plains All Am. Pipeline*, No. Civ.A.H.-99-4137, Civ.A.H-99-4212, 2001 WL 34633373, at *9 (S.D. Tex. Dec. 19, 2001) (awarding attorneys' fees of 30% of $29.5

---

award of reasonable costs and expenses (including lost wages) directly relating to the representation of the class to any representative party serving on behalf of a class").

[5] Pursuant to the PSLRA, the proposed Plan of Allocation also takes into account Class Members' purchases and sales of Conn's common stock, call options, and put options during the "90-day look-back period," i.e., the 90-day period immediately following the end of the Class Period.

million settlement); *Schwartz v. TXU Corp.*, No. 02-cv-2243, 2005 WL 3148350, at *27 (N.D. Tex. Nov. 8, 2005) ("courts throughout this Circuit regularly award fees of 25% and more often 30% or more of the total recovery under the percentage-of-the recovery method").   Class Counsel will also seek payment of litigation expenses incurred during the prosecution of the Action.

## II.   THE PROPOSED NOTICE PLAN AND FORMS SHOULD BE APPROVED

The proposed Notice and Summary Notice, attached as Exhibits 1 and 3 to the proposed Preliminary Approval Order, respectively, satisfy due process, the Federal Rules of Civil Procedure, and the PSLRA.   Rule 23 requires notice of the pendency of the class action to be "the best notice practicable under the circumstances."   Fed. R. Civ. P. 23(c)(2).   Due process is satisfied if the notice provides class members with the "information reasonably necessary for them to make a decision whether to object to the settlement."   *In re Katrina Canal Breaches Litig.*, 628 F.3d 185, 197 (5th Cir. 2010).

Collectively, the proposed forms of notice describe, *inter alia*, (i) the terms of the Settlement and the amount of the recovery; (ii) the considerations that caused Class Representatives and Class Counsel to conclude that the Settlement is fair, adequate, and reasonable to all Class Members; (iii) the maximum attorneys' fees and expenses that may be sought; (iv) the procedures for requesting exclusion from the Class and objecting to the Settlement; (v) the procedure for submitting a claim; (vi) the proposed Plan of Allocation for distributing the settlement proceeds to the Class; and (vii) the date, time, and place of the Settlement Hearing.   *See Schwartz*, 2005 WL 3148350, at *11 (approving notice that provides class members with relevant information regarding how the settlement fund will be allocated, the right of class members to exclude themselves from the settlement class and to object to the settlement; and the date of the fairness hearing, among other things).   The Notice also satisfies

the PSLRA's separate disclosure requirements by, *inter alia,* stating:  (i) the amount of the Settlement determined in the aggregate and on an average per share basis; (ii) that the Parties do not agree on the average amount of damages per share that would be recoverable; (iii) that Class Counsel intend to make an application for attorneys' fees and expenses (including the amount of such fees and expenses on an average per share basis); (iv) the name, telephone number, and address of Class Counsel; and (v) the reasons why the Parties are proposing the Settlement.  15 U.S.C. § 78u-4(a)(7)(A)-(F).

The proposed notice program uses the traditional methods for notifying class members: notification by mail, by publication in a national newspaper focusing on investors, and over the internet.  Upon entry of the Preliminary Approval Order, the Claims Administrator will mail the Notice and Claim Form to all Class Members who can be identified through reasonable effort using the transfer records provided by Defendants and information provided by banks, brokers, and other nominees.  Class Counsel will also cause the Summary Notice to be published in *The Wall Street Journal* and transmitted over *PR Newswire*.  In addition, the Notice and Claim Form will be made available for viewing and downloading on the settlement website.  The manner of providing notice, i.e., individual notice by mail supplemented by additional publication and internet notice, represents the best notice practicable under the circumstances, and satisfies the requirements of Rule 23, the PSLRA, and due process.  *See, e.g.*, *Schwartz*, 2005 WL 3148350, at *11 (finding the notice by publication and mail was sufficient).

Finally, Class Representatives also request that the Court appoint Epiq Class Action & Claims Solutions, Inc. ("Epiq") as the Claims Administrator to provide all notices approved by the Court to Class Members, to process Claim Forms, and to administer the Settlement.  Epiq is a nationally recognized notice and claims administration firm that has successfully administered

numerous complex securities class action settlements, including *In re Schering-Plough Corp./ENHANCE Securities Litigation*, No. 08-cv-397 (D.N.J.) ($473 million settlement); *In re Merck & Co., Inc. Vytorin/Zetia Securities Litigation*, No. 08-cv-2177 (D.N.J.) ($215 million settlement); and *In re Bank of New York Mellon Forex Transactions Litigation*, No. 12-md-2335-LAK (S.D.N.Y.) ($180 million settlement).

## III.   PROPOSED SCHEDULE OF EVENTS

Class Representatives respectfully propose the following schedule for the Court's review and approval, which summarizes the deadlines in the proposed Preliminary Approval Order.  If the Court agrees with the proposed schedule, Class Representatives request that the Court schedule the Settlement Hearing for a date approximately 100 calendar days after entry of the Preliminary Approval Order, or at the Court's earliest convenience thereafter.

| | |
|---|---|
| Deadline for mailing individual Notices and Claim Forms (the "Notice Date") | *10 business days after entry of Preliminary Approval Order.* |
| Deadline for publication in *The Wall Street Journal* and transmission over *PR Newswire* | *Within 14 calendar days of the Notice Date.* |
| Deadline for filing motions in support of the Settlement, the Plan of Allocation, and Class Counsel's application for fees and expenses | *No later than 35 calendar days before the Settlement Hearing.* |
| Deadline for submission of requests for exclusion or objections | *Received no later than 21 calendar days before the Settlement Hearing.* |
| Deadline for filing reply papers in support of the motions | *No later than 7 calendar days before the Settlement Hearing.* |
| Settlement Hearing | *At the Court's convenience, but approximately 100 calendar days after the entry of the Preliminary Approval Order.* |
| Deadline for submission of Claim Forms | *Postmarked or submitted online no later than 120 calendar days after the Notice Date.* |

## CONCLUSION

For the foregoing reasons, Class Representatives respectfully request that the Court enter the proposed Preliminary Approval Order, attached hereto as Exhibit A, which will: (i) preliminarily approve the Settlement; (ii) approve the proposed manner and forms of notice to Class Members; (iii) appoint Epiq as Claims Administrator; (iv) set a date and time for the Settlement Hearing to consider final approval of the Settlement and related matters, and grant such other and further relief as may be required.

Dated: June 14, 2018

*/s/ Thomas R. Ajamie*
Thomas R. Ajamie, Texas Bar No. 00952400
AJAMIE LLP
Pennzoil Place - South Tower
711 Louisiana, Suite 2150
Houston, Texas  77002
Telephone: (713) 860-1600
Facsimile: (713) 860-1699
tajamie@ajamie.com

*Liaison Counsel*

James M. Hughes (*pro hac vice*)
Christopher F. Moriarty (*pro hac vice*)
MOTLEY RICE LLC
28 Bridgeside Blvd.
Mt. Pleasant, SC  29464
Telephone: (843) 216-9000
Facsimile: (843) 216-9450
jhughes@motleyrice.com
cmoriarty@motleyrice.com

*Class Counsel for Class Representatives and the Class*

Deborah Clark-Weintraub (*pro hac vice*)
Beth Kaswan (*pro hac vice*)
SCOTT+SCOTT ATTORNEYS AT LAW LLP
The Helmsley Building
230 Park Avenue, 17th Floor
New York, New York  10169
Telephone: (212) 223-6444
Facsimile: (212) 223-6334

dweintraub@scott-scott.com
bkaswan@scott-scott.com

*Class Counsel for Class Representatives and the Class*

Jonathan Gardner (*pro hac vice*)
Christine M. Fox (*pro hac vice*)
LABATON SUCHAROW LLP
140 Broadway
New York, New York  10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
jgardner@labaton.com
cfox@labaton.com

*Additional Counsel for Class Representatives*

**CERTIFICATE OF SERVICE**

I certify that on the 14th day of June 2018, a true and correct copy of the foregoing document was filed with the Clerk of the Court using the CM/ECF system which will send electronic notification of such filing to all counsel of record.

*/s/ Thomas R. Ajamie*
Thomas R. Ajamie